**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JOSEPH SEIKEL and TERENCE SEIKEL, | Case No.: 1:23-cv-01 |
| *Plaintiffs*, | |
| v. | **AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. §§ 3729–3733** |
| DAVID B. ALVAREZ, APPLIED CONSTRUCTION SOLUTIONS, INC., ENERGY TRANSPORTATION LLC, ENERGY RESOURCE GROUP, LLC, ET360, LLC, BEAR CONTRACTING, LLC, BEAR UTILITIES, LLC, JASON P. HENDERSON, and JOHN DOES NOS., 1-50, FICTITIOUS NAMES, | ████████████ |
| *Defendants*. | |

ii

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................1

II.     JURISDICTION AND VENUE ..........................................................5

III.    PARTIES ............................................................................................5

    A.      Plaintiff/Relator...........................................................................5

    B.      Defendants ..................................................................................6

        1.      David B. Alvarez .............................................................6

        2.      Applied Construction Services, Inc. ................................6

        3.      Energy Transportation, LLC ...........................................7

        4.      Energy Resource Group, LLC .........................................7

        5.      ET360, LLC .....................................................................7

        6.      Bear Contracting, LLC....................................................7

        7.      Bear Utilities, LLC..........................................................8

        8.      Jason P. Henderson .........................................................8

        9.      John Does Nos. 1-50, Fictitious Names...........................8

IV.     BACKGROUND .................................................................................9

    A.      Background on SBA Lending in Response to COVID-19 .........9

    B.      Determining the Size of a Business ........................................11

    C.      Affiliation Principles for Small Businesses ...........................12

    D.      Liability And Remedies Under the False Claims Act.............14

V.      THE AFFILIATED DEFENDANTS' FRAUDULENT SCHEME ...............16

    A.      Overview of the Principal Affiliates .......................................16

        1.      Defendant David B. Alvarez...........................................17

        2.      Overview of Applied Construction Services, Inc. ....................17

        3.      Overview of Energy Transportation, LLC.....................18

        4.      Overview of ET360, LLC ...............................................19

5.      Overview of ERG, LLC ....................................................................20

6.      Overview of Bear Contracting, LLC .........................................21

7.      Overview of Bear Utilities, LLC ...............................................22

8.      Jason P. Henderson .......................................................................23

B.    Defendants Are Affiliated for Purposes of SBA Laws and Regulations ..............23

1.      The Affiliated Defendants Share Common Ownership ...........................23

2.      The Affiliated Defendants Share Common Management.........................25

3.      The Affiliated Defendants Cross-Sell Their Various Services .................31

4.      The Affiliated Defendants Share Critical Resources, Personnel, and Finances........................................................................35

        a.    Physical Office Space ...................................................35

        b.    Management Personnel and Resources...........................36

        c.    Employees and Equipment ...........................................37

C.    Defendants Intentionally Concealed Plans to Shut Down and Sell Some of the Affiliated Defendants Before Applying for PPP Loans.................................41

D.    The Alternative Size Test Does Not Apply .........................................................43

VI.    THE AFFILIATED DEFENDANTS INTENTIONALLY MISREPRESENTED THEIR SIZE STATUS ...............................................................45

VII.    THE AFFILIATED DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO DEFRAUD THE UNITED STATES ..............................45

VIII.    THE AFFILIATED DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS.......................................................50

IX.    SYSTEMIC DAMAGES CAUSED BY SMALL BUSINESS MISREPRESENTATION FRAUD ...........................................................................51

**COUNT I** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ......................52

**COUNT II** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ....................53

**COUNT III** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))...................53

**COUNT IV** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))...................54

**AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729 *ET SEQ*.**

This is an action brought on behalf of the United States of America by Joseph Seikel and

Terence Seikel ("Relators"), by and through their attorneys, against Defendants David B. Alvarez,

Applied Construction Solutions, Inc., Energy Transportation, LLC, Energy Resource Group, LLC,

ET360, LLC, Bear Contracting, LLC, Bear Utilities, LLC, Jason P. Henderson (collectively, the

"Affiliated Defendants"), and John Does #1-50, Fictitious Names, pursuant to the *qui tam* provisions

of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA").

## I.    INTRODUCTION

1.    In March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act

was enacted to provide emergency financial assistance to the millions of Americans who are

suffering the economic effects caused by the COVID-19 pandemic.   The CARES Act established

several new temporary programs and provided for expansion of others, including programs created

and/or administered by the United States Small Business Administration ("SBA").

2.    One source of relief provided by the CARES Act was the authorization of $349

billion in potentially forgivable loans to small businesses for job retention and certain other

expenses, through a program referred to as the Paycheck Protection Program ("PPP").   To date,

Congress has authorized over $659 billion in PPP funding.

3.    The PPP was established to ensure the continued vitality of small businesses.   "Small

businesses are the lifeblood of the U.S. economy: they create two-thirds of net new jobs and drive

U.S. innovation and competitiveness" while accounting for "44 percent of U.S. economic activity."[1]

Accordingly, Congress has long recognized that "the Government should aid, counsel, assist, and

---

[1] U.S. Small Bus. Admin. Office of Advocacy, *Small Businesses Generate 44 Percent of U.S. Economic Activity* (Jan. 30, 2019), https://advocacy.sba.gov/2019/01/30/small-businesses-generate-44-percent-of-u-s-economic-activity/.

protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government . . . be placed with small-business enterprises, . . . and to maintain and strengthen the overall economy of the Nation."  15 U.S.C. § 631(a).

4.      With limited exceptions not applicable here,[2] only small businesses with 500 or fewer employees are eligible borrowers in the PPP.

5.      This case involves a duplicitous scheme in which the Affiliated Defendants falsely certified in separate loan applications submitted to approved lenders and the SBA that they were distinct small businesses and that each was eligible to receive potentially forgivable PPP loans.  In reality, however, these entities are "affiliated" with each other under SBA rules and regulations, resulting in a combined total of at least 764 employees shared among the Affiliated Defendants.  As the direct result of these intentional misrepresentations, the Affiliated Defendants received PPP loan proceeds—for which they were not eligible—totaling up to $13,849,170.00.

6.      The Affiliated Defendants provide various services in the oil and gas industry, including transportation services, fluid management, emergency response, and environmental containment.

7.      All the Affiliated Defendants are controlled and/or managed by Defendant David B. Alvarez.  Although each of the Affiliated Defendants represented themselves to the SBA as distinct

---

[2]  Small business concerns can be eligible borrowers even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. § 632, and meet the SBA employee or revenue-based size standard corresponding to their primary industry.  None of the Affiliated Defendants qualify as small under this statutory and regulatory definition.  Further, not a single entity out of the 661,218 loans publicly disclosed by the SBA reported a total number of employees above 500.

entities, behind the scenes—and at Alvarez's direction—the Affiliated Defendants operate as one interconnected company, sharing office space, employees, software, computers, vehicles, equipment, human resources, and cash management.  The Affiliated Defendants also commingled funds as part of their shared operations.

8.    Alvarez also uses the Affiliated Defendants as interchangeable pieces in his business dealings.  For example, Alvarez often directs one of the Affiliated Defendants to loan equipment and personnel to perform work under a contract held by another Affiliated Defendant, often without requiring invoices or otherwise accounting for the use of these resources—an uncommon practice between entirely distinct companies.

9.    Not only were the Affiliated Defendants ineligible to receive PPP proceeds, but Defendant Alvarez had also already finalized plans to shutter at least one of the Affiliated Defendants *before* applying for the federal funds.  In early April 2020, Alvarez convened a meeting among senior personnel from Defendants ACS, Energy Transportation, and ET360.  At this meeting, Alvarez directed that ET360's trucking services be transferred to Energy Transportation's operations, while ET360's industrial and other non-trucking services be moved to ACS.  Thereafter, Alvarez explained the plan to wind up ET360's business entirely.

10.   The Affiliated Defendants took advantage of the emergency lending provisions of the PPP—recognizing the SBA would not be able to determine whether every business actually qualifies as small during a pandemic—that were intended to assist employees and small businesses battered by COVID-19.  The Affiliated Defendants fooled the federal government into approving PPP loans they did not deserve, resulting in millions of dollars in damages.

11.   Perhaps most importantly, the Affiliated Defendants deprived honest, hardworking small business owners of the relief opportunities they deserved.  Although the harm to the federal

government can be measured in dollars and cents, the downstream economic and social impact of these stolen loan opportunities is incalculable.

12.     In fact, the PPP's initial $349 billion allotment was exhausted after just 14 days, leaving the vast majority of eligible small businesses without access to relief.  In fact, of the approximately 30 million small businesses in the United States, the SBA was only able to approve 1.6 million PPP loans during the first round of funding.  Many small businesses that were unable to secure relief offered by the United States were forced to permanently lay off staff and shut down operations.

13.     As a consequence of the Affiliated Defendants' willful misrepresentations, the United States approved PPP loans to the Affiliated Defendants that were intended for eligible small businesses.  The United States would not have approved these PPP loans had it been fully aware of the nature of the combined affiliated entities and that the Affiliated Defendants did not constitute small business concerns under the applicable rules and regulations.

14.     Among other misconduct, as detailed herein, the Affiliated Defendants conspired with numerous co-conspirators to deceive the Government as to their small business status, and thus their eligibility to participate in the PPP.  This misconduct was based on collusion and conspiracy among the Affiliated Defendants and these co-conspirators to conceal their true size status from the Government.

15.     As a direct, proximate, and foreseeable result of the Affiliated Defendants' fraudulent course of conduct set forth herein, the Affiliated Defendants have knowingly made numerous false express and implied certifications and/or caused the submission of false or fraudulent statements and false claims to Government programs for PPP loan proceeds.  As a result of these false certifications, the Government was falsely and/or fraudulently induced to approve the Affiliated

Defendants' PPP loan applications and accepted terms and conditions to which it would not have agreed had it known the truth.

16.     Because the United States was falsely and/or fraudulently induced to approve these loans for the Affiliated Defendants, each claim for payment under each PPP loan application was a false claim.

17.     This conduct is continuing.

## II.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over claims brought on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732.

19.     This Court has personal jurisdiction over the Affiliated Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

20.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because the Affiliated Defendants operate businesses within this judicial district, and certain acts that form the basis of this Amended Complaint occurred in this judicial district.

21.     The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal their wrongdoing.

## III.     PARTIES

### A.     PLAINTIFF/RELATOR

22.     Relators Joseph Seikel, a resident of Michigan, and Terence Seikel, a resident of South Carolina, bring this action on behalf of themselves and the United States of America.

23.     Relators are insiders who have direct knowledge of the conduct alleged in this Amended Complaint and conducted an independent investigation to uncover false claims submitted to the United States.  Accordingly, Relators are an "original source" of the non-public information alleged in this Amended Complaint within the meaning of the federal FCA, 31 U.S.C. § 3730(e)(4)(A) and (B).

24.     Relators also voluntarily provided the non-public information alleged herein to the Government prior to filing this action in accordance with 31 U.S.C. § 3730(b)(2).

**B.     DEFENDANTS**

**1.     David B. Alvarez**

25.     Defendant David B. Alvarez ("Alvarez") is a resident of West Virginia.  Alvarez is the current owner and President of Defendant Energy Transportation, LLC.  Alvarez founded and controls Defendant Applied Construction Solutions, Inc., Defendant Energy Transportation, LLC, and Defendant ET360, LLC. Alvarez also serves as President of Defendant Applied Construction Solutions, Inc.

**2.     Applied Construction Services, Inc.**

26.     Defendant Applied Construction Solutions, Inc. ("ACS") is a West Virginia corporation with its principal place of business listed at 1000 Jerry Dove Drive, Suite 200 Bridgeport, West Virginia 26330.

27.     ACS was incorporated in 1981 and operated under the name MEC Construction, Inc. until June 27, 2011.  Defendant David B. Alvarez serves as President of ACS and is a 50% owner of the company.

28.     During all relevant time periods, ACS has conducted business operations in this district.

### 3.    Energy Transportation, LLC

29.    Defendant Energy Transportation, LLC ("Energy Transportation") is a West Virginia corporation with its principal place of business listed at 1000 Jerry Dove Drive, Suite 200 Bridgeport, West Virginia 26330.   Energy Transportation was incorporated in 2013.   Defendant David B. Alvarez is the President and 100% owner of Energy Transportation.

30.    During all relevant time periods, Energy Transportation has conducted business operations in this district.

### 4.    Energy Resource Group, LLC

31.    Defendant Energy Resource Group, LLC ("ERG") is a West Virginia corporation with its principal place of business at 1000 Jerry Dove Drive, Bridgeport, West Virginia 26330. ERG was incorporated in 2017.  Defendants David B. Alvarez and Jason Henderson together own 100% of ERG.

32.    During all relevant time periods, ERG has conducted business in this district.

### 5.    ET360, LLC

**33.**    Defendant ET360 d/b/a Quantum Environmental Services is a West Virginia corporation with its principal place of business at 63 Pallet Street Bridgeport, West Virginia 26330. ET360 was incorporated in 2016, and its current Chief Financial Officer is Jason Henderson. Defendants David B. Alvarez and Jason Henderson each own 50% of ET360.

**34.**    During all relevant time periods, ET360 has conducted business operations in this district.

### 6.    Bear Contracting, LLC

35.    Defendant Bear Contracting, LLC is a West Virginia corporation with its principal place of business listed at 1 Columbia Boulevard, Clarksburg, West Virginia 26301.   Bear Contacting was incorporated in 1998 and its current President is Mark Urso.  Defendant David B.

Alvarez serves as a principal partner and manager of the company. David B. Alvarez is one-third owner of Bear Holdings, LLC, which owns Bear Contracting.

### 7.    Bear Utilities, LLC

36.    Defendant Bear Utilities, LLC is a West Virginia corporation with its principal place of business listed at 1 Columbia Boulevard, Clarksburg, West Virginia 26301. Bear Utilities was incorporated on March 28, 2012, and its current President is Mark Urso.  Manuel Alvarez, brother of Defendant David B. Alvarez, is listed as the organizer of Bear Utilities.

### 8.    Jason P. Henderson

37.    Defendant Jason P. Henderson ("Henderson") is a resident of West Virginia. Henderson is the current Chief Financial Officer of Defendant Energy Transportation and serves as the de facto Chief Financial Officer of the remaining Affiliated Defendants.  Henderson also has ownerships interests in Defendant ERG and Defendant ET360.

### 9.    John Does Nos. 1-50, Fictitious Names

38.    John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with the Affiliated Defendants to perpetuate the scheme described herein.

39.    To the extent that any of the conduct or activities described in this Amended Complaint was not performed by the Affiliated Defendants, but by the individuals or entities described herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Affiliated Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with the Affiliated Defendants to perpetrate the scheme described herein.

40.     As a result of actions of John Does Nos. 1-50, Fictitious Names, the United States has suffered financial harm.

## IV.     BACKGROUND

### A.     BACKGROUND ON SBA LENDING IN RESPONSE TO COVID-19

41.     The United States Small Business Administration (the "SBA") is a federal agency of the Executive Branch that administers assistance to American small businesses. This assistance includes guaranteeing loans that are issued by certain lenders to qualifying small businesses.

42.     Under the SBA loan guarantee programs, the actual loan is issued by a commercial lender, but the lender receives the full faith and credit backing of the United States Federal Government on a percentage of the loan.

43.     Therefore, if a borrower defaults on an SBA-guaranteed loan, the commercial lender may seek reimbursement from the SBA, up to the percentage of the guarantee. By reducing the risk to commercial lenders, the SBA loan guarantee programs enable lenders to provide loans to qualifying small businesses when financing is otherwise unavailable to them on reasonable terms through normal lending channels.

44.     When a borrower seeks an SBA-guaranteed loan, the borrower must meet both the commercial lender's eligibility requirements for the loan as well as the SBA's eligibility requirements.

45.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 29, 2020, designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the initial authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses through the Paycheck Protection Program (the "PPP").

46.     On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act was signed into law, authorizing over $300 billion in additional PPP funding. As of the relevant dates of the loans obtained by the Affiliated Defendants, the PPP allows qualifying small businesses and other organizations to receive unsecured SBA-guaranteed loans with a maturity of two years and interest rate of one percent.   PPP loan proceeds must be used by businesses on payroll costs, mortgage interest, rent, and/or utilities.

47.     The PPP allows the interest and principal to be forgiven if businesses spend the proceeds on these expenses under certain conditions. Pursuant to the CARES Act, the amount of PPP funds a business is eligible to receive is determined by the number of employees employed by the business and their average payroll costs.   Businesses applying for a PPP loan must provide documentation to confirm that they have in the past paid employees the compensation represented in the loan application.

48.     The PPP is overseen by the SBA, which has authority over all PPP loans, but individual PPP loans are issued by approved commercial lenders who receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

49.     The PPP Borrower Application Form, also known as SBA Form 2483 (the "PPP Application"), asks whether the applicant (or any owner of the applicant) also serves as "an owner of any other business, or have common management with any other business?"  If answered in the affirmative, the applicant is required to list all such businesses and describe the relationship on a separate sheet identified in addendum A to the PPP Application.

50.     The PPP Application also required the applicant to certify that it (along with its affiliates) "employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. 121.201" for the applicant's industry.

None of Defendants operate under an industry class code with a size standard greater than 500 employees.

51.     The PPP Application also required the applicant to make and place his or her initials by the following certifications, among others:

- "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection";

- "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects"; and

- "I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. § 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. § 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. § 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

### B.   DETERMINING THE SIZE OF A BUSINESS

52.     For the purposes of federal programs like the PPP for which status as a small business is required, a concern must not exceed the size standard under the applicable North American Industry Classification System ("NAICS") code specified in the solicitation, whether the threshold is based upon number of employees or annual revenues.  13 C.F.R. §§ 121.401-121.413.

53.     In determining the size of a business, the SBA rules count the number of employees or the contractor's three-year annual revenues, as well as those of any affiliates of the contractor.  *Id.* § 121.103(a)(6).

54.     Each NAICS industry code has a corresponding size standard, and the table is published annually in the Federal Register.  *Id.* § 121.101.

55.     If a purported "small business" and its affiliates have employees or average annual receipts in excess of the relevant NAICS Code, it is not a small business and it may not represent itself as a small business for the purpose of obtaining PPP loan proceeds.

### C.     AFFILIATION PRINCIPLES FOR SMALL BUSINESSES

56.     In certain circumstances, two or more companies are considered to be "affiliated." When companies are affiliated, the SBA determines their size by combining the revenue and/or number of employees of each company.  Thus, each company is less likely to fall below the SBA's applicable limit and is less likely to be eligible for preferred contracting status.

57.     Affiliation exists when one business, directly or indirectly, controls or has the power to control another business, or when a third party, directly or indirectly, controls or has the power to control both businesses.  *See* 13 C.F.R. § 121.103(a); 49 C.F.R. § 19.101; U.S. Small Bus. Admin., *A Handbook for Small Business Liaison Officers* ("*SBLO Handbook*") 16 (2010), *available at* https://www.sba.gov/sites/default/files/articles/Small_Business_Liaison_Officer_ (SBLO)_Handbook_6_2010.pdf.

58.     For a business to be considered small, it cannot be controlled by a large business or have the ability to be controlled by one.  "It does not matter whether control is exercised, so long as the power to control exists."  13 C.F.R. § 121.103(a)(1).

59.     Control may be affirmative (*i.e.*, the power to make a business act in a certain way) or negative (*i.e.*, the power to block another business's actions).  *Id.* § 121.103(a)(3).

60.     Control may arise through ownership, management, or other relationships or interactions between the parties.  *See id.* § 121.103(a).  If one or more officers, directors, managing members, or general partners of a business control the Board of Directors and/or the management of another business, the businesses are affiliated.  *See id.* § 121.103(e).  The SBA uses a totality of the circumstances test and may find affiliation even when no single factor is sufficient.  *Id.* §

121.103(a)(5).  The SBA publishes clear guidance illustrating the operation of the affiliation rules.  Small       Bus.       Admin.,       *An       Overview       on       Affiliation*,  http://www.sba.gov/sites/default/files/affiliation_discussion_0.pdf (last visited January 18, 2019).

61.    Affiliation through common ownership and management can be found when a person or entity is a majority shareholder of a small business concern or where the officers, directors, or managing members of one concern are able to control the board of directors and/or management of another concern.  13 C.F.R. § 121.103(e).  The positions of CEO, COO, and CFO are commonly understood to be senior leadership positions that carry with them the ability to exercise substantive control or critical influence over the company's operations.

62.    Affiliation through identical business interests can be found either when two or more entities have substantially identical business or economic interests (either because of family ties, common investments, or firms economically dependent on each other), or when former owners, managers, or key employees of one concern organize a new concern in the same or related field.  *Id*. § 121.103(f).

63.    Ascertaining an entity's size is not a difficult exercise.  The SBA has extensive, layman-readable instructions that describe the process in plain English. *See, e.g*., Small Bus. Admin., *Size Standards*,  https://www.sba.gov/federal-contracting/contracting-guide/size-standards (last visited Apr. 4, 2023).

64.    Defendants knew, or at the very least should have known, that they were affiliated. First, Defendants Alvarez and Henderson are sophisticated and experienced businessmen.  If anyone should have been aware that the Affiliated Defendants were not eligible to receive PPP proceeds, it was Alvarez.  Defendant Alvarez is the Interim Chairman of MVB Financial Corp.—a publicly-traded bank that issued a minimum of 124 loans under the PPP.  Alvarez also serves on MVB's bank loan approval committee.  Meanwhile, Defendant Henderson has a business administration degree

from Fairmont State University, an MBA from West Virginia University, and has served as the de facto Chief Financial Officer for all the Affiliated Defendants. Second, Defendants could (and should) have easily consulted the SBA's resources to confirm they were not small business concerns due to their affiliation.

65.     If consulting the SBA website were too difficult, Defendants could have, free of charge, placed a phone call to one of the many SBA Procurement Centers around the country. These centers are staffed with experienced personnel trained to provide guidance on size and status compliance questions. The directory is found at: https://www.sba.gov/federal-contracting/counseling-help/procurement-center-representative-directory.

### D.     LIABILITY AND REMEDIES UNDER THE FALSE CLAIMS ACT

66.     When a business falsely certifies in its PPP Application that it is an eligible small business, it becomes subject to a stiff sanctions regime intended to deter fraud with the PPP.

67.     In addition to other laws that may be applicable, section 16(d) of the Small Business Act provides severe criminal penalties for knowingly misrepresenting the small business size status of a concern in connection with procurement programs. 15 U.S.C. § 645(d). Section 16(a) of the Act also provides, in part, for criminal penalties for knowingly making false statements or misrepresentations to SBA for influencing in any way the actions of the Agency. 13 C.F.R. § 121.108.

68.     The penalties for violating these certifications could not be more clear in the self-certifications made by each business concern bidding small business size: "any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be

subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act."  15 U.S.C. § 645(d).

69.     The False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, § 4(f), 123 Stat, 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States Government for three times the amount of damages the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  Prior to the FERA amendments, the FCA provided that a person is liable to the United States Government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . [a] false or fraudulent claim for payment or approval."   31 U.S.C. § 3729(a)(1).

70.     The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A).

71.     As amended by FERA, the FCA also makes a person liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent

claim." *Id.* § 3729(a)(1)(B).  The FCA, prior to the FERA amendments, provided that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id.* § 3729(a)(2).

72.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A).  The FCA further provides that "no proof of specific intent to defraud is required." *Id.* § 3729(b)(1)(B).

## V.     THE AFFILIATED DEFENDANTS' FRAUDULENT SCHEME

73.     As alleged in detail below, based on commonality of ownership, common management, identity of interests and other relevant factors, Defendants are affiliated concerns and, when taken together, were at all times material hereto ineligible to receive loans under the PPP. According to their own certifications to the SBA, the Affiliated Defendants collectively have at least 764 employees—far exceeding the 500-employee threshold required for eligibility to receive PPP loans.

### A.     OVERVIEW OF THE PRINCIPAL AFFILIATES

74.     The affiliation between and among the Defendants is evidenced by how the entities were originally formed: by the same individuals, and at many of the same addresses.  The significant overlap in the formation and subsequent operation of the Affiliated Defendants was the direct result of Defendant David B. Alvarez's deliberate effort to consolidate his companies into one, self-proclaimed "8760 company"—a reference to the total number of hours in a year.  Alvarez utilizes the "8760 company" motto as part of a marketing slogan to sell potential and current customers on the Affiliated Defendants' ability to provide services to his clients 24 hours a day, 365 days a year.

Behind the scenes, Alvarez manipulates the Affiliated Defendants as related, interchangeable pieces—stripped of any barriers that typically define distinct entities—to carry out his business dealings.

### 1.    Defendant David B. Alvarez

75.    Defendant David B. Alvarez is the current owner and President of Defendant Energy Transportation.  Alvarez also founded Defendant ACS, Defendant ERG and Defendant ET360. Alvarez maintains ownership interests in all the Affiliated Defendants.

76.    Alvarez manages and controls the operations of all the Affiliated Defendants.  His various roles include Director of ACS, President of both ACS and Energy Transportation, and Manager of Bear Contracting.

### 2.    Overview of Applied Construction Services, Inc.

77.    ACS was incorporated on March 11, 1981. Its principal office address is 5338 Shinnston Pike, Meadowbrook, WV 26404—the same address associated with Defendants Energy Transportation, ET360, and ERG.  The mailing address for ACS is P.O. Box 430, Bridgeport, WV 26330—the same address associated with Defendants Energy Transportation and ERG.  The listed address on ACS's PPP application is 1000 Jerry Dove Drive, Suite 200, Bridgeport, WV—the same address associated with Defendants Energy Transportation and ERG.

78.    The Directors of ACS are Defendant David B. Alvarez and his brother Manuel Alvarez III.  The President of ACS is Defendant David B. Alvarez.  His brother Manuel Alvarez III also serves as the Treasurer and Vice President of ACS.

79.    ACS's services are classified under NAICS code 237990—Other Heavy and Civil Engineering Construction.  The corresponding size standard for this NAICS code is $39.5 million in average annual receipts over the most recent three-year period.  The combined average annual receipts for all the Affiliated Defendants over the most recent three-year period far exceed the

revenue threshold for NAICS Code 237990.  Accordingly, ACS was not a small business under its NAICS Code and thus ineligible to receive loan proceeds under the PPP.

80.     Nor is ACS an eligible small business under the PPP.  In its PPP Application, ACS represented that it had 210 employees, not including any affiliates.  This statement was false because ACS, including its affiliates, had at least 764 employees.   As the direct result of its misrepresentations regarding its size, ACS received $4,160,400.00 in PPP loan proceeds.

81.     At the time ACS submitted its PPP application, which contained false certifications regarding its eligibility as a small business to receive PPP proceeds, the SBA had not issued any guidance regarding the applicability of the agency's "alternative size standard."[3]

### 3.     Overview of Energy Transportation, LLC

82.     Energy Transportation was formed as an LLC on April 10, 2013. Its principal office address is 5338 Shinnston Pike, Meadowbrook, WV 26404—the same address associated with Defendants ACS, ET360, and ERG.  The mailing address for Energy Transportation is P.O. Box 430, Bridgeport, WV 26330—the same address associated with Defendants ACS and ERG.  The Member and Organizer of Energy Transportation is Defendant David B. Alvarez.  Defendant Alvarez also serves as the President of Energy Transportation.

83.     Energy Transportation is a fully insured, licensed, U.S. Environmental Protection Agency and Department of Transportation-approved transporter of hazardous materials.  Energy Transportation claims that its services are classified under NAICS code 486910—Pipeline Transportation of Refined Petroleum Products.  However, Energy Transportation is not listed as one

---

[3] According to subsequent guidance provided by the SBA, the "alternative size standard" originally promulgated in 2010 pursuant to the Small Business Jobs Act, and captured in 15 U.S.C. § 632, may also be used to determine if a business can qualify for SBA loans. Under the "alternative size standard", if a business can show that its (i) maximum tangible net worth is not more than $15 million and (ii) average net income after Federal income taxes (excluding any carry-over losses) for the two full fiscal years before the date of the application is not more than $5 million, then it may qualify as a small business concern eligible to receive loans under the PPP, irrespective of its number of employees.

of the nineteen verified, active companies under this NAICS Code.  Rather, the corresponding size standard for Energy Transportation falls under NAICS 213122—Support Activities for Oil & Gas Operations, which has a $41.5 million threshold in average annual receipts over the most recent three-year period.  The combined average annual receipts for all the Affiliated Defendants over the most recent three-year period far exceed the revenue threshold for NAICS Code 213122.  Accordingly, Energy Transportation was not a small business under its NAICS Code and thus ineligible to receive loan proceeds under the PPP.

84.    Nor is Energy Transportation an eligible small business under the PPP.  In its PPP Application, Energy Transportation represented that it had 226 employees, not including any affiliates.  This statement was false because Energy Transportation, including its affiliates, had at least 764 employees.  As the direct result of its misrepresentations regarding its size, Energy Transportation received $4,897,770.00 in PPP loan proceeds.

85.    At the time Energy Transportation submitted its PPP application, which contained false certifications regarding its eligibility as a small business to receive PPP proceeds, the SBA had not issued any guidance regarding the applicability of the agency's "alternative size standard."

### 4.    Overview of ET360, LLC

86.    ET360 was formed as an LLC on March 17, 2016.  Its principal office address is 5338 Shinnston Pike, Meadowbrook, WV 26404—the same address associated with Defendants ACS, Energy Transportation, and ERG.  The CFO of ET360 is Defendant Jason Henderson, who also originally organized Defendant ERG.

87.    ET360 holds itself out as providing a full range of industrial construction, waste transportation, and emergency response services.   ET360's services are classified under NAICS code 213112—Support Activities for Oil and Gas Operations.  The corresponding size standard for this NAICS code is $41.5 million in average annual receipts over the most recent three-year period.

The combined average annual receipts for all the Affiliated Defendants over the most recent three-year period far exceed the revenue threshold for NAICS Code 213112.  Accordingly, ET360 was not a small business under its NAICS Code and thus ineligible to receive loan proceeds under the PPP.

88.     Nor is ET360 an eligible small business under the PPP.  In its PPP Application, ET360 represented that it had 178 employees, not including any affiliates.  This statement was false because ET360, including its affiliates, had at least 764 employees.  As the direct result of its misrepresentations regarding its size, ET360 received $2,378,200.00 in PPP loan proceeds.

89.     At the time ET360 submitted its PPP application, which contained false certifications regarding its eligibility as a small business to receive PPP proceeds, the SBA had not issued any guidance regarding the applicability of the agency's "alternative size standard."

### 5.     Overview of ERG, LLC

90.     ERG was formed as an LLC on December 16, 2017.  Its principal office address is 5338 Shinnston Pike, Meadowbrook, WV 26404—the same address associated with Defendants ACS, Energy Transportation, and ET360.  The mailing address for ERG is P.O. Box 430, Bridgeport, WV 26330—the same address associated with Defendants ACS and Energy Transportation.  The listed address for ERG in its PPP Application is 1000 Jerry Dove Drive, Suite 200, Bridgeport, WV—the same address associated with Defendants ACS and Energy Transportation.

91.     ERG was originally organized by Defendant Jason Henderson, who also serves as the Chief Financial Officer of Defendant ET360 and the de facto CFO of all the Affiliated Defendants.

92.     ERG offers environmental containment services in the oil and gas industry.  ERG's services are classified under NAICS code 213112—Support Activities for Oil and Gas Operations.  The corresponding size standard for this NAICS code is $41.5 million in average annual receipts over the most recent three-year period.  The combined average annual receipts for all the Affiliated

Defendants over the most recent three-year period far exceed the revenue threshold for NAICS Code 213112.  Accordingly, ERG was not a small business under its NAICS Code and thus ineligible to receive loan proceeds under the PPP.

93.     Nor is ERG an eligible small business under the PPP.  In its PPP Application, ERG represented that it had 76 employees, not including any affiliates.  This statement was false because ERG, including its affiliates, had at least 764 employees.   As the direct result of its misrepresentations regarding its size, ERG received $606,600 in PPP loan proceeds.

94.     At the time ERG submitted its PPP application, which contained false certifications regarding its eligibility as a small business to receive PPP proceeds, the SBA had not issued any guidance regarding the applicability of the agency's "alternative size standard."

### 6.     Overview of Bear Contracting, LLC

95.     Bear Contracting was formed as an LLC on March 30, 1998.  Its principal office address is 1 Columbia Road, Clarksburg, WV 26301—the exact same address as Defendant Bear Utilities, LLC.  The Managers of Bear Contracting include Manuel Alvarez, III (Defendant David B. Alvarez's brother), and Defendant David B. Alvarez.  Defendant David B. Alvarez is one of Bear Contracting's principal partners and manager.

96.     Bear Contracting offers heavy construction services for site development, the energy sector, and public infrastructure construction.  Bear Contracting's services are classified under NAICS code 238910—Site Preparation Contractors.  The corresponding size standard for this NAICS code is $16.5 million in average annual receipts over the most recent three-year period.  The combined average annual receipts for all the Affiliated Defendants over the most recent three-year period far exceed the revenue threshold for NAICS Code 237990.  Accordingly, Bear Contracting was not a small business under its NAICS Code and thus ineligible to receive loan proceeds under the PPP.

97.     Nor is Bear Contracting an eligible small business under the PPP.  In its PPP Application, Bear Contracting represented that it had 67 employees, not including any affiliates. This statement was false because Bear Contracting, including its affiliates, had at least 764 employees.  As the direct result of its misrepresentations regarding its size, Bear Contracting received $1,458,000.00 in PPP loan proceeds.

98.     At the time Bear Contracting submitted its PPP application, which contained false certifications regarding its eligibility as a small business to receive PPP proceeds, the SBA had not issued any guidance regarding the applicability of the agency's "alternative size standard."

**7.     Overview of Bear Utilities, LLC**

99.     Bear Utilities was formed as an LLC on March 28, 2012.  Its principal office address is 1 Columbia Road, Clarksburg, WV 26301—the exact same address as Defendant Bear Contracting, LLC.  One of the organizers of Bear Utilities is Manuel Alvarez IV—Defendant David B. Alvarez's nephew.

100.    Bear Utilities offers residential construction services.  Bear Utilities' services are classified under NAICS code 236118—Residential Remodeler.  The corresponding size standard for this NAICS code is $39.5 million in average annual receipts over the most recent three-year period. The combined average annual receipts for all the Affiliated Defendants over the most recent three-year period far exceed the revenue threshold for NAICS Code 236118.  Accordingly, Bear Utilities was not a small business under its NAICS Code and thus ineligible to receive loan proceeds under the PPP.

101.    Nor is Bear Utilities an eligible small business under the PPP.  In its PPP Application, Bear Utilities represented that it had 7 employees, not including any affiliates.  This statement was false because Bear Utilities, including its affiliates, had at least 764 employees.  As

the direct result of its misrepresentations regarding its size, Bear Utilities received between $258,200.00 in PPP loan proceeds.

102.    At the time Bear Utilities submitted its PPP application, which contained false certifications regarding its eligibility as a small business to receive PPP proceeds, the SBA had not issued any guidance regarding the applicability of the agency's "alternative size standard."

### 8.    Jason P. Henderson

103.    While Jason Henderson holds the official title of Chief Financial Officer of Defendant Energy Transportation, behind the scenes Alvarez uses Henderson as a de facto CFO for *all* the Affiliated Defendants—a tactical decision that allows Alvarez to closely monitor and maintain tight control over the financial decisions affecting all the Affiliated Defendants.

### B.    DEFENDANTS ARE AFFILIATED FOR PURPOSES OF SBA LAWS AND REGULATIONS

### 1.    The Affiliated Defendants Share Common Ownership

104.    Defendants share common ownership.    Specifically, at the time of its PPP applications and for at least a significant period thereafter, Alvarez maintained ownership and control of ACS, ERG, Energy Transportation, and ET360. *See* 13 C.F.R. § 121.103(a)(1) (common ownership occurs when one has the power to control the other).

105.    Shortly after being incorporated in December 2017, ERG was in the process of securing suppliers, including Environmental Tank & Container ("ETC").    In an effort to establish creditworthiness, Defendant Henderson, on behalf of ERG, made the representation to ETC's senior management that Defendant Alvarez was a major owner of ERG.    This representation was made verbally to Bill Polacek (ETC's Owner), Chris Rogers (ETC's Director of Operations), and Christina Galasso (ETC's Business Development executive).

106.    Shortly before the Affiliated Defendants submitted their PPP applications, Alvarez also represented himself as the owner of Energy Transportation, ET360, and ERG to potential

customers, including Gary Baxter, Director of Production Operations at EQT—the largest independent natural gas producer in North America.

107.   ERG employees similarly understood that Alvarez owned ERG. Jason Richards, who was employed at ERG, was deposed on July 26, 2020 in an unrelated federal civil matter. Richards testified that David Alvarez and Jason Henderson owned ERG.   Jacob Richards, who was also deposed on August 19, 2020 in an unrelated federal civil matter, testified that he "believe[s] that [Alvarez]'s the owner" of ERG.   Meanwhile, Aaron Giles, another ERG employee who was deposed on September 24, 2019 in an unrelated federal civil matter, testified that Alvarez is "the owner, or partial owner, of Energy Resource Group."   Finally, Amanda Hunt, who was employed by ERG, was deposed on September 6, 2019 in an unrelated federal civil matter and testified that Alvarez "owns Energy Resources [sic] Group, ACS, ET."

108.   Alvarez's ownership extends beyond ERG to ACS and Energy Transportation.   For example, during his October 27, 2020 deposition in an unrelated federal civil matter, Defendant Alvarez testified about the purchase of containment tanks and was specifically asked "[y]ou said we bought some. I assume that's one of your companies?" Defendant Alvarez replied that it was "either Applied Construction or maybe Energy Transportation," acknowledging that he owned both ACS and Energy Transportation.

109.   During this deposition, Defendant Alvarez was also asked about managers who had left ACS. He replied that they "were from the support company that I use." Defendant Alvarez later explained that the support company was ET360, which "supported a lot with Applied Construction and/or Energy Transportation and such."   When asked if ET360 was one of his companies, Defendant Alvarez replied that he "started it" with Defendant Henderson.   According to Defendant Alvarez, Defendant Henderson later "took it over."

110.    But despite supposedly handing control of ET360 over to Henderson, Alvarez continued to claim ownership and maintain control over ET360.  For example, on an ET360 credit application, dated January 11, 2019, to Phoenix Technology Services USA Inc, Defendant Alvarez listed himself—as opposed to Defendant Henderson—as the "Authorized Owner" of ET360.



ET 360, LLC dba **Quantum Environmental Services**
63 Pallet Street
Bridgeport, WV  26330
Phone:  624-7274
AP@quantumwv.com

**CREDIT APPLICATION**

| Legal Name of Company: | ET 360, LLC | | | FEIN: | | 811970883 |
|---|---|---|---|---|---|---|
| DBA: | Quantum Environmental Services | | | | | |
| Billing Address: | 63 Pallet Street | | | | | |
| City: | Bridgeport | State: | WV | Zip: | | 26330 |
| Phone: | 304-624-7274 | Email: | | Dalvarez@et8760.com | | |
| Authorized Owner: | Dave Alverez | Cell: | | 304-777-7711 | | |
| Year Established: | 2016 | State of Incorporation: | | WV | | |
| Type of Business: | Environmental restoration and cleaning, oil & gas industry | | | | | |
| Requested Credit Limit: | | Tax Exempt: | | No | PO is required | |
| Accounts Payable Contact: | Tracy Smith | Phone: | 304-624-7274 | Email: | tsmith@quantumwv.com | |
| Please email our invoices to the AP contact email address or use our general email at: | | | | ap@quantumwv.com | | |

111.    Plainly, Alvarez continued to exert actual ownership and control over ET360 at a time when Henderson purportedly was fulfilling the same role.

### 2.    The Affiliated Defendants Share Common Management

112.    At the direction of Defendant Alvarez, there has been, and continues to be, substantial involvement by the same key management at the Affiliated Defendants, including Defendant Jason Henderson, who serves as the de facto CFO for all the Affiliated Defendants. Despite Henderson's responsibilities, there was no question that Alvarez maintained the power to control the Affiliated Defendants and was the ultimate decisionmaker for any issues faced by the Affiliated Defendants.

113.    For example, ET360's internal organizational chart, last updated on April 4, 2020, identifies David Alvarez as the Chief Executive Officer and highest-ranking individual within the organization. In addition, Jason Henderson is listed as the President and second-highest ranking

individual of ET360, and according to the organizational chart, reports directly to David Alvarez. The organizational chart was shared with ET360's customers, including Jay Witt, Antero Resources' Director of Midstream Water Business.



114.   At the same time Alvarez was managing ET360, he was fulfilling the same role for ERG.   During his October 27, 2020 deposition in an unrelated federal civil matter, Defendant Alvarez was asked about a time when he had offered employment to a group of people he met in the parking lot of the Wonder Bar restaurant, which Defendant Alvarez owns. Amanda Hunt, an ERG employee, testified in her deposition in that same federal civil matter that Defendant Alvarez told this group of people that "he had jobs available for them if they wanted to come work [at ERG]." Defendant Alvarez testified that "ERG was hiring them" and that he had projects that were being

subcontracted to ERG. Defendant Alvarez explained in his deposition that he was "supporting *my* CFO," referring to Defendant Henderson.

115.    As further evidence of Alvarez's wide-ranging control over the Affiliated Defendants, Travis Knotts, the general manager for ET360 from June 2017 to June 2020, directly reported to David Alvarez, rather than Defendant Henderson.  And, in the event of a disagreement between Knotts and Henderson on the day-to-day management of ET360, it was Alvarez who had the final say.  In one instance, neither Knotts nor Henderson wanted to terminate a high-level ET360 employee; however, Alvarez exercised his ultimate control over ET360-related matters and ordered the termination of the employee over Knotts' and Henderson's objections.

116.    After Knotts left ET360 in June 2020, his ET360 phone number was reconfigured to automatically forward all calls to Alvarez, rather than Henderson. On at least two separate occasions, ET360 employees dialed Knott's ET360 phone number, in attempts to reach Knotts, and Alvarez answered the phone both times.

117.    The common management that Alvarez exercised over the Affiliated Defendants included, at his direction, the sharing of critical resources and personnel among the companies.  If Energy Transportation had trucks that were not being used for Energy Transportation's business, Alvarez would swap Department of Transportation stickers affixed to Energy Transportation trucks onto ET360 trucks that were performing the underlying services. The resource sharing among the Affiliated Defendants was premised on a "go along to get along" mantra where all of the entities were treated as if they were all one company even though they were not.  This resource sharing is described in greater detail below. *See infra* Section V(B)(4).

118.    Ultimately, the Affiliated Defendants—at Alvarez's direction—would structure a Master Services Agreement ("MSA") with a customer so that all services could be performed by the

other Affiliated Defendants either directly as a listed entity or indirectly as a "sub-contractor" of the entity holding the MSA.

119.    This was part of Alvarez's larger plan to create a monopoly over trucking services in the area and prevent any other businesses from penetrating that market.

120.    And while Alvarez directed some of the Affiliated Defendants to carry out tasks on behalf of the other Affiliated Defendants, Alvarez often did not require that the invoices for those services were accurately maintained or, ultimately, even paid. In fact, ET360 had substantial past-due balances owed to them by ACS, Energy Transportation, and ERG. ET360 was effectively funding the operations of these other affiliated entities with no expectation that the funding would be repaid. For example, during late 2019 and early 2020, ET360 had performed approximately $640,000 in services on behalf of ACS—including trucking, hauling and industrial cleaning—which was never paid, even though the rates had already been reduced well below market rate.

121.    Similarly, ET360 was instructed to haul for ERG on numerous occasions, but ERG would not pay ET360's invoices for these services.  Instead, the bills, which in this instance amounted to approximately $250,000, would stack up and go unpaid for long stretches of time.

122.    Because Alvarez did not insist on reconciling past due accounts between the Affiliated Defendants—which is an uncommon practice between entirely distinct companies—some employees, despite Alvarez's instructions, gave preference to third party vendors that would actually pay for services rendered in lieu of using one of the Affiliated Defendants.

123.    Defendant Henderson, in his role as CFO of all the Affiliated Defendants, also exerted common management over these entities.  As a specific example, on October 19, 2018, Henderson, in his capacity as the CFO of Energy Transportation and part owner of ERG, unilaterally directed ETC (a supplier of aboveground storage tanks) to change the "Bill To" field on a $1.3 million invoice for aboveground storage tanks from ERG to Energy Transportation—a company

owned and controlled by Alvarez.  As captured in the screenshot below, Henderson ordered the billing change even though the storage tanks were actually shipped to and used by ERG.[4] Henderson's decision to have Energy Transportation pay for ERG's storage tanks was noteworthy because Energy Transportation was not, and has never been, in the business of installing or renting aboveground storage tanks.  Following fulfillment of the order to ERG, ETC filed liens on the tanks, naming Energy Transportation as the debtor.

---

[4] While the original invoices are dated July 31, 2018, ETC did not revise them—per Henderson's direction— to make Energy Transportation the payor until October 19, 2018.



124.    At the end of each year, Alvarez held a business review meeting that was attended by all of the general managers from each of the Affiliated Defendants.  These annual meetings also included team-building exercises between the companies.  Alvarez and his daughter Andria Alvarez Wymer, who served as the director of business development for all the Affiliated Defendants, would

run these annual meetings.  The first of these meetings took place at the offices of Defendant Bear Contracting.  The second annual meeting was conducted at the building located on Jerry Dove Drive, which previously housed most of the Affiliated Defendants.

125.    During these meetings, each general manager would provide a business update to the entire group, complete with strategic goals, financial objectives, and initiatives for the following year.  The sharing of these goals and initiatives, which were really set by Alvarez and Jason Henderson, further betrayed the affiliated nature of the companies.  Specifically, some of the Affiliated Defendants would be considered "competitors" absent Alvarez's control.  For example, ET360's trucking services overlapped with Energy Transportation's same work in that area.  Further, the industrial cleaning and pipeline work offered by ET360 mirrored those same services provided by ACS.

126.    True competitors that do not share common ownership or management hardly have annual meetings in which they reveal their finances or internal business plans to each other; yet the Affiliated Defendants openly did so—all at Alvarez's direction.

### 3.    The Affiliated Defendants Cross-Sell Their Various Services

127.    Defendant Alvarez's control over the Affiliated Defendants allows him to cross-sell their various services.

128.    In many of his dealings with existing and potential customers, Defendant Alvarez represents himself as the owner of Defendants ACS, Energy Transportation, ET360 and ERG.  Alvarez also actively solicits work from customers on behalf of all four companies.

129.    In fact, Alvarez generates proposals that include services from all four of the Affiliated Defendants that often references the "8760 Solution."  According to the website for Energy Transportation, "8760 is the number of hours in a year and represents our commitment to

safety, training and service. To execute on our mantra 'The 8760 Solution,' we continuously work to build upon our culture, which is centered around this philosophy."

130.   As part of these customer presentations, Alvarez and Jason Henderson would explain the various services offered by the Affiliated Defendants.  It was a show of force by Alvarez to let the customers know that the Affiliated Defendants could address any needs the customer might have.

131.   In PowerPoint presentations, Alvarez touts the 8760 Solution as a way to offer "additional cost savings" to potential customers if they agree to use the services offered by Alvarez's "other related companies."  Discounts were often offered to customers if they used an affiliated entity.

132.   Alvarez provided such a presentation to Gary Baxter, the Director of Production Operations at EQT—then a potential customer for the Affiliated Defendants.  The presentation, given to Baxter in the form of a PowerPoint slide deck dated July 30, 2019, demonstrated the Affiliated Defendants' shared services and locations.  The presentation connected the services of Energy Transportation with both ET360 and ERG.

133.    Specifically, slide 5 of the presentation uses the Affiliated Defendants' self-proclaimed slogan of "8760" and explicitly maps and labels the Energy Transportation and ERG locations in relation to EQT's well-pads.  Notably, several of the locations labeled as "ET" are actually ET360 locations.  For example, the location identified in the presentation as an Energy Transportation site near Norwich, Ohio is actually an ET360 yard.



134.    While this deck was provided to Baxter by Energy Transportation, slide 6 (titled "Additional Cost Savings through other Related Companies") lists specific containment materials and material cost savings available to EQT through an "other related company," which refers to items specifically offered by ERG.  And slides 7 and 9 of the Energy Transportation PowerPoint boast savings available through services provided by ERG, which is again explicitly referred to as a "related company" and part of the "8760 package."

135.    The PowerPoint's description of the Affiliated Defendants as "related companies" was consistent with Baxter's other business interactions with Alvarez, who represented himself as the owner of Energy Transportation, ET360, and ERG.

136.    At Alvarez's direction, Kim Sinnett (Business Development at Energy Transportation) was instructed to "piggy back" connections established by ET360 to push use of Energy Transportation's trucks as well.  The rationale was that Energy Transportation could be brought in to support an ET360 project in the event ET360 was ever short on trucks or otherwise needed equipment or personnel.

137.    Alvarez also directed that ET360 cross-sell Defendant ERG's services to ET360's existing customer base.  It was not uncommon for Alvarez to coordinate client meetings that were attended by representatives from ET360, Rick Richards from ERG, and Kim Sinnett from Energy Transportation in a coordinated effort to collectively sell the three companies' services.  In other meetings, Alvarez and Defendant Jason Henderson personally participated in cross-selling meetings involving services offered by Defendants ERG and ACS services, while senior management presented cross-selling opportunities between ET360 and Energy Transportation.

138.    Importantly, Alvarez provided ET360 with a copy of ERG's full rate sheet—a highly confidential document containing valuable trade secret information that is not often shared even *within the same company*—to support the cross-selling among the Affiliated Defendants.

139.    Per Alvarez's design, cross-selling among the Affiliated Defendants allowed those companies with fewer resources and personnel to secure opportunities otherwise unavailable to them. For example, if ET360 was having a difficult time getting a customer to agree to use ET360's water trucks, ET360 would use ACS's or ERG's existing service agreements as a "pry-bar" to get access to the opportunity.

140.    During his September 4, 2020 deposition in an unrelated federal civil matter, Rick Richards, who at the time served as an ERG manager, explained how Alvarez and Henderson had set up ERG as a "shell company." Richards testified that when he joined ERG in May 2018, ERG was a non-operating entity with no employees. Though it essentially existed only on paper, ERG managed to secure a Master Service Agreement ("MSA") with EQT. Without Alvarez's ability to cross-sell capabilities among the Affiliated Defendants, ERG would not have been able to secure an MSA, given that it had no operations, employees, or historical safety records.

141.    Ultimately, the extent to which the Affiliated Defendants engage in cobranding and refer to themselves as "affiliates" is further evidence that Defendant Alvarez controls and manages these entities.

### 4.    The Affiliated Defendants Share Critical Resources, Personnel, and Finances

#### a.    Physical Office Space

142.     In early 2020, Alvarez consolidated the headquarters for the Affiliated Defendants in a building he previously owned, which is located at 5338 Shinnston Pike in Meadowbrook, West Virginia.  This was part of a larger plan by Alvarez to consolidate and streamline all operations of the Affiliated Defendants.

143.    Within the physical office building itself, employees with Defendants ACS, Energy Transportation, ERG, and ET360 all shared the same office space.  Up until early 2020, Defendant Alvarez had office space at 1000 Jerry Dove Drive where he and the Affiliated Defendants' accounting, information technology, human resources, and other back-office employees worked. These back-office employees routinely performed work across the various entities.

144.    In early 2020, David Alvarez exited the office space on Jerry Dove Drive and relocated the Affiliated Defendants' back-office employees to the building at 5338 Shinnston Pike.

At this location, there is no formal separation among the companies and employees from the various entities are free to move in and out of the office space.

### b.  Management Personnel and Resources

145.    Within this building complex, the Affiliated Defendants share both personnel and critical resources to run their operations.  Specifically, the Affiliated Defendants share information technology, human resources, business development, marketing, billing, and invoicing services.

146.    For example, and as previously stated, Alvarez's daughter Andria serves as the Business Development Director for all the Affiliated Defendants.

147.    The Affiliated Defendants also shared the same Human Resources Director, Beth Nuzzum, who would often send mass emails to employees for all the different companies.  These emails outlined the Affiliated Defendants' policies specifically related to COVID-19.

148.    The Affiliated Entities also shared their health insurance plans for their employees, even though each company was purportedly a separate business entity.  And the Affiliated Defendants consolidated the renewals for these health plans through Kitty Blackwood, who was an ET360 employee.  Specifically, these insurance renewals were streamlined for both Energy Transportation and ET360.

149.    The Affiliated Defendants all share the same information technology services. Defendant Alvarez tasked a single employee with overseeing the information technology needs of all the Affiliated Defendants.  The information technology manager, who was hired by Alvarez, manages all issues related to the computers and phones utilized by the Affiliated Defendants. Beyond sharing the same IT support services, the Affiliated Defendants all use the exact same Box cloud sharing platform to facilitate their operations—a sharing of document management systems that unaffiliated entities would not contemplate.

150.    When the accounting for all the Affiliated Defendants was consolidated at the Shinnston Pike address in early 2020, Defendant Jason Henderson was tasked with overseeing the accounting operations for all the companies.

151.    Further, all major capital expenditures for the Affiliated Defendants had to be approved by either Defendant Alvarez or Jason Henderson.  A capital request form from any one of the Affiliated Defendants was required to be submitted to Alvarez and Henderson for their approval.

152.    The Affiliated Entities also shared cash management.  For example, Ernie Rush, a previous ET360 employee, complained about not receiving a bonus that was promised to him. Shortly thereafter, Defendant Henderson handed Rush a $500 bonus check from ERG (not ET360).

153.    The hiring and onboarding of new employees for the Affiliated Defendants is also a shared exercise.  For example, ERG conducts safety performance reviews of new employees hired by the company.  However, ERG actually uses personnel from Energy Transportation, who use an Energy Transportation ("@et8760.com") email address, to perform the safety review functions.

### c.    Employees and Equipment

154.    Once hired, employees were frequently shared between the Affiliated Defendants. ET360 regularly provided employees and equipment to the other Affiliated Defendants, including helping Energy Transportation with industrial cleaning, assisting ACS with slip repairs, and supporting ERG with containment services.

155.    John Henderson, who was an ET360 employee, operated the equipment yard, which was shared across Energy Transportation, ET360, ACS, and ERG.  Whenever someone from the Affiliated Defendants needed certain equipment, they would call John Henderson from ET360 who would facilitate the request, often without accounting for the costs associated with using the equipment—an accounting omission that one would not expect from separate and distinct companies.

156.     Energy Transportation and ET360—two entities that would be considered competitors absent affiliation—frequently shared water-hauling trucks and drivers.  If ET360 needed water trucks or drivers, the company would simply call Energy Transportation.  Similarly, if customers called Energy Transportation for water trucks and Energy Transportation was out of stock, the representative from Energy Transportation would simply dispatch ET360's water trucks to the customer instead.

157.     As an example, Eric Reed, an ET360 employee, provided water hauling services for an ET360 customer using both an ET360 truck and an Energy Transportation truck in the same week.  Reed's associated work orders, which were submitted to the customer, sometimes listed ET360 as the service provider while other times "Energy Transportation LLC" was used.  Reed subsequently recorded his hours from those work orders on his ET360 timesheet and was, upon information and belief, paid by ET360 despite some of the services being rendered under ET's name using ET's assets.

158.     According to former ET360 employees, the sharing of trucks and drivers among the Affiliated Defendants was commonplace. In fact, Alvarez once required ET360 to cover extra shifts for ET's work, even though doing so put ET360's drivers out of compliance with Department of Transportation regulations. For instance, ET360's Antero Disposal tickets show that both ET360 and Energy Transportation trucks were used to perform work for Antero. According to these tickets, the same employee would drive an ET360 truck one day, and then an Energy Transportation truck the next day while working on the same project.

159.     The Affiliated Entities also share Health, Safety, and Environmental (HSE) personnel, which is a critical function in the oil and gas industry.  As an example, when a prospective employee for a position at ERG contacted the company, Jon Cline—an HSE employee *with ET*—would send a "Safety Performance History Records Request" form to the individual's

predecessor employers.  Although these request forms listed ERG as the prospective employer, these forms had a return address of "ATTN:  Jon Ellen Cline, Energy Transportation LLC, PO Box 430, Bridgeport, WV 26330."   Cline also provided an Energy Transportation fax number and email address as jcline@et8760.com.

160.    Of particular note, these forms provided the social security numbers and requested confidential information from the predecessor employers regarding the prospective employees. Furthermore, these forms stated the information was being requested in compliance with §40.25(g)

and 391.23(h), which generally (among other things) requires a prospective employer to inquire about a prospective employee's past driving performance and any drug and alcohol violations from his or her previous employers.   Ultimately, Energy Transportation and ERG were freely sharing prospective employees' social security numbers and other confidential information.

| PART 2: | | TO BE COMPLETED BY PREVIOUS EMPLOYER |
|---|---|---|

**ACCIDENT HISTORY**

The applicant named above was employed by us. Yes ☐   No ☐

Employed as _____ from (m/y) _____ to (m/y) _____

1.  Did he/she drive motor vehicle for you? Yes ☐   No ☐  If yes, what type? Straight Truck ☐   Tractor-Semitrailer ☐
Bus ☐   Cargo Tank ☐   Doubles/Triples ☐   Other (Specify) _____

2.  Reason for leaving your employ: Discharged ☐   Resignation ☐   Lay Off ☐   Military Duty ☐
If there is no safety performance history to report, check here ☐, sign below and return.

**ACCIDENTS:**  Complete the following for any accidents included on your accident register (§390.15(b)) that involved the applicant in the 3 years prior to the application date shown above, or check ☐ here if there is no accident register data for this driver.

| | Date | Location | # Injuries | # Fatalities | Hazmat Spill |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |

| PART 3: | TO BE COMPLETED BY PREVIOUS EMPLOYER |
|---|---|

**DRUG AND ALCOHOL HISTORY**

If driver was not subject to Department of Transportation testing requirements while employed by this employer, please check here ☐, fill in the dates of employment from _____ to _____, complete bottom of Part 3, sign, and return.

Driver was subject to Department of Transportation testing requirements from _____ to _____.

1.  Has this person had an alcohol test with the result of 0.04 or higher alcohol concentration?
    YES ☐   NO ☐
2.  Has this person tested positive or adulterated or substituted a test specimen for controlled substances?
    YES ☐   NO ☐
3.  Has this person refused to submit to a post-accident, random, reasonable suspicion, or follow-up alcohol or controlled substance test?
    YES ☐   NO ☐
4.  Has this person committed other violations of Subpart B of Part 382, or Part 40?
    YES ☐   NO ☐
5.  If this person has violated a DOT drug and alcohol regulation, did this person complete a SAP-prescribed rehabilitation program in your employ, including return-to-duty and follow-up tests?  If yes, please send documentation back with this form.
    YES ☐   NO ☐
6.  For a driver who successfully completed a SAP's rehabilitation referral and remained in your employ, did this driver subsequently have an alcohol test result of 0.04 or greater, a verified positive drug test, or refuse to be tested?
    YES ☐   NO ☐

161.   The Affiliated Defendants also celebrate as one company.  Specifically, Alvarez invites certain employees from all the Affiliated Defendants to attend an annual holiday party that Alvarez hosts at Wonder Bar.[5]

162.   The manner in which the Affiliated Defendants are owned, managed, and share resources and personnel further confirms that they are affiliates under SBA rules and regulations.

## C.   DEFENDANTS INTENTIONALLY CONCEALED PLANS TO SHUT DOWN AND SELL SOME OF THE AFFILIATED DEFENDANTS BEFORE APPLYING FOR PPP LOANS

163.   In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan.

164.   In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

165.   A PPP loan application must be processed by a participating financial institution (*i.e.*, the lender).  If a PPP loan application is approved, the lender funds the PPP loan using its own monies, which are 100% guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

---

[5] Defendant Alvarez is a principal partner of The Wonder Bar WV—a restaurant and bar located in Clarksburg, West Virginia.  The Wonder Bar also shares the same address associated with Defendant ACS and received two PPP loans totaling  $439,904.00.

166.     PPP loan proceeds must be used by the business on certain permissible expenses such as payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

167.     Not only were the Affiliated Defendants ineligible to receive PPP proceeds, but Defendant Alvarez had also finalized plans to shutter at least one of the Affiliated Defendants around the same time he was applying for the federal funds.

168.     In early April 2020, Alvarez convened a meeting among senior personnel from Defendants ACS, Energy Transportation, and ET360.  The meeting took place at 1000 Jerry Dove Drive.  In attendance were Travis Knotts (ET360 General Manager), Kevin Murphy (ET360 Water Truck Pusher), Kim Posey (Vice President, Energy Transportation), David Swiger (Hazmat Truck Pusher at Energy Transportation), Jodi Davis (Water Truck Pusher at Energy Transportation), Billy Martin (ACS General Manager), Andria Alvarez Wymer, Jason Henderson and David Alvarez.

169.     At this meeting, Alvarez explained the plan to wind up ET360's business entirely. Alvarez directed that ET360's trucking services be transferred to Energy Transportation's operations, while ET360's industrial and other non-trucking services be moved to ACS.  Based on the timing of this meeting in relation to ET360's PPP application, Alvarez had made the decision to dissolve ET360 before applying for PPP proceeds on behalf of the very same business.

170.     Leading up to this meeting, in response to questions raised by David Alvarez regarding ET360's overall profitability, Travis Knotts (ET360 General Manager) prepared and discussed with Alvarez the schedule shown below.  The schedule outlines the costs that Alvarez had directed be absorbed by ET360 without plans to compensate the company for services actually performed.

| Item | | Year Cost |
|---|---|---|
| 10 Extra support | $20.00 | 728,000.00 |
| Driver Training /7 | $21.00 | 535,000.00 |
| Insurance Change | | 300,000.00 |
| Gofleet | 45 | 112,500.00 |
| 3 party repairs | | 300,000.00 |
| Employee unbillable | | 450,000.00 |
| Ohio Operation | | ? |
| The Move | | ? |
| Brine plant | | ? |
| Free Work | | ? |
| ACS Owes | | 640,000.00 |
| | | |
| | | 3,065,500.00 |
| | | |

171.     Importantly, two items further demonstrate Alvarez's control over ET360.  First, the "ACS Owes" entry reveals the total accounts receivable owed to ET360 by ACS for which ET360 was not collecting in the normal course of business.  Second, the "Free Work" entry refers to months of free dump truck services performed by ET360 for West Virginia University, where Alvarez was serving as Chairman of the Board of Governors at the time.  Henderson, the purported owner of ET360, neither went to WVU nor sat on the Board of Governors.

**D.     THE ALTERNATIVE SIZE TEST DOES NOT APPLY**

172.     The SBA first published its "Paycheck Protection Program Loans Frequently Asked Questions (FAQs)" ("PPP FAQs") on April 6, 2020. The PPP FAQs state that even if a business has more than 500 employees, it can still qualify for the Paycheck Protection Program as a small business concern if it met both tests in SBA's "alternative size standard" as of March 27, 2020: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net

income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

173.     All the Affiliated Defendants submitted their PPP applications *before* the PPP FAQs were first published on April 6, 2020. Thus, at the time Defendants falsely certified their eligibility as small businesses to receive PPP loan proceeds, the SBA had not issued any guidance regarding the applicability of the agency's "alternative size standard."

174.     Regardless, the Affiliated Defendants do not qualify as small businesses under the alternative size test.  The Affiliated Defendants operate capital intensive businesses requiring investments in numerous pieces of heavy equipment such as excavators, water trucks, and large storage tanks. The NAICS Codes the Affiliated Defendants are classified under give a sense of how large such companies in the oil and gas space are. For example, the corresponding size standard for NAICS code 237990—Other Heavy and Civil Engineering Construction—is $39.5 million in average annual receipts over the most recent three-year period.  The corresponding size standard for NAICS code 213122—Support Activities for Oil & Gas Operations—is a $41.5 million threshold in average annual receipts over the most recent three-year period.

175.     Relators estimate that the Affiliated Defendants had approximately $30,000,000 in accumulated business assets at the time they submitted their PPP applications. Furthermore, Relators estimate that the Affiliated Defendants employed approximately 800 people with an annual payroll of about $73,000,000.

176.     Given that the Affiliated Defendants had approximately $30 million in assets and a workforce of nearly 800 employees with approximately $75 million in annual payroll costs in March 2020, the Affiliated Defendants had a maximum tangible net worth well exceeding $15 million. Thus, even if the alternative size test applies (which it does not), the Affiliated Defendants would not qualify.

## VI.     THE AFFILIATED DEFENDANTS INTENTIONALLY MISREPRESENTED THEIR SIZE STATUS

177.    In addition to the certifications the Affiliated Defendants made regarding each PPP Application, they did so subject to and under the terms of their certifications to the United States that they were small businesses that were eligible to participate in the PPP.

178.    As a result of the Affiliated Defendants' misconduct, all their PPP Applications submitted with such false certifications constituted false claims that the Government should not and would not have paid.

179.    As a result of the Affiliated Defendants' false and/or fraudulent representations and conduct in securing small business PPP loans, and the Government's reliance thereon, the Government was falsely and/or fraudulently induced to enter into and accept contract and terms and conditions to which it would not have agreed had it known the truth. Because the Government was falsely and/or fraudulently induced to approve the small business PPP loans with the Affiliated Defendants, each claim for payment under these applications was a false and/or fraudulent claim. The claims submitted and caused to be submitted by the Affiliated Defendants were also false and/or fraudulent because the Affiliated Defendants knowingly failed to abide by their obligations under the law.

## VII.    THE AFFILIATED DEFENDANTS CONSPIRED WITH OTHER AFFILIATED ENTITIES TO DEFRAUD THE UNITED STATES

180.    As alleged in this Amended Complaint, one facet of the Affiliated Defendants' scheme involved one or more plans with other entities to further the overall fraudulent representations of the Affiliated Defendants' size through a pattern and practice of false and misleading representations ("overt acts").

181.    As alleged in this Amended Complaint, the Affiliated Defendants' senior executives, including Defendants Alvarez and Henderson, directed their employees to gain the agreement of each of these entities to conceal the affiliation among the Affiliated Defendants.

182.    As a result of these overt acts, the SBA made payments to the Affiliated Defendants under the PPP that Defendants were ineligible to receive.  Besides Defendants, the Co-Conspirators include numerous other related entities through which the Affiliated Defendants have conducted their fraudulent scheme.

183.    Enviro Energy Solutions, LLC ("EES") is a West Virginia limited liability company registered on April 7, 2017 with a principal office at 1000 Jerry Dove Drive, Bridgeport, West Virginia 26330.  This address is also the principal place of business as Defendants ACS, Energy Transportation and ERG.  The company's organizer is Defendant Jason Henderson and Defendant Alvarez is listed as a member.  Defendant Henderson also maintains an ownership interest in EES. It is not known whether EES applied for or received loan proceeds through the PPP.

184.    Alvarez Farms, LLC is a West Virginia limited liability company registered on November 2, 2006 with a principal office at 813 Birch Street, Bridgeport, West Virginia 26330. One of the three company's organizers is Defendant Alvarez.  Defendant Alvarez also maintains an ownership interest in Alvarez Farms.  It is not known whether Alvarez Farms applied for or received loan proceeds through the PPP.

185.    Applied Home Solutions, LLC is a West Virginia limited liability company registered on November 16, 2016 with a principal office at 1012 Wonderbar Road, Clarksburg, West Virginia 26301, which is the same address associated with co-conspirators Play Therapy Aviation, Rich Mountain Holdings, Energy Logistics Solutions, and Energy Liquid Solutions. The company's organizer is Defendant Alvarez. Defendants Alvarez and Henderson maintain ownership interests in

Applied Home Solutions.  Applied Home Solutions a received $37,100 in loan proceeds through the PPP.

186.   Buffalo Lake Development, LLC is a West Virginia limited liability company registered on January 29, 2003 with a principal office at 363 Washington Avenue, Clarksburg, West Virginia 26301.  The company's organizers are Defendant Alvarez and David J. Romano.  It is not known whether Buffalo Lake Development applied for or received loan proceeds through the PPP.

187.   LIG, LLC is a West Virginia limited liability company registered on November 10, 2010 with a principal office at 446 Locust Drive, Bridgeport, West Virginia 26330.  This address is also the current address of other Affiliated Defendants, including Defendant Alvarez.   The company's organizer is Gregory A. Morgan and Kim Alvarez is listed as a manager.  It is not known whether LIG applied for or received loan proceeds through the PPP.

188.   GPO Energy, LLC is a West Virginia limited liability company registered on November 8, 2013 with a principal office at 1737 Johnson Creek, Walton, West Virginia 25286.  The company's organizers include Defendant Energy Transportation, which is 100% owned by Defendant Alvarez.  It is not known whether GPO Energy applied for or received loan proceeds through the PPP.

189.   Park Properties, LLC is a West Virginia limited liability company registered on January 30, 2012 with a principal office at 200 Ferry Street, Clarksburg, West Virginia 26301.  The company's organizer is Vincent F. D'Annunzio, who is a cousin of Defendant Alvarez.  It is not known whether Park Properties applied for or received loan proceeds through the PPP.

190.   Play Therapy Aviation, LLC is a West Virginia limited liability company registered on January 3, 2019 with a principal office at 1012 Wonderbar Road, Clarksburg, West Virginia 26301, which is the same address associated with co-conspirators Applied Home Solutions, Rich Mountain Holdings, Energy Logistics Solutions, and Energy Liquid Solutions.  The company's

manager is Defendant Alvarez.  It is not known whether Play Therapy Aviation applied for or received loan proceeds through the PPP.

191.    Rich Mountain Holdings, LLC is a West Virginia limited liability company registered on June 2, 2017 with a principal office at 1012 Wonderbar Road, Clarksburg, West Virginia 26301, which is the same address associated with co-conspirators Applied Home Solutions, Play Therapy Aviation, Energy Logistics Solutions, and Energy Liquid Solutions.  The company's organizer is James V. Cann and Defendant Alvarez is listed as a member.  It is not known whether Rich Mountain Holdings applied for or received loan proceeds through the PPP.

192.    The Johnson Place, LLC is a West Virginia limited liability company registered on August 5, 1996, with a principal office at 813 Birch Street, Bridgeport, West Virginia 26330.  The company's organizers are Defendant Alvarez and Manuel Alvarez, III.  It is not known whether The Johnson Place applied for or received loan proceeds through the PPP.

193.    WWYD, LLC is a West Virginia limited liability company registered on October 16, 2013, with a principal office at P.O. Box 430, Bridgeport, West Virginia 26330.  The designated office address is 446 Locust Road, Bridgeport, West Virginia 26330. This address is also the current address of Defendant Alvarez.  The company's organizer is Gregory A. Morgan and Defendant Alvarez is listed as a manager.  It is not known whether WWYD applied for or received loan proceeds through the PPP.

194.    Advantage Consulting, LLC is a West Virginia limited liability company registered on November 27, 2018, with a principal office at 8270 Cottonwood Lane, Stonewood, West Virginia 26301.  The company's organizer is Jason Henderson.  It is not known whether Advantage Consulting applied for or received loan proceeds through the PPP.

195.    Energy Logistics Solutions, LLC is a West Virginia limited liability company registered on December 27, 2018, with a principal office at 1012 Wonderbar Road, Clarksburg,

West Virginia 26301, which is the same address associated with co-conspirators Applied Home Solutions, Play Therapy Aviation, Rich Mountain Holdings, and Energy Liquid Solutions.  The company's organizer and manager is Jason Henderson.  It is not known whether Energy Logistics Solutions applied for or received loan proceeds through the PPP.

196.    Energy Liquid Solutions, LLC is a West Virginia limited liability company registered on February 1, 2019, with a principal office at 1012 Wonderbar Road, Clarksburg, West Virginia 26301, which is the same address associated with co-conspirators Applied Home Solutions, Play Therapy Aviation, Rich Mountain Holdings, and Energy Logistics Solutions.  The company's organizer is Defendant Alvarez.  It is not known whether Energy Liquid Solutions applied for or received loan proceeds through the PPP.

197.    The Affiliated Defendants and its co-conspirators shared in the conspiratorial objective to deceive the United States concerning the number of employees they had, and further agreed and intended to each perform and to each benefit from these unlawful overt acts in furtherance of Defendants' scheme to target and financially injure Government Programs. Accordingly, the Affiliated Defendants and the co-conspirators entered into these unlawful financial relationships for the purpose of Defendants' planned scheme to target Government Programs and submit or cause the submission of false or fraudulent claims and records.

198.    As described in this Amended Complaint, Defendants intentionally conspired with one or more of these affiliated entities to get a false or fraudulent claims allowed or paid by the United States; one or more of these conspirators performed one or more overt acts to effect the object of the conspiracy; and Government Programs suffered damages as a result of the false or fraudulent claims.

199.    Through the acts and omissions described in this Amended Complaint, Defendants, with each other and with affiliated entities known and unknown, knowingly agreed and conspired to

defraud the Government by having false or fraudulent statements, records, and certifications submitted to, paid and approved by Government officials, their contractors, intermediaries and/or their agents.

200.    By virtue of their conspiratorial agreement, Defendants caused to be presented, made and/or used false records or statements, including size status certifications to Government, causing the United States to suffer significant damages.

## VIII.   THE AFFILIATED DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS

201.    The Affiliated Defendants submitted numerous false claims to the Government in the form of PPP Applications, which certified that the Affiliated Defendants were legitimate small business concerns when they sought loan proceeds through the PPP.

202.    The Affiliated Defendants' fraudulent scheme served its intended purpose, as they induced the SBA to approve and distribute loan proceeds to the Affiliated Defendants under the PPP.  In doing so, the Affiliated Defendants submitted false claims in the form of false certifications, which misrepresented the true size of their businesses and resulted in millions of dollars in improper payments by the SBA and the Treasury.

203.    The Affiliated Defendants' intentional misrepresentations regarding their size as small, which were contained in its certifications submitted to Government Programs, were false within the meaning of the federal False Claims Act.

204.    Claims for payments submitted to Government Programs, in part or in whole, which were the result of the Affiliated Defendants' misrepresentations regarding their size as small, were false within the meaning of the federal False Claims Act.

205.    The Affiliated Defendants' misrepresentations regarding their size as small caused them to be approved loans which were void *ab initio* and caused the submission of claims for payment that were false when made.

206.    The Affiliated Defendants' misrepresentations regarding their size as small were made knowingly and with the intent to cause the submission of false claims to Government Programs.

207.    Government Programs provided loan proceeds to the Affiliated Defendants under the PPP based on Defendants' false claims, and as a result have incurred and continue to incur significant damages due to Defendants' intentional misrepresentations regarding their size as small.

208.    By falsely certifying its eligibility to participate in the PPP and causing subsequent claims for loan proceeds to be made that the Affiliated Defendants knew were ineligible for payment by the SBA, the Affiliated Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as described herein.

## IX.    SYSTEMIC DAMAGES CAUSED BY SMALL BUSINESS MISREPRESENTATION FRAUD

209.    Firms that misrepresent their small business status to secure awards intended for eligible small businesses create severe harm to the country in a number of respects.  Most apparent, the misrepresentation harms legitimate small businesses because it denies them the opportunity to secure much needed financial assistance during COVID-19.  The Affiliated Defendants have directly harmed hundreds if not thousands of legitimate small businesses who were entitled to, but may not have, received PPP loan proceeds but for the unclean hands of the Affiliated Defendants.

210.    The Affiliated Defendants' misrepresentations also undermine the public's confidence in the integrity of the government programs designed to provide assistance to small businesses during times of crises.

## COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))[6]

211.     Relators reallege and incorporate by reference the allegations made in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

212.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as mended.

213.     Through the acts described above, the Affiliated Defendants and their agents and employees knowingly misrepresented submitted or caused to be submitted to the United States Government knowingly false or fraudulent claims for PPP loan proceeds.

214.     As alleged herein, the Affiliated Defendants' representations to the United States were knowingly false. By engaging in the conduct described herein, the Affiliated Defendants knowingly submitted, or caused to be submitted, false claims for payment to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

215.     Through the acts described above, the Affiliated Defendants and their agents and employees knowingly made, used or caused to be made or used false statements and records to get such false and fraudulent claims paid and approved by the United States Government.

216.     The United States, unaware of the falsity of the records, statements and claims made by the Affiliated Defendants, paid the Affiliated Defendants for claims that would otherwise not have been allowed.

217.     By reason of the Affiliated Defendants' false records, statements and claims, the United States Government has been damaged and continues to be damaged in the amount of millions of dollars.

---

[6]  To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(1) (2006).

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))[7]

218.    Relators reallege and incorporate by reference the allegations made in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

219.    As alleged herein, the Affiliated Defendants knowingly made false representations to the United States. The Affiliated Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

220.    Because of the Affiliated Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 28 C.F.R. § 85.5[8].

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))[9]

221.    Relators incorporate herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

222.    As detailed above, the Affiliated Defendants knowingly conspired, and may still be conspiring, with the various entities and/or persons described herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§

---

[7]  To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(2) (2006).

[8] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

[9] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(3) (2006).

3729(a)(1)(A) & (a)(1)(B). The Affiliated Defendants and these entities and/or persons committed overt acts in furtherance of the conspiracy as described above.

223.   As a result of Affiliated Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

**COUNT IV**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))[10]**

224.   Relators incorporate herein by reference the preceding paragraphs of the Amended Complaint as though fully set forth herein.

225.   As alleged in detail above, the Affiliated Defendants knowingly avoided or decreased their obligation to pay or transmit money to the Government. Specifically, the Affiliated Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

226.   As a result of the Affiliated Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

**PRAYER FOR RELIEF**

**WHEREFORE,** Relators pray for judgment against the Affiliated Defendants as follows:

A.   That the Affiliated Defendants be ordered to cease and desist from submitting any falser claims, or further violating 31 U.S.C. § 3729 *et seq.*;

B.   That judgment be entered in Relators' favor and against the Affiliated Defendants in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided

---

[10] To the extent wrongdoing occurred prior to May 20, 2009, this Amended Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(7) (2006).

by 31 U.S.C. § 3729(a) and 28 C.F.R. § 85.5, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

D.     That the Affiliated Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

E.     That judgment be granted for Relators against the Affiliated Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit; and

F.     That the Court issue an order enjoining the Defendants from continuing to engage in the fraudulent conduct alleged herein; and

G.     That this Court award such further relief as it deems just and proper.

## JURY TRIAL DEMAND

Relators demand a trial by jury of all issues so triable.

Respectfully submitted,

Dated:  April 4, 2023

/s/ *Anthony J. Majestro*
Anthony J. Majestro, Esq. (WVSB #5165)
Powell & Majestro, PLLC 405 Capitol Street,
Suite P-1200 Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

William G. Powers (admitted pro hac vice)
Andrew M. Miller (admitted pro hac vice)
Baron & Budd, P.C.
The Watergate 600 New Hampshire Ave., NW,

10th Floor Washington, DC 20037
Telephone: 202.333.4562
Facsimile: 202.337.1039
wpowers@baronbudd.com
amiller@baronbudd.com

*Attorneys for Plaintiffs/Relators*