## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA *ex rel.*
JOSEPH SEIKEL and TERENCE SEIKEL,

      Plaintiffs,

v.

DAVID B. ALVAREZ; APPLIED
CONSTRUCTION SOLUTIONS, INC.;
ENERGY TRANSPORTATION, LLC;
ENERGY RESOURCE GROUP, LLC;
ET360, LLC; BEAR CONTRACTING, LLC;
BEAR UTILITIES, LLC; JASON P.
HENDERSON; and JOHN DOES NOS. 1-50,
FICTITIOUS NAMES;

      Defendants.

Civil Action No.  1:23-cv-00001
Honorable Thomas S. Kleeh

## MEMORANDUM OF LAW IN SUPPORT OF
## HENDERSON DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

## I.      INTRODUCTION

Defendants Jason P. Henderson, Energy Resource Group, LLC, and ET360, LLC (collectively, the "Henderson Defendants"), by and through counsel, submit this memorandum of law in support of their motion to dismiss the amended complaint. The Court should dismiss the Amended Complaint for False Claims Act Violations Under 31 U.S.C. §§ 3729–3733 filed by Joseph Seikel and Terence Seikel (collectively, "the Seikels") for the following reasons. First, the Seikels are not qualified to bring this *qui tam* action as relators. Second, the Seikels fail to allege fraud with the requisite particularity pursuant to Federal Rule of Civil Procedure 9(b). Third, the Seikels fail to state a claim under the False Claims Act ("FCA") upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court should thus dismiss the amended complaint against the Henderson Defendants with prejudice.

II.     **STATEMENT OF THE CASE AND RELEVANT FACTS**

   A.     **Paycheck Protection Program.**

On March 13, 2020, President Trump declared a state of emergency due to the ongoing COVID-19 pandemic. Additionally, President Trump signed into law the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. 116-136, 134 Stat. 281 (the "CARES Act"), which allowed the U.S. Small Business Administration ("SBA") to guarantee 100% of 7(a) loans under a new Paycheck Protection Program ("PPP").

   1.     **Definition of Small Business.**

The SBA has established a series of regulations that govern what businesses are eligible for a PPP loan. An entity generally is eligible for a PPP loan if it, combined with its affiliates, is (i) a small business as defined in Section 3 of the Small Business Act (15 U.S.C. § 632); (ii) has 500 or fewer employees whose principal place of residence is in the United States; or (iii) is a business that operates in certain industries and meets applicable employee-based size standards for that industry.[1] The SBA published additional guidance through frequently asked questions, which guidance states that "[b]orrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the CARES Act and of the Paycheck Protection Program Interim Final Rule ("PPP Interim Final Rule") . . . ."[2]

In its first version of these Paycheck Protection Program Loans Frequently Asked Questions, which was issued on April 6, 2020 ("April 6, 2020 FAQs"), the SBA explains that a small business with more than 500 employees could qualify for PPP consideration:

---

[1] *See* Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811–17 (Apr. 15, 2020).
[2] *See* Office of Capital Access, *FAQ for PPP Borrowers and Lenders*, SBA.GOV (Apr. 6, 2020), https://www.sba.gov/document/support-faq-ppp-borrowers-lenders.

Question: Are small business concerns (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) required to have 500 or fewer employees to be eligible borrowers for First Draw PPP Loans?

Answer: No. Small business concerns can be eligible borrowers for First Draw PPP Loans even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632. A business can qualify if it meets the SBA employee-based or revenue-based size standard corresponding to its primary industry. Go to www.sba.gov/size for the industry size standards.

Additionally, a business can qualify for a First Draw PPP Loan as a small business concern if it met both tests in SBA's "alternative size standard" as of March 27, 2020: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

A business that qualifies as a small business concern under section 3 of the Small Business Act, 15 U.S.C. 632, may truthfully attest to its eligibility for a First Draw PPP Loan on the Borrower Application Form, unless otherwise ineligible.[3]

This guidance expressly applies to First Draw PPP Loans, without restriction on when the application was submitted. As the FAQs state, the SBA's "alternative size standard" is a two-prong test.[4] First, the entity, and all of its affiliated companies, cannot have a maximum tangible net worth in excess of $15 million. Second, the entity, and all of its affiliated companies, cannot have an average net income after federal income taxes for two full fiscal years that exceeds $5 million. This test does not require the entity, and its affiliated companies, to have 500 or fewer employees.

---

[3] *See* Office of Capital Access, *FAQ for PPP Borrowers and Lenders*, SBA.GOV (Apr. 6, 2020), https://www.sba.gov/document/support-faq-ppp-borrowers-lenders. This response was included through the most recent FAQs in July 2022. *See* Office of Capital Access, *FAQ for PPP Borrowers and Lenders*, SBA.GOV (July 8, 2022), https://www.sba.gov/document/support-faq-ppp-borrowers-lenders.

[4] The Alternative Size Standard was created in a September 29, 2010 notice explaining that the Small Business Jobs Act of 2010 required the SBA to create an alternative size standard for small business classifications because the "small business concern" test was too restrictive. *See* Small Business Administration, *Small Business Jobs Act: New Alternative Size Standard for 7(a) and 504 Loans*, SBA.GOV (Sept. 29, 2010), https://www.sba.gov/document/information-notice-5000-1175-small-business-jobs-act-new-alternative-size-standard-7a-and-504-loans. The SBA has not updated the alternative size standard, and the two-prong test in the 2010 notice is the same two-prong test listed in Question 2 of the PPP FAQs.

2. **Affiliation Rules.**

Under the affiliation rules for SBA loans ("SBA Affiliation Rules"), "concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.301 (2022). Under the SBA Affiliation Rules, there are four tests based on control that PPP applicants are required to consider when determining whether the applicant has affiliates. Those tests are: (1) affiliation based on equity ownership; (2) affiliation arising under stock options, convertible securities, and agreements to merge; (3) affiliation based on management; and (4) affiliation based on identity of interest. *Id.*[5]

The CARES Act initially suggested that affiliation should be tested under 13 CFR § 121.103(a). Under those regulations, the SBA considered factors such as "ownership, management, previous relationship with or ties to another concern, and contractual relationships, in determining whether affiliation exists."[6] Additionally, the SBA could consider the "totality of the circumstances" when determining whether affiliation exists.[7] However, the SBA's recent guidance on affiliation points applicants toward the affiliation standards contained in the 2019 version of Section 121.301(f), set forth above.[8] In doing so, the SBA expressly limited the scope of those rules by focusing on only those four tests for affiliation. *See* 13 CFR § 121.301(f).[9] The SBA thus allowed applicants to disregard the other affiliation tests, most notably the test based on the "totality of the circumstances." The SBA's "Small Business Compliance Guide: A Guide to the SBA's Size Program and Affiliation Rules" clearly states that affiliation based on the totality

---

[5] *See also* Office of Capital Access, *Affiliation Rules for Paycheck Protection Program*, SBA.GOV (Apr. 3, 2020), https://www.sba.gov/document/support-affiliation-rules-paycheck-protection-program.
[6] 13 C.F.R. § 121.103(a).
[7] 13 C.F.R. § 121.103(a)(5).
[8] Section 1102(e) of the CARES Act permanently rescinded the SBA's February 2020 amendment to section 121.301.
[9] *See also* Office of Capital Access, *Affiliation Rules for Paycheck Protection Program*, SBA.GOV (Apr. 3, 2020), https://www.sba.gov/document/support-affiliation-rules-paycheck-protection-program.

of circumstances does not apply to the Business Loan, Disaster Loan, and Surety Bond Programs.[10]

### B.   Procedural Background.

Defendant Jason P. Henderson ("Henderson") is a resident of Stonewood, Harrison County, West Virginia. Henderson is the owner of Defendant Energy Resource Group, LLC ("ERG")[11] and Defendant ET360, LLC ("ET360")[12] (collectively, the "Henderson Companies"). Generally, the Henderson Companies service or, in the case of ET360, formerly serviced the oil and gas industry. ERG performs geomembrane installations for environmental containments, waste disposal sites, and water storage solutions for industrial sites, the oil and gas industry, and municipal waste disposal sites. ET360 performed Industrial/Environmental Cleaning services and Water Transportation. Like many small businesses, the Henderson Defendants experienced economic hardship as a result of the coronavirus pandemic. In an attempt to mitigate that hardship, the Henderson Defendants applied for PPP loans in the early days of PPP and utilized an accounting firm and its qualified certified public accountants to prepare the loan applications. These qualified professionals were familiar with the Henderson Defendants from previous business dealings and assisted the Henderson Defendants with ensuring each entity that applied was qualified for the PPP loans, and the Henderson Defendants' PPP applications were approved. ERG submitted an application for the second round of PPP funding in February 2021 but received no response. Further, the Henderson Defendants have yet to have their PPP loans forgiven.

The Seikels allege that Joseph Seikel is a resident of Michigan and that Terence Seikel is

---

[10] *See* Office of Government Contracting and Business Development, *Affiliation Guide for Size Standards¸* SBA.GOV (July 13, 2020), https://www.sba.gov/document/support-affiliation-guide-size-standards.

[11] Information regarding ERG is publicly available on the West Virginia Secretary of State website: https://apps.wv.gov/SOS/BusinessEntitySearch/Details.aspx?Id=58nN/550O27FJ7pbwWK/cQ==&Searc h=tFooM7gt0Q7ZFD3whb%2fsp%2fdPe5IOoqhiaSpdicS1Xtg%3d&Page=0.

[12] Information regarding ET360 is publicly available on the West Virginia Secretary of State website: https://apps.wv.gov/SOS/BusinessEntitySearch/Details.aspx?Id=T6InEQ+a1MOwRuDJV6xs0g==&Sear ch=%2f6JcgAC5d756touNixfy8w%3d%3d&Page=0.

a resident of South Carolina. ECF No. 80 ¶ 22. The Seikels further allege to be "insiders who have direct knowledge of the conduct alleged in [the] Amended Complaint and conducted an independent investigation to uncover false claims submitted to the United States." *Id.* ¶ 23. What the Seikels fail to disclose, however, is that they in fact are not "insiders" with "direct knowledge" but rather are owners and members of Octane Environmental, LLC ("Octane"), an Ohio limited liability company with its principal office in Bridgeport, West Virginia,[13] which is a business competitor to the Henderson Companies and the other Defendants named in this matter. As plainly stated on its publicly available website, the mission of Octane is "to be a leading, high quality supplier of water management, containment, and related services for the oil and gas industry."[14]

On October 22, 2020, the Seikels, on behalf of the United States of America, initiated the instant *qui tam* action in the United States District Court for the Eastern District of Pennsylvania by filing, under seal, their Complaint for False Claims Act Violations Under 31 U.S.C. §§ 3729–3733 against the Henderson Defendants; Defendants David B. Alvarez ("Alvarez"), Applied Construction Solutions, Inc. ("ACS"), and Energy Transportation, LLC (collectively, the "Alvarez Defendants"); Bear Contracting, LLC, and Bear Utilities, LLC (collectively, the "Urso Defendants"); and John Does Nos. 1–50, Fictitious Names. ECF No. 1. The complaint asserted four counts: (1) Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A); (2) Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B); (3) Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C); and (4) Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G). *Id.* at 38–41.

Shortly after the complaint was filed, the Department of Justice began investigating the Seikels' claims. The Department of Justice first contacted the Henderson Defendants on March

---

[13] Information regarding Octane is publicly available on the West Virginia Secretary of State website: https://apps.wv.gov/SOS/BusinessEntitySearch/Details.aspx?Id=5FhHg7atDnCHTDl9nmvkPQ==&Searc h=ldEjbj8TL5R0xDbJ8CdE3wbHNDQqdw%2fPDwJjkcutHoE%3d&Page=0.
[14] The Octane website is publicly available at: https://octaneenvironmental.com/.

6

25, 2021. The Henderson Defendants readily cooperated with the Department of Justice, producing several explanatory memos and thousands of pages of supporting documentation. On July 26, 2022, the United States District Court for the Eastern District for Pennsylvania ordered the United States to decide if it was going to intervene and ordered the complaint to be unsealed by August 25, 2022. On August 24, 2022, the Department of Justice filed a notice stating that its "investigation ha[d] not been completed and, it [was] therefore unable to decide, as of the Court's deadline, whether to proceed with the action. Accordingly, . . . it [was] not intervening at th[at] time." ECF No. 23. The complaint was then unsealed on August 25, 2022.

The Court also issued Summons to the Defendants on August 25, 2022. ECF No. 25. On November 1, 2022, a Deputy Clerk for the Eastern District of Pennsylvania informed counsel for the Seikels that, if service was not made by November 23, 2022, the Court would dismiss the complaint without prejudice for lack of prosecution. ECF No. 26. On November 23, 2022, the Henderson Defendants and Alvarez Defendants each filed a Waiver of the Service of Summons and were served with the complaint. ECF Nos. 32, 33.[15]

On November 9, 2022, the Alvarez Defendants filed their Motion to Transfer Venue Under 28 U.S.C. § 1404(a), requesting that the court transfer the litigation to the Northern District of West Virginia. ECF No. 28. On November 16, 2022, the Henderson Defendants filed their Notice of Joinder to Alvarez Defendants' Motion to Transfer Venue Under 28 U.S.C. § 1404(a). ECF No. 30. The Seikels filed their response on December 14, 2022. ECF No. 34. A hearing on the Alvarez Defendants' motion was held on January 4, 2023, during which the Eastern District of

---

[15] The Seikels never served the Urso Defendants with the original complaint. Upon information and belief, the Henderson Defendants understand that the Urso Defendants were investigated by the Department of Justice, which discovered no malfeasance by those entities. Afterwards, the SBA forgave the Urso Defendants' PPP loans. *See Tracking PPP: Search Every Company Approved for Federal Loans*, PROPUBLICA.ORG (Jan. 11, 2023), https://projects.propublica.org/coronavirus/bailouts/.

Pennsylvania court ruled from the bench that the matter should be transferred. *See* ECF No. 40. By order dated January 4, 2023, the Eastern District of Pennsylvania court granted the Alvarez Defendants' motion to transfer venue and directed that the case be transferred to the Northern District of West Virginia. ECF No. 41. By joint stipulation of the parties, and by order entered on January 26, 2023, the time for the Henderson Defendants and Alvarez Defendants to file responsive pleadings was extended through February 28, 2023. ECF No. 56.

On February 28, 2023, the Henderson Defendants filed a Motion to Dismiss and Amended Memorandum in Support. ECF Nos. 63, 65. The Alvarez Defendants also filed a Motion to Dismiss. ECF Nos. 66, 67. On March 13, 2023, the Henderson Defendants, the Alvarez Defendants, and the Seikels filed a Joint Stipulation, wherein the parties consented to the Seikels filing an amended complaint pursuant to Federal Rule of Civil Procedure 15(A)(1)(B), as well as the following deadlines: (1) April 4, 2023, for the Seikels to file their amended complaint; (2) thirty days after the filing of the amended complaint for Defendants to file a responsive pleading; and (3) thirty days thereafter for the Seikels to respond to any motions to dismiss. ECF No. 73. Defendants also reserved their right to object to the amended complaint, except for untimeliness. *Id.* On March 14, 2023, the Court entered an Order Adopting Joint Stipulation. ECF No. 74.

On April 4, 2023, the Seikels filed a Motion for Leave to File Amended Complaint Under Seal. ECF No. 75. On April 11, 2023, the Court entered an Order Denying Motion for Leave to File Amended Complaint Under Seal. ECF No. 78. The Court explained:

> [T]he Amended Complaint asserts no new claims, no new causes of action, and no new theories of recovery, and it adds no new defendants. It asserts the same four counts that are asserted in the Complaint. The Amended Complaint, attached to the pending motion, was not submitted until after Defendants filed their motions to dismiss. . . . The basic factual framework and allegations of fraud remain the same as when the United States initially provided its Notice that it did not intend to intervene.

*Id.* at 3–4.[16] On April 12, 2023, the Amended Complaint for False Claims Act Violations Under 31 U.S.C. §§ 3729–3733 was filed. ECF No. 80.[17] The amended complaint alleges the same four counts: (1) Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A); (2) Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B); (3) Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C); and (4) Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G). *Id.* at 52–54.

On April 28, 2023, the Court unsealed the United States' Notice of Election to Decline Intervention, which was filed under seal on April 7, 2023. ECF No. 76.

## III.  LEGAL STANDARD

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). In deciding a motion to dismiss, a court may consider facts derived from sources beyond the four corners of the complaint, including documents attached to the complaint, documents attached to the motion to dismiss so long as they are integral to the complaint and authentic, and facts subject to judicial notice. *Heslep v. Ams. for Afr. Adoption, Inc.*, 890 F. Supp. 2d 671, 681 (N.D. W. Va. 2012) (citing *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

For a complaint to survive a motion to dismiss, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007)). While a complaint does not need detailed factual allegations, a plaintiff's obligation requires more than mere labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Twombly*, 550 U.S. at 555. Well-pleaded facts do not include "legal conclusions drawn

---

[16] Also on April 11, 2023, the Court entered an Order denying as moot the Henderson Defendants' and the Alvarez Defendants' motions to dismiss, due to the filing of the amended complaint. ECF No. 79.
[17] To date, the Seikels have not served the Urso Defendants with the amended complaint.

from the facts," "unwarranted inferences," or "unreasonable conclusions or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). As the Fourth Circuit has summarized:

> Ultimately, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face. Facial plausibility is established once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. In other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims across the line from conceivable to plausible.

*Id.* at 255–56 (internal quotations and citations omitted).

## IV.   ARGUMENT

The Court should dismiss the amended complaint against the Henderson Defendants for three reasons. First, the Court lacks jurisdiction because the Seikels are not qualified to be relators under the FCA. Second, the Seikels have failed to allege fraud with particularity. Third, the Seikels fail to state a claim under the FCA upon which relief can be granted.

### A.   The Court Lacks Jurisdiction Because the Seikels Are Not Qualified to Be Relators Under the FCA.

The Court should dismiss the amended complaint for lack of subject matter jurisdiction because the Seikels are not qualified to bring this *qui tam* action as relators under the FCA. The public disclosure bar requires dismissal because the allegations in the amended complaint have been publicly disclosed, and the Seikels are not original sources or insiders.

The FCA authorizes a private person to bring a claim for violation of Section 3729 on behalf of that person and the United States. *See* 31 U.S.C. § 3730(b). The FCA also bars certain actions. The public disclosure bar provides that courts "shall dismiss an action or claim under [§ 3730] . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4). As such, when the allegations in a complaint were publicly

disclosed before the suit was filed, the public disclosure bar will be triggered. *United States ex rel. May v. Purdue Pharma L.P.*, 811 F.3d 636, 642 (4th Cir. 2016).[18] The public disclosure bar will also be triggered where a purported relator "(1) know[s] of no useful new information about the scheme they allege, and (2) learned of the relevant facts through knowledge their attorney acquired when previously litigating the same fraud claim." *Id.* at 643. "The public disclosure bar 'encompasses actions even partly based upon prior public disclosures.'" *United States ex rel. Jones v. Collegiate Funding Servs., Inc.*, 469 F. App'x 244, 254 (4th Cir. 2012). Further, pursuant to the latest version of the FCA, "the public-disclosure bar no longer requires actual knowledge of the public disclosure, but instead applies if substantially the same allegations or transactions were publicly disclosed." *United States ex rel. Beauchamp*, 816 F.3d at 40 (citation omitted).

If the public disclosure bar is invoked, the court will apply a three-pronged analysis to determine "(1) if there was a public disclosure, (2) if the relator's allegations were 'based upon' the public disclosure, and, if so, (3) whether the relator is nonetheless 'entitled to original source status' as '"an individual who has direct and independent knowledge of the information on which the allegations [] are based[.]"'" *United States ex rel. Black v. Health & Hosp. Corp. of Marion Cnty.*, 494 F. App'x 285, 293 (4th Cir. 2012) (alterations in original) (citations omitted). "[T]he Supreme Court has recognized that the first prong of the public disclosure bar is satisfied if the disclosure 'put[s] the Federal Government on notice of a potential fraud.'" *Id.* at 294 (citation omitted). "Once a defendant files a motion to dismiss based on the public-disclosure bar, the relator bears the burden of proving by a preponderance of the evidence that the bar does not apply." *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 274 (4th Cir. 2012) (citation omitted).

---

[18] "Courts have unanimously construed the term 'public disclosure' to include websites and online articles," and "news media" to include newspapers and publicly available websites. *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 43 n.6 (4th Cir. 2016) (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011)).

Here, the public disclosure bar precludes the Seikels' claims. Allegations of PPP fraud have been in the public discourse since shortly after PPP went into effect.[19] The Seikels' allegations did not put the Federal Government on notice of potential fraud; their allegations are not unique from those which were publicly disclosed before they filed their complaint. Further, the organization, management, and operations of the Henderson Defendants, Alvarez Defendants, and Urso Defendants are publicly disclosed, as apparent from the face of the amended complaint, as well as publicly available information through the West Virginia Secretary of State. Finally, information about the Henderson Defendants', Alvarez Defendants', and Urso Defendants' PPP applications is publicly available.[20] As such, the public disclosure bar applies to the Seikels' claims.

Moreover, the Seikels cannot overcome the public disclosure bar because they are not "an original source of information." The FCA defines an "original source" as follows:

> [A]n individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31. U.S.C. § 3730(e)(4)(B). "To establish that his knowledge meets this standard, a relator must 'allege specific facts—as opposed to mere conclusions—showing exactly how and when" he obtained it. *Ahumada*, 756 F.3d at 276 (citation omitted).

Rather than being original sources or insiders, the Seikels are competitors of the Henderson

---

[19] *See, e.g.*, Ben Popkin, *Congressional Investigation Finds Over $1 Billion in Coronavirus Aid Fraud*, NBCNEWS (Sept. 1, 2020), https://www.nbcnews.com/business/economy/congressional-investigation-finds-over-1-billion-ppp-fraud-n1239001; Dan Mangan, *Coronavirus Fraud: Two New England Men Are First to Be Charged with Scamming Small Business Loan Program*, CNBC (May 5, 2020), https://www.cnbc.com/2020/05/05/coronavirus-men-charged-with-fraud-over-cares-act-ppp-small-business-aid.html.
[20] *Tracking PPP: Search Every Company Approved for Federal Loans*, PROPUBLICA.ORG (Jan. 11, 2023), https://projects.propublica.org/coronavirus/bailouts/.

Defendants, Alvarez Defendants, and Urso Defendants.[21] Even in the Amended Complaint, the Seikels do not specify how they are "insiders" as to Defendants. Nor could they since, as discussed above, the Seikels are members of Octane. *See supra* footnote 13. According to Octane's publicly available website, Octane provides "scalable containment, water storage, and other related services to oilfield companies harvesting the Appalachian basin." Further, that the Seikels are disgruntled competitors, rather than insiders, is apparent from the face of the amended complaint.[22] For example, the Seikels imply that the Henderson Companies and Alvarez Defendants working together was problematic. *See, e.g.*, ECF No. 80 ¶¶ 117–18. However, there is nothing improper with a business regularly subcontracting with a business owner that it trusts.

The Seikels are not an "original source" because they do not have "direct and independent knowledge of the information on which the allegations are based." 31 USC § 3730(e)(4)(B). The Supreme Court has interpreted the "information" referenced in subparagraph (e)(4)(B) to mean the relator's allegations, not the publicly disclosed allegations. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 472–73 (2007). The errors on the face of the amended complaint demonstrate that the Seikels are not original sources, or insiders, and thus are not qualified to bring this action. Specifically, the errors on the face of the amended complaint regarding the qualifications for a

---

[21] In separate litigation, this Court denied a motion to compel by Octane and the Seikels, quashing their subpoena duces tecum for the records of ERG (a non-party), because the records requests were overbroad and sought confidential and "valuable information on a direct competitor" for which they failed to show a substantial need. *See Richards v. Octane Env't, LLC*, No. 1:18cv00158 (N.D. W. Va.), ECF No. 200. This Order noted that the Seikels and Octane "do not dispute that they are competitors with ERG." *Id.* at 4.

[22] The Seikels' credibility in representing themselves as insiders is further undermined by their own acts in other litigation. In a Michigan lawsuit involving a dispute regarding a stock purchase agreement, Terence Seikel, who was the defendants' chief financial officer and who was involved in drafting the stock purchase agreement, testified at trial. In reaching its conclusion that there was sufficient evidence to support the jury's verdict in favor of the plaintiffs and against the defendants, the Court of Appeals of Michigan recognized that Terence Seikel's testimony was inconsistent and that his "credibility was seriously diminished when plaintiff demonstrated, and Seikel admitted, that he lied to the government on an SEC form and in the confidential memorandum that he presented to the bank." *Buzzitta v. Larizza Indus., Inc.*, No. 214039, 2021 WL 624969, at *2 (Mich. Ct. App. May 25, 2001).

"small business" and the affiliation standard demonstrate that the Seikels are not insiders.

The Seikels vaguely allege that "[w]ith limited exceptions not applicable here, only small businesses with 500 or fewer employees are eligible borrowers in the PPP." ECF No. 80 ¶ 4. In discussing the standards for determining the size of a business, the Seikels refer to the size standards under the North American Industry Classification System ("NAICS") codes. *See, e.g.*, *id.* ¶ 52. Although the Seikels later superficially reference the Alternative Size Standard, their allegations fail to acknowledge either the government's acceptance of the Alternative Size Standard as a viable means for a small business to qualify for PPP consideration or the Henderson Defendants' eligibility for PPP consideration under that standard. As discussed more fully below, the Alternative Size Standard provides an avenue for a small business to qualify for PPP funding regardless of its number of employees. The Seikels' failure to recognize the significance and application of the Alternative Size Standard demonstrates that they are not insiders.

The Seikels' misapprehension of the affiliation standards also demonstrates that they are not insiders. The Seikels allege that "[t]he SBA uses a totality of the circumstances test and may find affiliation even when no single factor is sufficient." *Id.* ¶ 60. Application of the totality of the circumstances test, however, is improper. Rather, as discussed above, there are only four tests for determining affiliation for purposes of PPP: (1) affiliation based on ownership; (2) affiliation arising under stock options, convertible securities, and agreements to merge; (3) affiliation based on management; and (4) affiliation based on identity of interest. Although the Seikels amend their complaint in an attempt to frame their allegations, at least in part, based on proper theories such as affiliation based on ownership or affiliation based on management, the face of the amended complaint—particularly, its many allegations wholly irrelevant to evaluation of affiliation under those standards—reveals that they are nonetheless attempting to establish affiliation based on the

inapposite "totality of the circumstances" test. *See, e.g.*, *id.* ¶¶ 61–64, 104–71.

Finally, the amended complaint is full of factual allegations that, even assuming they are true, are irrelevant to a determination of affiliation under these four tests, and thus cannot be viewed as supporting the plausibility of the Seikels' claims. Such irrelevant allegations include, but are not limited to, the following: (1) potentially shuttering a business before receiving PPP funds, ECF No. 80 ¶ 167–69; (2) how the entities were originally formed, if formed prior to 2020, *id.* ¶ 74–103; (3) the mailing addresses for the entities, *id.* ¶ 77, 82, 86, 90; (4) cross-marketing strategies of the entities, *id.* ¶ 127–41; (5) inviting employees of other companies to holiday parties, *id.* ¶ 161; and (6) sharing certain office space and resources, *id.* ¶¶ 142–62. The Seikels' failure to recognize that allegations such as these are irrelevant to the affiliation determination shows that they are not insiders or original sources qualified to bring this action. Accordingly, the Court should dismiss the amended complaint for lack of jurisdiction.

**B.      The Amended Complaint Fails to State a Claim Upon Which Relief Can Be Granted.**

The Court should also dismiss the amended complaint for failure to state a claim upon which relief can be granted. First, the Seikels fail to allege fraud with sufficient particularity. Second, the Seikels fail to state a claim under the FCA upon which relief can be granted.

**1.      The Seikels Fail to Plead Fraud with Particularity.**

The Court should dismiss the amended complaint because the Seikels fail to plead fraud with particularity. Pursuant to Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In the context of FCA claims, the Fourth Circuit has recognized that a plaintiff may either (1) "allege with particularity that specific false claims actually were presented to the government for payment," which requires the relator to "describe the time, place, and contents of the false

representations, as well as the identity of the person making the misrepresentation and what he obtained thereby"; or (2) allege a pattern of conduct that would "*necessarily* have led to submission of false claims" to the government. *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 196 (4th Cir. 2022). "To satisfy Rule 9(b), a plaintiff asserting a claim under the Act 'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained.'" *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 456–57 (4th Cir. 2013) (citation omitted).

Here, the Seikels have failed to allege their claims of fraud with sufficient particularity. Although the Seikels allege that "[a]ll the Affiliated Defendants are controlled and/or managed by Defendant David B. Alvarez," *see* ECF No. 80 ¶¶ 7–8, and that the Defendants are affiliated, *see* ECF No. 80 ¶¶ 104–162, allegations about the Defendants' business practices and relationships are not specific allegations of fraudulent activity under the FCA. Even as supplemented in the amended complaint, the Seikels' pleading of fraud is devoid of specific details regarding the time, place, and contents of the actual false representations.

More specifically, in Paragraphs 201–208, the Seikels summarily allege that the Defendants knowingly defrauded the government by presenting false statements regarding the size of their businesses, but the Seikels do not specifically allege details and contents of the Defendants' PPP application submissions. Nowhere in the amended complaint do the Seikels allege the dates upon which any PPP application was submitted, nor who submitted the PPP applications to the SBA on behalf of the Henderson Defendants. The enumerated Counts I–IV largely incorporate and rely on the allegations previously stated in the amended complaint and do not contain any further or more specific allegations necessary to maintain such claims. The Seikels' allegations of fraud thus lack the required specificity under Rule 9(b) and should be dismissed.

### 2. The Court Should Dismiss the Amended Complaint Because the Seikels Fail to Plead a Claim Under the FCA Upon Which Relief Can Be Granted.

The Court should dismiss the amended complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In general, a relator must adequately allege four elements to state a claim under the FCA: "(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a 'claim')." *Boyko*, 39 F.4th at 188 (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999)). The Seikels expressly allege claims under 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), 3729(a)(1)(C), and 3729(a)(1)(G), which require that the false statement or fraudulent course of conduct be carried out "knowingly." "For the first element to be met, 'the statement or conduct alleged must represent an objective falsehood.'" *United States of Am. ex rel. Vitale v. MiMedx Grp., Inc.*, 381 F.Supp.3d 647, 652 (D.S.C. 2019) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370. 376–77 (4th Cir. 2008)).

Here, the Seikels have failed to sufficiently state claims under the FCA upon which relief can be granted. First, they have failed to sufficiently plead that the Henderson Defendants made a false claim because the Seikels fail to sufficiently plead that the Henderson Defendants were affiliated with other Defendants and thus not eligible for PPP funding. In the alternative, the Seikels fail to sufficiently plead that the Henderson Defendants, even if assumed to be affiliated with the other Defendants, did not satisfy the Alternative Size Standard. Second, the Seikels fail to sufficiently plead that the purportedly false claims were made with the requisite scienter. Third, they fail to sufficiently plead that the purportedly false claims were material to the issuance of PPP funding. Accordingly, the Court should dismiss the amended complaint pursuant to Rule 12(b)(6).

a.    **The Seikels Fail to Sufficiently Plead That the Henderson Defendants Were Affiliated with the Other Defendants.**

The amended complaint is premised on the Seikels' insufficiently pled, and also inaccurate, theory that the Defendants are affiliated and, when considered in the aggregate, were ineligible for PPP funding. However, by focusing on the inapplicable "totality of the circumstances" test and failing to sufficiently plead affiliation under the applicable standards, the Seikels fail to sufficiently allege that the Defendants satisfied any of the applicable tests for affiliation. As the Seikels fail to sufficiently allege affiliation, the Seikels fail to sufficiently plead that the Defendants submitted false claims and violated the FCA, and the Court should thus dismiss the amended complaint.

An entity is generally eligible for PPP funding if it is (1) a small business defined in Section 3 of the Small Business Act (15 U.S.C. 632), (ii) has 500 or fewer employees whose principal place of residence is in the United States, or (iii) is a business that operates in certain industries and meets applicable SBA employee-based size standards for that industry. *See Business Loan Program Temporary Changes; Paycheck Protection Program*, 85 Fed. Reg. 20811–17 (Apr. 15, 2020). In determining the size of a business, the "SBA counts the receipts, employees, or other measure or size of the concern whose size is at issue and all of its domestic and foreign affiliates." 13 C.F.R. § 121.103(a)(6). "[C]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.301(f). There are four tests for determining whether a PPP applicant has affiliates: (1) affiliation based on ownership; (2) affiliation arising under stock options, convertible securities, and agreements to merge; (3) affiliation based on management; and (4) affiliation based on identity of interest. *Id.* § 121.301(f)(1)–(4).

Although, read in its entirety, the amended complaint attempts to plead affiliation under the totality of the circumstances, even read favorably to the Seikels, the amended complaint

attempts to allege affiliation only under the first and third of the proper standards.[23] Even in that regard, however, the Seikels fail to plausibly allege a claim upon which relief can be granted.[24]

Under the test for "affiliation based on ownership," affiliation arises when "an individual, concern, or entity that . . . owns or has the power to control more than 50 percent of the concern's voting equity." *Id.* § 121.301(f)(1). The Seikels allege that Alvarez has an ownership interest in ERG and ET360. ECF No. 80 ¶¶ 31,33.[25] The Seikels do not, however, allege that Alvarez owns more than 50 percent of the voting equity in either entity. *See id.* Accordingly, the Seikels fail to sufficiently allege that the test for affiliation based on ownership has been satisfied. Instead, the Seikels' allegations regarding ownership do not concern, in any manner, whether Alvarez owns or has the power to control more than 50 percent of the Henderson Companies' voting equity and are thus irrelevant to the determination of affiliation based on ownership. *See id.* ¶¶ 104–11.

Next, under the test for "affiliation based on management," "[a]ffiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns." 13 C.F.R. § 121.301(f)(3). Further, "[a]ffiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls

---

[23] The second enumerated test (affiliation arising under stock options, convertible securities, and agreements to merge) is inapplicable because there are no stock options, convertible securities, or agreements to merge applicable to ERG or ET360. The fourth enumerated test (affiliation based on identity of interest) is also inapplicable on its face because Henderson and Alvarez do not satisfy the definition of "close relatives" pursuant to 13 C.F.R. § 120.10. The Realtors have not alleged that the Henderson Defendants are affiliated with any other Defendants under either of these tests.

[24] The Seikels cite to 13 C.F.R. § 121.103(a) regarding affiliation, *see* ECF No. 80 ¶¶ 57–60, 103; however, the SBA's guidance directs that the applicable affiliation standards for PPP loans are those contained in the 2019 version of § 121.301(f), such that the SBA has expressly limited the scope to only the four tests for affiliation. *See* 13 C.F.R. § 301(f); *Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program*, SBA.GOV (Apr. 3, 2020), https://www.sba.gov/sites/default/files/2020-04/Affiliation%20rules%20overview%20%28for%20 public %29%20v2.pdf.

[25] The Seikels have not alleged that Henderson has an ownership interest in any of the other Defendant entities, so further analysis under that test is not necessary regarding Henderson's control of such entities.

the Board of Directors or management of one of more other concerns." *Id.* Finally, "[a]ffiliation also arises where a single individual, concern or entity controls the management of the applicant concern through a management agreement." *Id.*

As noted on the publicly available West Virginia Secretary of State website, ET360 is a member-managed limited liability company, and Jason Henderson is the sole member.[26] Pursuant to West Virginia Code Section 31B-4-404, "any matter relating to the business of the company may be decided by a majority of the members." Henderson, as the sole member, controls the management of ET360. As noted on the West Virginia Secretary of State website, ERG is a manager-managed limited liability company.[27] Pursuant to West Virginia Code Section 31B-4-404, in a manager-managed limited liability company, "any matter relating to the business of the company may be exclusively decided by the manager or, if there is more than one manager, by a majority of the managers." Jason Henderson, John Henderson, and Rick Richards are designated as managers of ERG and thus control the management of ERG.[28] Accordingly, neither Alvarez nor any other Defendant had the type of management control sufficient to support a finding of affiliation. The Seikels have not sufficiently pleaded otherwise. Instead, again, the Seikels' amended complaint does not contain allegations about who, under the structure of the entities, controls the management but only contains allegations that are irrelevant to the test for affiliation based on management under the standard. *See* ECF No. 80 ¶¶ 112–26. The Seikels' pleading of facts that are irrelevant to the applicable standard further demonstrates their attempt at a "totality of the circumstances" approach and failure to understand the applicable tests for affiliation.

Because the Seikels fail to sufficiently allege affiliation, the Henderson Defendants must

---

[26] *See supra* footnote 12.
[27] *See supra* footnote 11.
[28] *Id.*

be considered individually, and the Henderson Defendants were individually eligible to apply for and receive PPP funding, even assuming the employee numbers alleged in the amended complaint to be true. As such, the Henderson Defendants did not make any false statement that could constitute a basis for the Seikels' FCA claims. Accordingly, the Seikels fail to state a plausible claim upon which relief can be granted, and the amended complaint should be dismissed.

      **b.**    **In the Alternative, the Seikels Fail to Sufficiently Plead That the Alternative Size Standard Does Not Apply.**

In the alternative, even if the Defendants were considered in the aggregate, the Court should nonetheless dismiss the amended complaint because the Defendants would satisfy the Alternative Size Standard, and the Seikels have not sufficiently pleaded otherwise. As discussed above, the SBA has expressly stated that the Alternative Size Standard is a viable basis for PPP application. As described above, the "alternative size standard" is a two-prong test. First, the entity's, and all its affiliated companies', maximum tangible net worth cannot be more than $15 million. Second, the entity, and all its affiliated companies, cannot have an average net income after federal income taxes for two full fiscal years that exceeds $5 million. Importantly, the Alternative Size Standard does not require the entity, and its affiliated companies, to have 500 or fewer employees.

Although the Seikels allege that the Defendants did not qualify for PPP funding under the Alternative Size Standard, the Seikels' interpretation of the law is erroneous on its face. First, the Seikels allege that the Alternative Size Standard does not apply because the Henderson Defendants' applications were submitted before the April 6, 2020 FAQs were issued. *See* ECF No. 80 ¶ 173. However, the April 6, 2020 FAQs concerning the Alternative Size Standard expressly apply to "First Draw PPP Loans," without restriction on when applications are submitted. *See supra* footnote 2. Further, the relevant FAQ provides that an applicant needed to meet the Alternative Size Standard's tests "as of March 27, 2020," indicating that the Alternative Size

Standard applied retroactively. The Seikels' attempt to restrict the application of the Alternative Size Standard conflicts with the SBA guidance. The Seikels also attempt to plead that the Alternative Size Standard does not apply based on unfounded estimates of the Defendants' assets and payroll costs. ECF No. 80 ¶¶ 175–76. Such conclusory estimates are insufficient to plausibly plead that the Defendants would not have qualified under the Alternative Size Standard.

Accordingly, even if the Court finds that the Seikels have sufficiently pleaded affiliation, and that the Defendants should be aggregated for determination of PPP eligibility, the Seikels have failed to sufficiently plead that the Henderson Defendants did not satisfy the Alternative Size Standard. As such, their applications cannot have included any false statements, and the Seikels' FCA claims cannot stand. The Court should thus dismiss the amended complaint.

### c.   The Seikels Fail to Sufficiently Plead That the Purportedly False Claims Were Made with the Requisite Scienter.

Even if the Henderson Defendants made false statements in their PPP applications, which the Henderson Defendants deny, the amended complaint should nonetheless be dismissed because the Seikels fail to sufficiently allege that such statements were made with the requisite scienter. Under the FCA, "knowing" means "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Where a defendant's reading of a relevant statute "was at the very least objectively reasonable and because it was not warned away from that reading by authoritative guidance, it did not act 'knowingly' under the False Claims Act." *United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340, 343–44 (4th Cir. 2022); *see also United States ex rel. Swafford v. Borgess Med.*, 24 F. App'x 491, 2001 WL 1609913, at *1 (6th Cir. 2001) (per curiam) ("Disputes as to the interpretation of regulations do not implicate False Claims Act liability."); *United States*

*ex rel. Burlbaw v. Orenduff*, 548 F.3d 931 (10th Cir. 2008) (holding that even if the relator's evidence "somehow did raise a weak inference that a particular defendant" intended to misrepresent its eligibility, "this would not be enough to reach a jury" because the ambiguity of "the applicable statutory and regulatory scheme[] preclude a reasonable jury from finding scienter"); *United States ex rel. Hixson v. Health Mgmt. Sys.*, 613 F.3d 1186, 1191 (8th Cir. 2010) (requiring relators to "show that there is *no* reasonable interpretation" of the law supporting the defendant's position, regardless of what the defendants may have actually believed about the law).

Here, the Seikels have not sufficiently alleged that the Henderson Defendants knowingly made a false claim through their PPP applications. The Seikels merely allege that that the "Defendants knew, or at the very least should have known, that they were affiliated." ECF No. 80 ¶ 64. This allegation is supported by allegations that call for inference but without an allegation that the Henderson Defendants had actual knowledge. *Id.* Further, regardless of whether the Henderson Defendants should be considered affiliated with any other Defendants, the Henderson Defendants' understanding of the relevant guidelines regarding the PPP application requirements is at the very least objectively reasonable. The Seikels have failed to allege any "authoritative guidance" that warned away from the Henderson Defendants' reading of the relevant guidelines. Accordingly, the Seikels have failed to sufficiently plead that the Henderson Defendants acted with the requisite scienter, and the amended complaint should thus be dismissed.

> ### d.     The Seikels Fail to Sufficiently Plead That the Purportedly False Claims Were Material.

Further, even if the Henderson Defendants made false statements in their PPP applications, which the Henderson Defendants deny, the amended complaint should be dismissed because the Seikels fail to sufficiently allege that the falsity of such statements was material. The Fourth Circuit has held that a relator must allege "both materiality *and* a 'false statement or fraudulent course of

conduct' as distinct elements of an FCA claim." *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 702 (4th Cir. 2014) (citation omitted) (emphasis in original).

The Supreme Court of the United States has held that the misrepresentation "must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016). A misrepresentation should not be deemed "material" solely because the government designates compliance with a certain statutory, regulatory, or contractual requirement as a condition of funding. *Id.* at 178. The Supreme Court of the United States has likewise emphasized that "the False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Id.* at 196. In determining whether a misrepresentation is material, courts consider: (a) whether the government expressly designated the provision as a condition of payment; (b) whether there is evidence the defendant knew that the government consistently refused to pay claims in cases based on noncompliance with the particular statutory, regulatory, or contractual requirement; and (c) whether the government paid a particular claim in full despite its actual knowledge that certain requirements were violated. *Id.* at 194–95.

Here, even if the Henderson Defendants' PPP applications contained false statements, the Court should nonetheless dismiss the amended complaint because the Seikels have not sufficiently alleged the materiality of the statements. The Seikels fail to allege that the purported falsity of any statement within the PPP applications was material to the government's decision to issue PPP funding. *See* ECF No. 80 ¶¶ 211–26. As failure to comply with a statutory or regulatory requirement is, alone, insufficient to establish the materiality threshold, the Seikels' fail to sufficiently allege that the purported failure of the Henderson Defendants to satisfy the size standard would have been material to the issuance of the PPP loans. The Court should thus dismiss

the amended complaint for failure to state a claim upon which relief can be granted.

### 3. The Court Should Not Grant Leave for the Seikels to Further Amend the Amended Complaint.

If the Seikels request further leave to amend, the Court should decline the request. The Federal Rules of Civil Procedure provide that a court should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Here, the Seikels failed to amend their original complaint, filed on October 22, 2020, until after the Henderson Defendants and Alvarez Defendants moved to dismiss the complaint on February 28, 2023, despite the facts purportedly uncovered by the Seikels' investigation and the ongoing investigation by the Department of Justice.[29] The amended complaint, however, fails to cure the deficiencies identified by the Defendants and should be dismissed for the same reasons. To permit the Seikels to amend their amended complaint again, over two years after it was originally filed and after failing to cure the deficiencies identified in the Defendants' earlier motions to dismiss, would be unjust.

## V. CONCLUSION

WHEREFORE, for all of the foregoing reasons, Defendants Jason P. Henderson, Energy Resource Group, LLC, and ET360, LLC respectfully request the Court to grant their motion and enter an order dismissing the amended complaint against them with prejudice.

---

[29] The Seikels also failed to amend their complaint after they became aware of facts that expressly contradict certain allegations in the complaint. On October 27, 2020, only five days after the complaint in this action was filed, in a separate matter before this Court in which the Seikels were named defendants, *Richards v. Octane Environmental, LLC,* No. 1:18-cv-00158 (N.D. W. Va.), Defendant Alvarez sat for a deposition. *See Richards*, ECF No. 28–9. Both Seikels were present for this deposition. As part of this deposition, Alvarez testified, under oath, that he does not own ERG, that he never had an ownership interest in ERG, and that ERG is Henderson's company. *Id.* at 10:5–14; 16;10–21; 17:1–8; 42:5–13. Alvarez also clarified that, although he was involved in starting ET360, ET360 is now Henderson's company. *Id.* at 32:4–14. If the Seikels did not amend their complaint to correct the record after learning these salient facts over two years ago, the Court should not grant them leave to do so now.

STEPTOE & JOHNSON PLLC
OF COUNSEL

*/s/*     Shawn A. Morgan
Allison B. Williams (WV ID # 11329)
Shawn A. Morgan (WV ID # 6640)
Quentin T. Collie (WV ID # 13830)
400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8000
allison.williams@steptoe-johnson.com
shawn.morgan@steptoe-johnson.com
quentin.collie@steptoe-johnson.com

*Counsel for Defendants Jason P. Henderson, Energy Resource Group, LLC, and ET360, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of May 2023, a true and correct copy of the foregoing "Memorandum of Law in Support of Henderson Defendants' Motion to Dismiss Amended Complaint" was electronically filed and served through the Court's CM/ECF system on counsel of record listed as:

| | |
|---|---|
| BARON & BUDD, P.C.<br>OF COUNSEL | William G. Powers<br>Andrew M. Miller<br>The Watergate, 10th Floor<br>600 New Hampshire Avenue, NW<br>Washington, DC 20037 |
| POWELL & MAJESTRO, PLLC | Anthony J. Majestro<br>405 Capitol St., Suite P-1200<br>Charleston, WV 25301 |
| BAILEY & GLASSER, LLP<br>OF COUNSEL | Marc R. Weintraub<br>Alexandra Langley Serber<br>Patricia M. Kipnis<br>209 Capitol St.<br>Charleston, WV 25301 |
| U.S. DEPT. OF JUSTICE | Christopher James Prezioso<br>Maximillian F. Nogay<br>U.S. Attorney's Office - Whg<br>PO Box 591<br>Wheeling, WV 26003<br><br>Elizabeth L. Coyne<br>U.S. Attorney's Office<br>615 Chestnut St, Suite 1250<br>Philadelphia, PA 19106 |

STEPTOE & JOHNSON PLLC
OF COUNSEL

/s/      Shawn A. Morgan
Shawn A. Morgan (WV ID # 6640)
400 White Oaks Boulevard
Bridgeport, WV 26330
(304) 933-8000
shawn.morgan@steptoe-johnson.com

*Counsel for Defendants Jason P.*
*Henderson, Energy Resource Group, LLC,*
*and ET360, LLC*

16423557