**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

UNITED STATES OF AMERICA ex rel.
JOSEPH SEIKEL and TERENCE SEIKEL,

      Plaintiffs/Relators,

v.

DAVID B. ALVAREZ; APPLIED
CONSTRUCTION SOLUTIONS, INC.;
ENERGY TRANSPORTATION, LLC;
ENERGY RESOURCE GROUP, LLC;
ET360, LLC; BEAR CONTRACTING, LLC;
BEAR UTILITIES, LLC; JASON P.
HENDERSON; and JOHN DOES NOS. 1-50,
FICTITIOUS NAMES;

      Defendants.

Case No.: 1:23-cv-00001-TSK
Judge: Thomas S. Kleeh

**<u>ALVAREZ DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS
THE RELATORS' AMENDED COMPLAINT</u>**

**INTRODUCTION**

In October of 2020, Relators Joseph Seikel and Terence Seikel ("Relators") filed a complaint in the Eastern District of Pennsylvania, alleging that the named Defendants submitted fraudulent loan applications for the Paycheck Protection Program ("PPP"), in contravention of the False Claims Act ("FCA") under 31 U.S.C. § 3729 *et seq.* Relators further alleged that Defendants conspired with and among each other, as well as up to potentially fifty unknown co-conspirators, to collectively carry out their alleged fraudulent scheme against the United States Government.

After the Alvarez Defendants filed their first Motion to Dismiss in February of 2023, pointing out the numerous defects in the original complaint, Relators decided exercised their right to file an amended complaint. They understandably felt pressure to make the Amended Complaint as robust as possible in light of the recent developments of (1) the transfer of the case to this venue from the Eastern District of Pennsylvania, which they had inexplicably fought despite its obvious propriety as the locus of the allegations; and (2) the Government's recent declination to intervene – a material turning point in the case. Despite Relators' attempt to keep this action afloat (though under wraps – a maneuver this Court rejected when it denied their motion to seal the pleading), the Amended Complaint can only be described as "floating" in the sense that it is "belly-up."

Relators' Amended Complaint remains woefully insufficient for various reasons. Critically, Relators are unqualified to bring an action under the plain language of the FCA, which in and of itself necessitates dismissal. Relators still fail to plead that they have insider knowledge that would establish them as an original source of their allegations; they cannot do so, as Relators are not only outsiders, but direct business competitors. Even assuming Relators could continue with this action, the Amended Complaint should be dismissed for failure to state a claim for which relief may be granted. The key elements of the claims are only set out with generalized allegations;

none of the scant details that Relators added to the Amended Complaint buttress the central elements. As such, Relators' FCA claims do not meet the requirements of Federal Rule of Civil Procedure 9(b) to plead fraud with particularity. Finally, Relators' repeated failure to adequately plead that the defendants have engaged in a coordinated fraudulent scheme means that Relators cannot sustain an action for "false claims" as contemplated by the False Claims Act; thus, Federal Rule of Civil Procedure 12(b)(6) mandates dismissal.

For the aforementioned reasons, Relators' Amended Complaint should be dismissed with prejudice.

## BACKGROUND AND PROCEDURAL HISTORY

On March 13, 2020, President Trump declared a state of emergency due to the ongoing COVID-19 pandemic for all States, territories, and the District of Columbia. Additionally, President Trump signed into law the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") which allowed the U.S. Small Business Administration ("SBA") to guarantee 100% of 7(a) loans under a new Paycheck Protection Program ("PPP"). Section 1102(a)(36)(D) of the CARES Act explicitly aims to increase the number of small businesses who may receive emergency loans by providing an expansive definition of the "certain small businesses and organizations" who are eligible for PPP loans: "During the covered period, *in addition to small business concerns*, any business concern, nonprofit organization, veterans organization, or Tribal business concern described in section 31(b)(2)(C) shall be eligible to receive a covered loan.…"[1]

### I.     Definition of Small Business

The SBA has a series of regulations that govern what businesses are eligible for a PPP loan. An entity generally is eligible for a PPP loan if it, combined with its affiliates, is (i) a small business

---

[1] CARES Act, Pub. L. No. 116-136, § 1102(a)(36)(D) (2020) (emphasis added).

as defined in Section 3 of the Small Business Act (15 U.S.C. § 632), (ii) has 500 or fewer

employees whose principal place of residence is in the United States, or (iii) is a business that

operates in one of certain industries and meets applicable SBA employee-based size standards for

its industry.[2] The SBA has also published additional guidance through frequently asked questions.

In the Paycheck Protection Program Loans Frequently Asked Questions as of July 8, 2022

("July FAQs")[3], under Question 2:

> **Question:** Are small business concerns (as defined in section 3 of the Small
> Business Act, 15 U.S.C. 632) required to have 500 or fewer employees to be
> eligible borrowers for First Draw PPP Loans?

> **Answer:** No. Small business concerns can be eligible borrowers for First Draw PPP
> Loans even if they have more than 500 employees, as long as they satisfy the
> existing statutory and regulatory definition of a "small business concern" under
> section 3 of the Small Business Act, 15 U.S.C. 632. A business can qualify if it
> meets the SBA employee-based or revenue-based size standard corresponding to
> its primary industry. Go to www.sba.gov/size for the industry size standards.

> Additionally, a business can qualify for a First Draw PPP Loan as a small business
> concern *if it met both tests in SBA's "alternative size standard"* as of March 27,
> 2020: (1) maximum tangible net worth of the business is not more than $15 million;
> and (2) the average net income after Federal income taxes (excluding any carry-
> over losses) of the business for the two full fiscal years before the date of the
> application is not more than $5 million.

> A business that qualifies as a small business concern under section 3 of the Small
> Business Act, 15 U.S.C. 632, may truthfully attest to its eligibility for a First Draw
> PPP Loan on the Borrower Application Form, unless otherwise ineligible.

As the July FAQs state, the SBA's "alternative size standard" is a two-prong test. First, the entity,

and all its affiliated companies, cannot have a maximum tangible net worth in excess of $15

million. Second, the entity, and all its affiliated companies, cannot have an average net income

(after federal income taxes) for the two full fiscal years preceding its application that exceeds $5

---

[2] *See* Fed. Reg. Vol. 85, No. 73 (Apr. 15, 2020).
[3] *See SBA Support: FAQ for PPP Borrowers and Lenders*, SBA.GOV (July 8, 2022) (emphasis added), available at
https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (last visited May 2, 2023).

million. Crucially, this test does not require the entity, and its affiliated companies, to have 500 or fewer employees. Indeed, the FAQs state that the alternative size standard exists "additionally" to the traditional SBA definition of a "small business concern" as another, separate means by which a business can qualify for a First Draw PPP Loan.

## II.    Affiliation Rules

Under the affiliation rules for SBA loans ("SBA Affiliation Rules")[4], "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." Such control may be either affirmative (*i.e.*, a right to take action) or negative (*i.e.*, a right to prevent action). Under the SBA Affiliation Rules, there are four tests based on control that PPP applicants must consider when determining whether the applicant has any affiliates. Those tests are as follows:

1.   Affiliation based on equity ownership;

2.   Affiliation arising under stock options, convertible securities, and agreements to merge;

3.   Affiliation based on management; and

4.   Affiliation based on identity of interest.[5]

The SBA's guidance on affiliation for PPP loans points applicants toward the affiliation standards contained in the 2019 version of section 121.301(f), as discussed above.[6] In doing so, the SBA expressly limited the scope of the standard affiliation rules by focusing on only four tests for affiliation.[7] The SBA thus allowed applicants to disregard the other affiliation tests, most notably the test based on the "totality of the circumstances." The SBA's "Small Business Compliance

---

[4] 13 C.F.R. § 121.301.
[5] *See* 13 C.F.R. § 121.301; "Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program" SBA Guideline, Apr. 3, 2020.
[6] Section 1102(e) of the CARES Act permanently rescinded the SBA's February 2020 amendment to section 121.301.
[7] 13 C.F.R. § 121.301(f); "Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program" SBA Guideline, Apr. 3, 2020.

Guide: A Guide to the SBA's Size Program and Affiliation Rules" clearly states that affiliation based on the totality of the circumstances does not apply to the Business Loan, Disaster Loan, and Surety Bond Programs.[8]

### III. Procedural History

Like many small businesses nationwide, the Alvarez Defendants experienced economic hardship as a direct result of the coronavirus pandemic. In an attempt to mitigate that economic hardship, the Alvarez Defendants applied for PPP loans in the early days of the PPP.

On October 22, 2020, Relators filed their complaint under seal in the Eastern District of Pennsylvania.[9] Shortly thereafter, the Department of Justice began investigating Relators' claims. Although the communications with the Government and discovery to date have necessarily not been a part of public record, undersigned counsel can attest that the Department of Justice first reached out to the Alvarez Defendants on March 25, 2021. Furthermore, counsel can attest that the Alvarez Defendants readily cooperated with the Department of Justice, producing several explanatory memos and thousands of pages of supporting documentation. On July 26, 2022, the Eastern District of Pennsylvania ordered the United States to decide if it was going to intervene and ordered the complaint to be unsealed by August 25, 2022.[10] On August 24, 2022, the Department of Justice filed a notice stating that its "investigation has not been completed and, it is therefore unable to decide, as of the Court's deadline, whether to proceed with the action. Accordingly … it is not intervening at this time."[11] The complaint was then unsealed August 25, 2022.[12]

---

[8] *See* SBA's Small Business Compliance Guide: A Guide to the SBA's Size Program and Affiliation Rules at p. 8.
[9] ECF No. 1.
[10] *See* ECF No. 23.
[11] ECF No. 23.
[12] ECF No. 24.

On November 9, 2022, the Alvarez Defendants filed a motion to transfer this litigation to the Northern District of West Virginia.[13] Only then did Relators serve the Complaint upon the Alvarez Defendants on November 23, 2022—more than two years after they filed the Complaint.[14] The Eastern District of Pennsylvania held a hearing on the Alvarez Defendants' motion to transfer on January 4, 2023, and ruled from the bench that the matter should be transferred because it lacked ties to the jurisdiction.[15] The Alvarez Defendants filed their first motion to dismiss on February 28, 2023.[16] On March 13, 2023, Relators and all Defendants filed a Joint Stipulation with this Court allowing Relators to file an amended complaint and reserving Defendants' right to object to Relators' amendment except on the basis of untimeliness.[17] Relators moved this Court to allow them to file the Amended Complaint under seal, which this Court denied.[18] This Court also denied the Alvarez Defendants' initial motion to dismiss as moot, because of the filing of the Amended Complaint.[19] On April 12, 2023, Relators filed their Amended Complaint.[20]

On April 7, 2023, the United States notified the Court that it had decided not to intervene in the action.[21]

Despite filing the Amended Complaint, Relators to date have still not served Mark Urso, Bear Contracting, LLC, or Bear Utilities, LLC ("Bear Entities"), who are still named as Defendants in this action.[22]

---

[13] ECF No. 28.

[14] ECF No. 32.

[15] *See* ECF No. 41.

[16] ECF No. 67.

[17] *See* ECF No. 73.

[18] ECF Nos. 75, 78.

[19] ECF No. 79.

[20] ECF No. 80.

[21] The United States initially filed this Notice of Election under seal; upon the Court's denial of Relators' motion to file the Amended Complaint under seal, the United States asked that its decision be unsealed, which occurred on April 28, 2023; *see* ECF No. 76.

[22] The Alvarez Defendants understand that the Bear Entities were investigated by the Department of Justice, which discovered no malfeasance by those entities. Afterwards, the SBA forgave the Bear Entities' PPP loans. Despite this investigation, Relators named the Bear Entities as Defendants in this action and did not remove them as Defendants

## ARGUMENT

**I.      Joseph Seikel and Terence Seikel are not qualified to be relators under the FCA because of the Public Disclosure Bar.**

The False Claims Act explicitly provides for the ability of private persons—relators—to bring forth actions under the FCA on behalf of the United States Government. 31 U.S.C. § 3730(b). However, the FCA also contains limitations on who can serve as a relator. Particularly, section 3730 provides that a court shall dismiss an action or claim "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed … unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(4)(A). In order to qualify as an "original source," a relator must have either (i) voluntarily disclosed to the Government the information on which their allegations are based, prior to any public disclosure thereof; or (ii) have knowledge independent of and materially adding to the publicly disclosed allegations, and they must voluntarily provide the Government with such information before filing an FCA action. 31 U.S.C. § 3730(e)(4)(B).

Relators in the instant case attempt to argue that they have independent, material knowledge and are an original source of information. *See* Am. Compl., ¶¶ 23-24. Despite this insistence, Relators' alleged "inside information" is vague and noncommittal, and much of their Amended Complaint merely rehashes boilerplate language from the statute.

Pursuant to the latest version of the FCA, following the 2010 amendments, "the public-disclosure bar no longer requires actual knowledge of the public disclosure, but instead applies if substantially the same allegations or transactions were publicly disclosed." *U.S. ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 40 (4th Cir. 2016) (citation omitted). A public disclosure

---

in their Amended Complaint. To date, five months after serving the Alvarez Defendants—which occurred three months after the Complaint was unsealed—Relators have yet to serve the Bear Entities.

need not be an official Government disclosure to trigger the public disclosure bar. "Courts have unanimously construed the term 'public disclosure' to include websites and online articles," and "news media" to include newspapers and publicly available websites to enable the public disclosure bar to cover a broad range of material that can be easily accessed or seen by the public. *Id.* at 43, n.6; *see also Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 408 (2011). The 2010 amendments thus restrict the number of private citizens who can qualify as relators to bring an FCA action under 31 U.S.C. § 3730(b). Even if a would-be relator does not have actual knowledge of a public disclosure, if they plead substantially the same allegations or transactions that were publicly disclosed "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media," their claims will be dismissed unless they are an original source of that information. 31 U.S.C. § 3730(e)(4).

Relators mainly allege facts that can already be found from public sources. For instance, the West Virginia Secretary of State's website allows members of the public to research domestic business organizations, allowing any internet user to learn a business's office address, mailing address, members, owners, organization year, and purpose, and one can even access annual reports for a fee.[23] Similarly, ProPublica has a search engine on its website to search for PPP loan applications, and providing an organization's name will enable any internet user to learn the location of the organization, the organization's industry, the lender of the loan, the date the loan was approved, the loan amount, and the loan status (*i.e.*, whether it has been forgiven, and if so, when).[24] Additionally, Relators' allegations that Defendants are all affiliated because certain

---

[23] *WV Secretary of State – Business and Licensing – Corporations – Online Data Services*, WV.GOV (Apr. 2023), available at https://apps.sos.wv.gov/business/corporations/ (last visited May 2, 2023).

[24] *Tracking PPP: Search Every Company Approved for Federal Loans*, PROPUBLICA.ORG (Jan. 11, 2023), available at https://projects.propublica.org/coronavirus/bailouts/ (last visited May 2, 2023).

individuals are invited to attend a holiday party, and because Relators plucked and critiqued language from a published website, all come from publicly disclosed information. *See* Am. Compl., ¶¶ 129, 161. Even with over two years to investigate, Relators cannot provide any specific dates in their Amended Complaint. *See, e.g.,* Am. Compl., ¶¶ 9, 142. Relators can hardly claim to be an "original source" when their allegations only contain publicly available information.

Indeed, the lynchpin of Relators' claims is that the Defendant entities are affiliated entities, and that their composite size rendered them ineligible for PPP loans. *See* Am. Compl., ¶¶ 213-15, 219, 222, 225 (bringing all counts against "Affiliated Defendants"). At first glance, the website for Defendant Energy Transportation, LLC (a publicly available website) may appear to imply that it belongs to a group of affiliated businesses, as it emphasizes the "8760 Commitment" to provide service "24 hours a day, 7 days a week, 365 days a year" along with its "Industry Affiliates."[25] However, the word "affiliated" with respect to the SBA is a term of art with a strict legal definition, while the word choice on the Energy Transportation website could easily have been one of any number of synonyms that indicate a group of companies cooperating to serve the public, such as "associates" or "partners." *See* 13 C.F.R. § 121.301 (defining "affiliation" for the SBA). Notably, the "affiliates" listed on the Energy Transportation website include Bear Contracting, LLC, and Bear Utilities, which were already investigated by the Department of Justice and had their loans forgiven, and whom Relators *still* have chosen not to serve nor remove as named Defendants.[26]

Finally, Relators neglect to mention that they are direct competitors to the Alvarez Defendants. They are owners and members of Octane Environmental, LLC, an Ohio corporation

---

[25] *Company – Energy Transportation*, ET8760.COM, available at http://www.et8760.com/company/ (last visited May 2, 2023).
[26] *See BEAR CONTRACTING, LLC – Tracking PPP – ProPublica*, PROPUBLICA.ORG (June 1, 2021), available at https://projects.propublica.org/coronavirus/bailouts/loans/bear-contracting-llc-6366057000 (last visited May 2, 2023);
*BEAR UTLITIES, LLC – Tracking PPP – ProPublica*, PROPUBLICA.ORG (June 1, 2021), available at https://projects.propublica.org/coronavirus/bailouts/loans/bear-utilities-llc-7569627010 (last visited May 2, 2023).

with its principal office in Bridgeport, West Virginia.[27] Even reviewing the Amended Complaint in the light most favorable to Relators, it strains credulity that they can simultaneously be competitors—inherently outsiders—and "insiders who have direct knowledge." Am. Compl., ¶ 23. At this stage, Relators' allegations must be taken as true, but the omission of the objectively verifiable fact that they are business competitors diminishes the credibility of the Complaint.

**II.    Relators' Amended Complaint Lacks Substantive Facts Supporting Violation of Affiliation Tests and in the Alternative, Alleges the Wrong Size Standards under the PPP, thus Compelling Dismissal.**

Even assuming that Relators are eligible "original sources" to bring FCA claims, their Amended Complaint must nevertheless be dismissed due to its prolific legal errors demonstrating a lack of understanding about the PPP, the SBA, or the Defendants that they insist violated the False Claims Act. Relators allege that the Alvarez Defendants submitted false PPP loan applications to the Government without providing facts to support the affiliation of the Alvarez Defendants with the Henderson Defendants, and Relators misinterpret and incorrectly analyze the alternative size test.

**A.    Relators Fail to Plead Sufficient Facts Supporting Allegations of Affiliation.**

Instead of using the proper test to plead affiliation among all Defendants, Relators instead rely upon the "totality of the circumstances" test. Am. Compl., ¶ 60. While the SBA has used the totality of the circumstances test in other circumstances, recent guidance has emphasized the affiliation standards in the 2019 version of 13 C.F.R. § 121.301, redirecting the focus to four specific affiliation tests and away from other possible affiliation tests, including the "totality of the circumstances" test. *See Background and Procedural History Section II, supra.* As discussed

---

[27] *WV Secretary of State Business Entity Search*, WV.GOV (Apr. 2023), available at https://apps.wv.gov/SOS/BusinessEntitySearch/Details.aspx?Id=5FhHg7atDnCHTDl9nmvkPQ==&Search=jSe9JsH%2f91xFeDRutIDQmw%3d%3d&Page=0 (last visited May 2, 2023).

above, the only four tests that can determine whether entities are "affiliated" for the purposes of the PPP, are as follows:

1.   Affiliation based on equity ownership;

2.   Affiliation arising under stock options, convertible securities, and agreements to merge;

3.   Affiliation based on management; and

4.   Affiliation based on identity of interest.[28]

Even when taking the allegations in Relators' Amended Complaint as true, the facts they assert bear no relation to these four tests and therefore cannot support any FCA claims. For instance, Relators allege that Defendants are affiliated because of "how the entities were originally formed: by the same individuals, and at many of the same addresses." Am. Compl., ¶ 74. However, the issue of how the entities were originally formed is not a relevant consideration when all Defendant entities were formed prior to 2020.[29] Likewise, a shared mailing address does not support any of the four pertinent tests; sharing a physical mailing location does not indicate any sort of affiliation by equity ownership, stock options, securities, mergers, management, or identity of interest.

Later in the Amended Complaint, Relators insist that all Defendants are affiliated because David Alvarez "utilizes the '8760 company' motto as part of a marketing slogan to sell … the Affiliated Defendants' ability to provide services to his clients 24 hours a day, 365 days a year." Am. Compl., ¶ 74. This slogan does nothing to point towards any of the four tests for affiliation. Cross-marketing strategies do not indicate affiliated ownership, equity, management, or identity of interest, nor does the occasional sharing of resources or information technology services. *See*

---

[28] *See* 13 C.F.R. § 121.301; "Affiliation Rules Applicable to U.S. Small Business Administration Paycheck Protection Program" SBA Guideline, Apr. 3, 2020.

[29] Defendant Applied Construction Solutions, Inc. was founded in March 1981; Defendant Energy Transportation, LLC was founded in April 2013; Defendant Energy Resource Group, LLC was founded in December 2017; and Defendant ET360, LLC was founded in March 2016.

*id.*, ¶¶ 117, 154-57. Companies operating in the same or similar locations may have limited options for suppliers of trucks, equipment yards, IT providers, or office space at reasonable prices; the decision to cooperate and reduce expenses for all parties involved shows professionalism, not affiliation. Finally, inviting employees from local companies in the same industry to a holiday party, *id.*, ¶ 161, merely points to cordial management—not affiliated management—of the respective businesses.

### B.   Relators Utilize the Incorrect Test for Size Standards Under the PPP.

Relators assert that "[w]ith limited exceptions not applicable here, only small businesses with 500 or fewer employees are eligible borrowers in the PPP." *Id.*, ¶ 4. Relators rely almost entirely upon the size standards set by the North American Industry Classification System ("NAICS") code. *Id.*, ¶¶ 52-55, 79, 83, 87, 92, 96, 100. The NAICS codes are relevant for a traditional SBA size analysis, but the PPP specifically implemented an alternative size test so that a greater number of struggling small businesses across the country could receive aid. Since the first version of the PPP FAQs was published in April 2020—months before Relators filed their initial complaint—and through the latest version of the PPP FAQs that was published in July 2022—nine months before Relators filed their Amended Complaint, the FAQs have explained that a business can qualify for a PPP loan as a small business concern under the SBA's alternative size standard if it met certain requirements as of March 27, 2020.[30] To qualify under the alternative size standard, a business, and all its affiliated companies, need only meet the following two requirements: (1) have a maximum tangible net worth not exceeding $15 million; and (2) the average net income after federal income taxes (excluding any carry-over losses) of the business

---

[30] *SBA Support: FAQ for PPP Borrowers and Lenders*, SBA.GOV (July 8, 2022), available at https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (last visited May 2, 2023); *SBA Support: FAQ for PPP Borrowers and Lenders*, SBA.GOV (April 6, 2020), available at https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (last visited May 2, 2023).

for the two fiscal years before the date of the application must not exceed $5 million.[31] For the express purpose of applying for PPP loans, businesses meeting these two requirements can qualify as a "small business concern" that is eligible for relief under section 3 of the Small Business Act, 15 U.S.C. § 632.

Even when taking Relators' allegations as true and operating under the allegations that the Alvarez Defendants are affiliated, Relators' failure to properly consider the alternative size test further demonstrates their lack of insider knowledge, as well as an inadequate grasp on the workings of the PPP as a whole. Relators assert that the "Affiliated Defendants" do not qualify as small businesses under the alternative size test, comparing their estimated sizes to the NAICS size standards for small businesses in their industries. *See* Am. Compl., ¶¶ 174-76. However, this "analysis" is a red herring. The NAICS size standards are irrelevant under the alternative size test; as the name suggests, the *alternative* size test provides an *alternative* (*i.e.*, affording a *choice* of two or more things, propositions, or courses of action)[32] means of qualifying as a "small business concern" for the exclusive purpose of obtaining PPP loans. The only relevant considerations are tangible net worth and average net income after taxes—not NAICS standards, nor the number of employees. Relators' attempt at analysis that blatantly conflates the two tests shows that even with more than two years to investigate and understand their claims, they have a flawed understanding of the PPP that is misleading at best and deceptive at worst. Furthermore, viewing the Amended Complaint in the light most favorable to Relators, their "estimates" and "approximations" once again demonstrate that they lack concrete knowledge of insiders who are qualified to serve as relators in the first place; this is to be expected, as the Seikels are business competitors and thus

---

[31] *Id.*

[32] *Alternative Definition & Meaning | Dictionary.com*, DICTIONARY.COM (2023), available at https://www.dictionary.com/browse/alternative (last visited May 2, 2023) (emphasis added).

inherently cannot be insiders. Any facts and figures that Relators included in their Amended Complaint were derived from public disclosures, and the FCA does not contemplate allowing would-be relators to "instead of plowing new ground, attempt[] to free-ride by merely reiterating previously disclosed fraudulent acts." *Beauchamp*, 816 F.3d at 43.

## III.   The Amended Complaint Fails to State a Valid Claim for which Relief may be Granted; as such, this Case should be Dismissed.

Taking all the allegations in Relators' Amended Complaint—including the bare assertion that they have specialized, insider knowledge that renders them able to serve as relators in the first place—as true, the Amended Complaint must nonetheless be dismissed because it fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

### A.   The Complaint does not sufficiently plead a conspiracy to violate the FCA.

Relators' sole claim centers on the alleged existence of a "scheme [that] involved one or more plans with other entities to further the overall fraudulent representations of the Affiliated Defendants' size through a pattern and practice of false and misleading representations" and that the "Affiliated Defendants…including Defendants Alvarez and Henderson, directed their employees to gain the agreement of each of these entities to conceal the affiliation among the Affiliated Defendants." Am. Compl., ¶¶ 180-81.

However, Relators fail to state which employees were a part of this alleged conspiracy and they fail to identify which "other entities" were involved in the conspiracy. Instead, Relators provide a long list of entities with which Defendant Alvarez is associated, which can be found through a search on the West Virginia Secretary of State's public website.

The Alvarez Defendants acknowledge that the Court must view the facts contained in the Amended Complaint as true, but even these facts do not show a "pattern and practice of false and misleading representations." According to Relators, in late 2017 or early 2018, Defendant

Henderson made a representation to ETC that Defendant Alvarez was an owner of ERG. Am.

Compl., ¶ 106. However, according to Relators, Defendant Alvarez was in fact an owner of ERG

at that time, and therefore this was not in fact a false or misleading statement. *See* Am. Compl., ¶

4. Relators cannot simultaneously claim that the Alvarez Defendants made "false and misleading

representations" and then refer to factually true statements in support of such claim.

Additionally, Relators cite snippets of the deposition of Defendant Alvarez in a litigation

between Octane—Relators' business—and former employees of Octane. *See* Am. Compl., ¶¶ 108-

9, 114. The complete exchange of the deposition which Relators cite is below.[33]

> Q: With that being said, during this meeting, when you met Terence Seikel, at any
> point in time, did you tell him that you would like to talk to him because you might
> be interested in purchasing Octane Environmental?
> A. I don't know if it would be stated exactly like that. But most everybody that
> comes into a restaurant in the evening and knows you're in the oil and gas business
> wants to boast about what they're doing and you're doing. And at the end of the
> day, at that point in time, I don't recall the exact discussions, but it could've
> happened, whether he was talking to me or vice versa.
> Q. Okay. So do you have any specific recollection – and obviously, it didn't have
> to be these exact words. But do you have any recollection of telling Mr. Seikel that
> you might be interested in purchased [sic] Octane?
> A. I think that could've happened. I mean, at the end of the day, we – we're in that
> space and I believe – and I'm not sure – we might have been buying containment
> from Octane.
> Q. Are you talking about ASTs, aboveground storage tanks?
> A. I'm just talking about containments for smaller – like a frac tank or containments
> related to – we call them bird baths. You put them under equipment when it's
> running in case there's oil dripping or something, but I believe that we bought some
> from him, but there again –
> Q. You said we bought some. I assume that's one of your companies?
> A. Either Applied Construction or maybe Energy Transportation.
> Q. Okay. I think I may have already asked you this. But do you know how many
> times you have actually talked to Terence Seikel?
> A. I think I could probably count them on less than one hand.
> Q. Okay. So two, maybe three times?
> A. Less than five.
> Q. Okay. Aside from possibly discussing a sale of Octane or just the oil and gas
> industry, do you remember anything else about the conversations that you had with
> Terence Seikel?

---

[33] *See* ECF No. 28, Kipnis Decl., ¶ 9, Ex. F.

A. There again, you're say it's back in '17, I'd have to – to be honest with you, if Terry or Terence walked in the room, you'd have to point him out to me right now. I can't get a recollection of his face.

…

Q. In April and May of 2018, what was your role with Energy Resource Group?

A. I have no idea. Because I didn't own it, and I don't believe that – mostly what I recall is I was renting employees off of Energy Resource Group or subcontracting work to them.

Q. Do you remember when that was?

A. Not specifically.

…

Q. And again, [Amanda Hunt] just said, he just told them that he supported work in West Virginia and if that they wanted to come work for him he was just explaining that he had jobs available for them if they wanted to come work there. So does that sound like something that you might have said?

A. In a generalized form, you know, I like employing people in West Virginia and I do care about West Virginia. I don't believe that I was hiring those people. I think [Energy Resource Group] was hiring them, and to the tense [sic] that come work is I had projects that I was, you know, subcontracting to [Energy Resource Group] – and not really subcontracting, providing labor on.

Q. Okay, so you weren't offering them a job at [Energy Resource Group]; is that what you're saying?

A. No. Because I didn't own [Energy Resource Group].

Q. Okay.

A. But I was more supporting my CFO, who's – I don't know if you know – is handicapped and you know, just being positive to whatever his decision was there to, you know, start a company, which I believe he started earlier to this date, but I don't know the exact dates.

Q. You said you were supporting your CFO. You're talking about Jason [Henderson], correct?

A. Correct.

Q. Why did you say your CFO?

A. Well, so he is the CFO of Energy Transportation.

…

Q. Okay that's fair. So you may have—and I know you had a lot of conversations. But you may have talked to [Rick Richards] about this case when the case was filed? I think that's what you said.

A. I did have a conversation with him maybe a few weeks or so agon. I said, interesting enough, Octane hired a manager and – a couple of managers for me; do you think I should sue them? But that was about the extent of it in a – in a joking way, and just because I don't know. I thought it was humorous about the same time that I'm getting asked to be deposed, but that's all right.

Q. Which managers went from your company to Octane?

A. Travis [Knotts] and Ernie [Rush] and they really weren't even from my company, but they were from the support company that I use. But it was just interesting.

16

These deposition statements do not show any conspiracy to violate the FCA because Defendant Alvarez was unaware that while Relators were listening to his sworn testimony in a case not at all related to the PPP, they had filed their Complaint against him under seal in Federal Court in Pennsylvania. Nor did Relators choose to amend the complaint with Defendant Alvarez' October 27, 2020, deposition statements until more than two years later. Even after adding these excerpts from the October 27, 2020, deposition in the Amended Complaint, Relators have failed to plead specific, particular facts which indicate a meeting or discussion took place in which Defendants hatched a plan to defraud the Federal Government by lying on their respective PPP applications.

### B.    The Complaint does not sufficiently plead a violation of the FCA.

As the name suggests, the "False Claims Act" inherently necessitates a "false" claim, but truth or falsehood is not the only component of an FCA case. In an FCA action for submitting false claims, a relator must plead the following elements:

(a)  The defendant submitted, or caused to be submitted, a claim for payment or approval;

(b)  The claim for payment or approval was false;

(c)  The falsity was material to the government; and

(d)  The defendant acted with the required scienter, meaning the defendant either:

(i)  Knew that the claim was false;

(ii) Acted in deliberate ignorance of the truth or falsity of the relevant claim; or

(iii) Acted in reckless disregard of the truth or falsity of the relevant claim.

*See* 31 U.S.C. §§ 3729(a)(1)(A), 3729(b)(1); *see also Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 182 (2016). The first element is commonly referred to as the "presentment" element, as it requires that a defendant presented—whether by submitting directly or causing to be

submitted—a claim for payment or approval. *See United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013). These elements are conjunctive, meaning that all elements must be met for a defendant to be liable under the FCA.

Relators have sufficiently pleaded the first element, that the Alvarez Defendants submitted a claim for payment or approval: the PPP applications. However, Relators fail to sufficiently allege the other three elements—all four of which are required to find liability under the FCA—and therefore their Amended Complaint must be dismissed for failure to state a claim for which relief may be granted.

### 1. Relators' Misinterpretation of the Alternative Size Test Results in an Inadequate Allegation of Falsehood.

The second element that a relator must establish in an FCA action for submission of false claims is that the claims submitted were false. Relators belabor their Amended Complaint with allegations that the Alvarez Defendants would not qualify as small businesses because as "affiliates," they have more than 500 employees each. *See* Am. Compl., ¶¶ 80, 84, 88, 93, 97, 101. Relators allege all "Affiliated Defendants" had a total of 764 employees, but also that none of the entities independently had more than 226 employees. *Id.*

Even when taking Relators' allegations of affiliation as true, which would render not only the Alvarez Defendants but all "Affiliated Defendants" as having over 700 employees, the Amended Complaint still fails to properly plead that the Alvarez Defendants' statements were false. While Relators make numerous references to NAICS codes and the SBA's standard regulations under 13 C.F.R. § 121.301, they fail to properly consider whether the Alvarez Defendants qualify as "small business concerns" under the alternative size standard. Without a proper assessment of this alternate test, Relators have not adequately alleged that the Alvarez

Defendants' statements were *false*—as meeting the alternative size test means that the Alvarez Defendants' statements and representations that they were eligible for PPP loans were *true*.

As explained in further detail above, the alternative size test provides an additional means by which a business entity may qualify as a "small business concern" that is eligible to receive relief under the Paycheck Protection Program. *See Argument Section II.B., supra.* A business entity does not need to meet both the traditional SBA test and the alternative size test to apply for PPP loans. As the word "alternative" implies and the FAQs confirm, fulfilling the requirements of either one test *or* the other is sufficient.[34]

The falsity of the statements presented to the Government is an essential element of an FCA claim; indeed, a defendant cannot sensibly be held liable under the *False* Claims Act for a *true* claim for payment. Relators can devote paragraphs and pages to pleading that the Alvarez Defendants do not meet the NAICS size standards, and at this stage those allegations must be taken as true. However, their failure to properly consider and assess the Alvarez Defendants' ability to qualify as a "small business concern" under the alternative size standard renders the Amended Complaint incomplete and insufficient. The SBA only looks at two factors to determine whether a PPP applicant qualifies as a small business concern: (1) its maximum tangible net worth does not exceed $15 million; and (2) its average net income after Federal income taxes (excluding carry-over losses) for the two full fiscal years before the date of the application does not exceed $5 million.[35] Relators provide their "estimates" of the assets and workforce of the "Affiliated Defendants" and from there reach the conclusion that their maximum tangible net worth exceeded $15 million. Am. Compl., ¶¶ 174-76. These "estimates" are not based on insider knowledge—as

---

[34] *See SBA Support: FAQ for PPP Borrowers and Lenders*, SBA.GOV (July 8, 2022) (emphasis added), available at https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (last visited May 2, 2023).
[35] *Id.*

they cannot be, given that Relators are business competitors—but rather drawn from assumptions based on the NAICS Codes under which Defendants are classified. *Id.* The NAICS Code size standards, while pertinent for the traditional SBA regulations under 13 C.F.R. § 121.301, do not factor into the equation for the alternative size standard. The alternative size standard is based on the actual net worth and actual average net income of an applicant, not "estimates" or generalized standards for different industries.

Relators may have truncated their analysis due to their belief that the alternative size test does not apply to the Alvarez Defendants. *See* Am. Compl., ¶ 176. Their repeated insistence that the alternative size test does not apply comes from the fact that the SBA first published the PPP FAQs on April 6, 2020, which was after the Alvarez Defendants had already submitted their PPP applications. *Id.*, ¶ 172-73. Relators overlook that the April 6, 2020, FAQs ("Initial FAQs")[36] specifically state the following:

> Additionally, a business can qualify for a First Draw PPP Loan as a small business concern if it met both tests in SBA's "alternative size standard" *as of March 27, 2020*: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

The Initial FAQs therefore make clear that the alternative size standard applies retroactively, so that a PPP applicant needed to meet both tests as of March 27, 2020—*before* the Alvarez Defendants submitted their PPP applications. The most recent version of the FAQs, the July FAQs, still contain this important language.[37] Therefore, Relators cannot even argue that the most recent

---

[36] *SBA Support: FAQ for PPP Borrowers and Lenders*, SBA.GOV (April 6, 2020) (emphasis added), available at https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (last visited May 2, 2023).
[37] *See SBA Support: FAQ for PPP Borrowers and Lenders*, SBA.GOV (July 8, 2022), available at https://www.sba.gov/document/support-faq-ppp-borrowers-lenders (last visited May 2, 2023).

version of the FAQs prior to the filing of the Amended Complaint changed the test for First Draw PPP loans; it remains the same as it has been for over two years.

Relators not only fail to acknowledge that the alternative size standard applies—which the text of the FAQs states plainly—but their minimalist attempt at analysis does not use the correct standards or measurements. By conflating the traditional SBA test and the PPP-specific alternative size test, Relators fail to allege that the alternative size standard has not been met. As such, Relators do not adequately allege that the Alvarez Defendants' PPP applications contained false statements, and therefore the Amended Complaint fails to allege an FCA violation.

### 2.      Relators Wholly Fail to Allege the Element of Materiality.

Relators make no allegations of the third element, that the allegedly false statements were material to the Government. The only mention of materiality is boilerplate language from the statute: "[T]he Affiliated Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims[.]" Am. Compl., ¶ 208. The Supreme Court has held that a misrepresentation "must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 192. A misrepresentation is not "material" solely because the Government has designated compliance with a certain statutory, regulatory, or contractual requirement as a condition of funding; such a provision is relevant but not dispositive. *Id.* at 178. In determining whether a misrepresentation is material, courts consider whether: (a) the government expressly designated the provision as a condition of payment; and (b) evidence exists that the defendant knew the Government consistently refuses to pay claims based on noncompliance with the particular statutory, regulatory, or contractual requirement. *Id.* at 194-95. The Supreme Court has specifically emphasized that "the False Claims Act is not a means of imposing treble damages and other penalties for insignificant regulatory or contractual

violations." *Id.* at 196. Relators have failed to plead that the allegedly false statements the Alvarez Defendants submitted to the Government were material to the Government's decision to grant the PPP loan applications. The implication that falsehood in any form is "material" is not only rejected by the Supreme Court, but also by the Fourth Circuit's own pleading requirements. The Fourth Circuit has held that a relator must allege "both materiality *and* a 'false statement or fraudulent course of conduct' as distinct elements of an FCA claim." *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 702 (4th Cir. 2014) (emphasis in original). Relators have utterly failed to plead this element, and therefore the Amended Complaint fails to adequately allege that the Alvarez Defendants violated the FCA.

### 3. Relators Do Not Sufficiently Allege that the Alvarez Defendants Acted with the Requisite Scienter.

The Amended Complaint is likewise deficient in its inability to allege that the Alvarez Defendants had the necessary level of scienter to violate the FCA. The FCA itself defines "knowing" and "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information[.]"[38] 31 U.S.C. § 3729(b)(1). Relators acknowledge this standard in paragraph 72 of the Amended Complaint, where they provide the statutory definitions in the FCA. Nonetheless, Relators merely plead that "Defendants knew, or at the very least, should have known, that they were affiliated." Am. Compl., ¶ 64. Having directly quoted the statute, Relators—to use their own language—*should have known* that "should have known" is not sufficient to meet the FCA's standard for knowledge. Relators therefore did not meet the higher standard of actual knowledge, nor the other possible definitions of deliberate

---

[38] Alvarez Defendants bring this lower standard to the Court's attention. However, Relators in their Complaint plead the higher standard, which they cannot meet, nor can they meet the lower standard which actually applies here.

ignorance or reckless disregard. 31 U.S.C. §§ 3729(a)(1)(A), 3729(b)(1). Rather than pleading specific facts to show actual knowledge of affiliation, Relators try to allege that the Alvarez Defendants had actual knowledge through implication and throwing vaguely related factual allegations together, in what is best described as a "totality of the circumstances" approach. "Defendant Alvarez is the Interim Chairman of MVB Financial Corp. . . . Alvarez also serves on MVB's bank loan approval committee." Am. Compl., ¶ 64. Unable to plead that Alvarez had actual knowledge, Relators instead try to insinuate that he knew the requirements for an SBA emergency loan program by virtue of his position.

Even taking Relators' allegations as true that the Alvarez Defendants did somehow submit false claims to the Government for payment, if they did not do so "knowingly," then no FCA action against them can stand. *See U.S. ex rel. Owens v. First Kuwaiti General Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) ("Congress, however, has made plain 'its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.'" (citations omitted)).

## CONCLUSION

For the reasons described above, the Alvarez Defendants respectfully request that this Court dismiss the claims asserted in the Amended Complaint with prejudice, as Relators have failed to plead a claim for which relief can be granted under the requirements of Rule 12(b)(6) of the Federal Rules of Civil Procedure; or in the alternative, for lack of jurisdiction over this action as relators are not qualified to bring this *qui tam* matter.

Dated: May 4, 2023

DAVID B. ALVAREZ; APPLIED CONSTRUCTION SOLUTIONS, INC.; AND ENERGY TRANSPORTATION, LLC

By Counsel

*/s/ Marc R. Weintraub*_____
Marc R. Weintraub (WVSB # 8055)
Bailey & Glasser LLP
360 Central Avenue, Suite 1450
St. Petersburg, FL  33701
Telephone:  727.894.6745
Facsimile:  727.894.2649
Email:  mweintraub@baileyglasser.com

Alexandra L. Serber (*admitted pro hac vice*)
Bailey & Glasser LLP
1055 Thomas Jefferson St, Suite 540
Washington, DC  20007
Telephone:  202.463.2101
Facsimile:  202.463.2103
Email:  aserber@baileyglasser.com

Patricia M. Kipnis (WVSB # 12896)
Bailey & Glasser LLP
162 Locust Street
Philadelphia, PA  19103
Telephone:  215.274.9420
Facsimile:  202.463.2103
Email:  pkipnis@baileyglasser.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of May, 2023, the foregoing was electronically filed

and served through the Court's CM/ECF system to counsel of record.

<i>/s/ Marc R. Weintraub</i>_____<br>Marc R. Weintraub (WVSB # 8055)