**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. JOSEPH SEIKEL and TERENCE SEIKEL,**<br><br>    **Plaintiffs-Relators,**<br><br>v.<br><br>**DAVID B. ALVAREZ, APPLIED CONSTRUCTION SOLUTIONS, INC., ENERGY TRANSPORTATION LLC, ENERGY RESOURCE GROUP, LLC, ET360, LLC, BEAR CONTRACTING, LLC, BEAR UTILITIES, LLC, JASON P. HENDERSON, and JOHN DOES NOS., 1-50, FICTITIOUS NAMES,**<br><br>    **Defendants.** | **Civ. Action No. 1:23-cv-01** |

**RELATORS' BRIEF IN OPPOSITION TO
TO DEFENDANTS' MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................................................. iii

INTRODUCTION ................................................................................................................ 1

PRELIMINARY STATEMENT ........................................................................................... 1

LEGAL STANDARD ........................................................................................................... 3

ARGUMENT ........................................................................................................................ 4

I.     The Public Disclosure Bar Does Not Apply To This Case.......................................... 4

   A.   The Allegations and Transactions on Which Relators' Lawsuit Are Grounded Were Not
   Publicly Disclosed. .......................................................................................................... 5

   B.   Even If There Were a Public Disclosure, Relators Are Original Sources ..................... 8

      1.   Relators Have Direct and Independent Knowledge of the Affiliated Defendants'
      Fraud ............................................................................................................................. 9

      2.   The Affiliated Defendants Invent Two Public Disclosure Tests Not Found in the FCA
      or Recognized By Any Court .................................................................................... 13

II.    Relators' Amended Complaint Plausibly Alleges Violations of the FCA ................. 15

   A.   Relators' Amended Complaint Plausibly Alleges that the Affiliated Defendants Made
   False Statements ............................................................................................................. 15

      1.   Defendants Manufacture a Dispute About the Tests for Affiliation ...................... 18

      2.   The Alternative Size Standard Does Not Retroactively Apply to Defendants' False
      Certifications .............................................................................................................. 19

      3.   Even if the Alternative Size Standard Could Excuse the Affiliated Defendants' False
      Certifications, Relators Have Plausibly Alleged the Defendants Do Not Meet the
      Alternative Size Test .................................................................................................. 22

   B.   Relators Plausibly Allege that the Affiliated Defendants' False Statements Were
   Material .......................................................................................................................... 23

   C.   Relators' Amended Complaint Plausibly Alleges that the Affiliated Defendants
   Knowingly Made False Statements. .............................................................................. 26

   D.   Relators' Amended Complaint Plausibly Alleges that the Affiliated Defendants
   Conspired to Commit Violations of the FCA. ............................................................... 30

III.   Relators' Amended Complaint Alleges Fraud with Particularity Sufficient to Satisfy Fed. R. Civ. P. 9(b)..................................................................................................................... 32

IV.    If the Court Grants Defendants' Motions, It Should Allow Leave to Amend.................. 35

CONCLUSION.................................................................................................................. 35

CERTIFICATE OF SERVICE ......................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Baldwin v. City of Greensboro*,
   714 F.3d 828 (4th Cir. 2013) ....................................................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................................3

*Citynet, LLC on behalf of the U.S. v. Frontier W.Va., Inc.*,
   Civil Action No. 2:14-15947, 2018 WL 1582527 (S.D. W. Va. Mar. 30, 2018) ...............6, 30

*Doe v. Gormley*,
   No. CV ADC-15-2183, 2016 WL 4400301 (D. Md. Aug. 17, 2016)........................................8

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir. 1999) ....................................................................................4

*Erickson v. Pardus*,
   551 U.S. 81 (2007)....................................................................................................3

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
   559 U.S. 280 (2010)..............................................................................................21, 22

*Harrison v. United States Postal Serv.*,
   840 F.2d 1149 (4th Cir. 1988) ..................................................................................4

*Harrison v. Westinghouse Savannah River Co.*,
   176 F.3d 776 (4th Cir. 1999) ....................................................................................15

*Hughes Aircraft Co. v. U.S. ex rel. Schumer*,
   520 U.S. 939 (1997)..................................................................................................20

*Ibarra v. United States*,
   120 F.3d 472 (4th Cir. 1997) ..................................................................3, 5, 18, 28

*Kungys v. United States*,
   485 U.S. 759 (1988)..................................................................................................24

*Landgraf v. USI Film Products*,
   511 U.S. 244 (1994)..................................................................................................20

*Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ....................................................................................35

*Neder v. United States*,
   527 U.S. 1 (1999)..........................................................................................................24

*Ostrzenski v. Seigel*,
   177 F.3d 245 (4th Cir. 1999) ......................................................................................35

*Presley v. City of Charlottesville*,
   464 F.3d 480 (4th Cir. 2006) ........................................................................................3

*Smith v. Clark/Smoot/Russell*,
   796 F.3d 424 (4th Cir. 2015) ......................................................................................34

*U.S. ex rel. Baltazar v. Warden*,
   635 F.3d 866 (7th Cir. 2011) ........................................................................................7

*U.S. ex rel. Beauchamp v. Academi Training Ctr.*,
   816 F.3d 37 (4th Cir. 2016) ...............................................................................4, 5, 6

*U.S. ex rel. Black v. Health & Hosp. Corp. of Marion Cnty.*,
   494 F. App'x 285 (4th Cir. 2012) ............................................................................7, 21

*U.S. ex rel. Bunk v. Gov't Logistics N.V.*,
   842 F.3d 261 (4th Cir. 2016) ..................................................................................32, 34

*U.S. ex rel. Carlisle v. Pacific Ambulance et al.*,
   No 3:09-cv-02628 (S.D. Cal. 2009)............................................................................14

*U.S. ex rel. Devarapally v. Ferncreek Cardiology, P.A.*,
   No. 5:17-CV-616-FL, 2023 WL 2333872 (E.D.N.C. Mar. 2, 2023)....................................23

*U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*,
   402 F. Supp. 3d 162 (D. Md. 2019)......................................................................23, 26

*U.S. ex rel. Godfrey v. KBR, Inc.*,
   360 F. App'x 407 (4th Cir. 2010)................................................................................30

*U.S. ex rel. Harman v. Trinity Indus. Inc.*,
   No. 2:12-cv-00089 (E.D. Tex.)....................................................................................14

*U.S. ex rel. Howard v. Caddell Constr. Co., Inc.*,
   No. 7:11-CV-270-H, 2016 WL 11786600 (E.D.N.C. Feb. 29, 2016) ....................................25

*U.S. ex rel. Jones v. Concerted Care Grp.*,
   No. CV RDB-16-3056, 2022 WL 861396 (D. Md. Mar. 23, 2022) ................................25, 33

*U.S. ex rel. Lowery v. All Medicines, Inc.*,
   No. 7:17-CV-128-FL, 2021 WL 1405960 (E.D.N.C. Apr. 14, 2021) ....................4, 23, 26, 31

*U.S. ex rel. Maharaj v. Est. of Zimmerman*,
    No. DLB-18-2998, 2020 WL 4501464 (D. Md. Aug. 5, 2020)........................................23, 27

*U.S. ex rel. Mateski v. Raytheon Co.*,
    816 F.3d 565 (9th Cir. 2016) ....................................................................................8

*U.S. ex rel. McLain v. KBR, Inc.*,
    No. 1:08-CV-499 GBL/TCB, 2013 WL 710900 (E.D. Va. Feb. 27, 2013)............................3

*U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*,
    912 F.3d 731, 735 (4th Cir. 2019) ..............................................................................26

*U.S. ex rel. Outlaw v. Compassionate Care Hospice Grp., Inc.*,
    No. 3:18-CV-00914-JFA, 2019 WL 10893989 (D.S.C. Sept. 3, 2019)...................................6

*U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*,
    612 F.3d 724 (4th Cir. 2010) ....................................................................................15

*U.S. ex rel. Rector v. Bon Secours Richmond Health Corp.*,
    No. 3:11-CV-38, 2014 WL 1493568 (E.D. Va. Apr. 14, 2014) ..............................................35

*U.S. ex rel. Sanofi-Aventis US LLC v. Mylan Inc., et al.*,
    Civil Action No. 16-CV-11572 (D. Mass.).....................................................................13

*U.S. ex rel. Saunders v. Unisys Corp.*,
    No. 1:12-CV-00379 GBL, 2014 WL 1165869 (E.D. Va. Mar. 21, 2014)................................6

*U.S. ex rel. Savage et al. v. CH2M Plateau Remediation Co. et al.*,
    Case No. 4:14-cv-05002 (E.D. Wash.) ...........................................................................14

*U.S. ex rel. Sheldon v. Allergan Sales, LLC*,
    49 F.4th 873 (4th Cir. 2022) ....................................................................................29

*U.S. ex rel. Villafane v. Sollinger*,
    457 F. Supp. 2d 743 (W.D. Ky. 2006) .........................................................................6

*U.S. ex rel. Vitale v. MiMedx Grp., Inc.*,
    381 F. Supp. 3d 647 (D.S.C. 2019)...........................................................................6

*United States v. Berkeley Heartlab, Inc.*,
    225 F. Supp. 3d 487 (D.S.C. 2016)........................................................................31, 32

*United States v. Gwinn*,
    No. CIVA 5:06-CV-00267, 2008 WL 867927 (S.D. W. Va. Mar. 31, 2008) .......................27

*United States v. Savannah River Nuclear Sols., LLC*,
    No. 1:16-CV-00825-JMC, 2016 WL 7104823 (D.S.C. Dec. 6, 2016) ...................................23

*United States v. Triple Canopy, Inc.*,
    857 F.3d 174 (4th Cir. 2017) ..................................................24

*United States ex rel. Schutte v. SuperValu Inc*,
    No. 21-1326, 598 U.S. _____, slip op. (2023) ..........................29

*United States v. Academi Training Ctr., Inc.*,
    220 F. Supp. 3d 676 (E.D. Va. 2016) ......................................25

*United States v. Meridian Senior Living, LLC*,
    No. 5:16-CV-410-BO, 2018 WL 1463347 (E.D.N.C. Mar. 23, 2018) ................6, 8

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
    579 U.S. 176 (2016)...........................................................24, 26

**Federal Statutes**

31 U.S.C. § 3729.................................................................24, 26, 30

31 U.S.C. § 3730...................................................................1, 4

CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020)..................22

**Rules**

Fed. R. Civ. P. 8(a) ..................................................................3

Fed. R. Civ. P. 9(b) ............................................................. *passim*

Fed. R. Civ. P. 12(b) ........................................................... *passim*

**Regulations**

13 C.F.R. 121.201 ....................................................................25

13 C.F.R. § 121.103 ..............................................................16, 17

**Other Authorities**

5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
    1298 (4th ed. 2008)...........................................................33

*About the CARES Act and the Consolidated Appropriations Act,* U.S. Dep't
    Treasury, https://home.treasury.gov/policy-issues/coronavirus/about-the-
    cares-act ......................................................................34

*Mylan Agrees to Pay $465 Million to Resolve False Claims Act Liability for Underpaying EpiPen Rebates*, U.S. Dep't Just. (Aug. 17, 2017), https://www.justice.gov/opa/pr/mylan-agrees-pay-465-million-resolve-false-claims-act-liability-underpaying-epipen-rebates ....................................................................14

*SBA Announces Opening of Paycheck Protection Program Direct Forgiveness Portal*, U.S. Small Bus. Admin. (July 28, 2021), https://www.sba.gov/article/2021/jul/28/sba-announces-opening-paycheck-protection-program-direct-forgiveness-portal............................................................................5

*Paycheck Protection Program Loans: Frequently Asked Questions (FAQs)*, U.S. Small Bus. Admin. 1, 2 (July 8, 2022), https://www.sba.gov/sites/sbagov/files/2022-07/FAQ%20PPP%20for%20Borrowers%20and%20Lenders%20Questions%201-71%20V12%20%28FINAL%207-8-22%29-508.pdf; ........................................................21

*First Draw PPP loan*, U.S. Small Bus. Admin. (May 24, 2023), https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan....................................................34

## INTRODUCTION

By and through their undersigned counsel, Relators Terence Seikel and Joseph Seikel ("Relators") respectfully submit this memorandum of points and authorities in opposition to the motions to dismiss filed by Defendants David B. Alvarez, Applied Construction Solutions, Inc., Energy Transportation, LLC (the "Alvarez Defendants") and Defendants Jason P. Henderson, Energy Resource Group, LLC, ET360 (the "Henderson Defendants") (collectively, "Defendants" or "Affiliated Defendants"), under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), *see* ECF 89, 88. For the reasons stated herein, the Affiliated Defendants' Motions have no merit and should be denied in their entirety.

## PRELIMINARY STATEMENT

On October 22, 2020, Relators filed a Complaint under seal in the Eastern District of Pennsylvania, alleging causes of action under the federal False Claims Act ("FCA") against the Affiliated Defendants. ECF 1. The Eastern District of Pennsylvania transferred the action to the Northern District of West Virginia on January 4, 2023. ECF 41. On February 28, 2023, the Alvarez Defendants and Henderson Defendants filed Motions to Dismiss. ECF 65, 67.

On March 14, 2023, the Court entered the Parties' Joint Stipulation, which extended Relators' time to file an Amended Complaint. ECF 74. On April 4, 2023, Relators filed their Motion to Seal pursuant to 31 U.S.C. § 3730(b)(2), attaching the Amended Complaint. ECF 75 ("FAC"). On May 4, 2023, the Henderson Defendants and the Alvarez Defendants filed motions to dismiss the Amended Complaint. ECF 88 ("Henderson Defs. Br."), 89 ("Alvarez Defs. Br.").[1]

---

[1] The first page of the Alvarez Defendants' Brief contains only the case caption and is not numbered. The second page is labeled as page 1, but the ECF header lists page 2 of 26. Relators will refer to the page number in the ECF header when citing the Alvarez Defendants' Brief.

At the heart of the allegations in this case is that the Affiliated Defendants—which provide various services in the oil and gas industry, including transportation services, fluid management, emergency response, and environmental containment—operate as one interconnected company. Am. Compl. ¶¶ 6-7.   Specifically, the Affiliated Defendants shared, among other things, employees, vehicles, equipment, human resources, and cash management. *Id*. ¶ 7.   Defendant Alvarez is alleged to have used the Affiliated Defendants as interchangeable pieces in his business dealings, including directing one of the Affiliated Defendants to loan equipment and personnel to perform work under a contract held by another Affiliated Defendant, often without requiring invoices or otherwise accounting for the use of these resources. *Id*. ¶ 8.

In this action, Relators allege that the Affiliated Defendants falsely certified in separate loan applications submitted to approved lenders and the SBA that they were distinct small businesses and that each was eligible to receive potentially forgivable PPP loans. The Amended Complaint details how these misrepresentations concealed the reality that all of these entities are actually "affiliated" with each other under SBA rules and regulations, resulting in a combined total of at least 764 employees shared among the Affiliated Defendants. As the direct result of these intentional misrepresentations, the Affiliated Defendants received PPP loan proceeds—for which they were not eligible—totaling up to $13,849,170.00.

In the face of Relators' well-pled Amended Complaint, the Affiliated Defendants raise a host of arguments that manage to ignore the detailed allegations of fraud, improperly attempt to read new tests into the FCA's public disclosure bar, and raise factual disputes not appropriate on a threshold motion to dismiss.  None of the Affiliated Defendants' arguments have merit and their motions to dismiss should be denied in their entirety.

**LEGAL STANDARD**

As a general matter, Rule 8(a) requires only that a plaintiff provide "a short and plain statement of the claim . . . [that will] give the defendant fair notice of what the [plaintiff's] claim is and the grounds upon which it rests." *See Erickson v. Pardus*, 551 U.S. 81, 93 (2007) (citing Fed. R. Civ. P. 8(a)(2)). Actions sounding in fraud, including FCA suits, are further governed by Rule 9(b), which requires that a "party . . . state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

A court must deny a motion to dismiss under Rule 12(b)(6) when a complaint contains sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Federal Rule of Civil Procedure 12(b)(6) evinces a "plausibility standard," but there is no "probability requirement at the pleading stage." *Id.* at 556, 560. Rule 12(b)(6) calls for only "enough fact to raise a reasonable expectation that discovery will reveal evidence of" a defendant's misconduct. *Id.*

A Rule 12(b)(6) motion tests the sufficiency of a complaint and does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). In considering such a motion, the court is to "read the complaint as a whole, and take the facts asserted therein as true." *U.S. ex rel. McLain v. KBR, Inc.*, No. 1:08-CV-499 GBL/TCB, 2013 WL 710900, at *3 (E.D. Va. Feb. 27, 2013) (citing *LeSueur–Richmond Slate Corp. v. Fehrer*, 666 F.3d 261, 264 (4th Cir. 2012)). This means the court should "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Contrary facts asserted by defendants are not proper for consideration at this

juncture, but rather may be raised at a later juncture in the case." *U.S. ex rel. Lowery v. All Medicines, Inc.*, No. 7:17-CV-128-FL, 2021 WL 1405960, at *6 (E.D.N.C. Apr. 14, 2021).

Accordingly, a Rule 12(b)(6) motion should only be granted if, after accepting all well-pled allegations in the complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff "cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 243; *Harrison v. U.S. Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir. 1988).

## ARGUMENT

### I.     The Public Disclosure Bar Does Not Apply To This Case.

The FCA's public disclosure bar provides that courts shall dismiss a declined qui tam if "substantially the same allegations or transactions" alleged in the qui tam were publicly disclosed in certain qualifying sources and the relator is not an "original source" of the information. 31 U.S.C. § 3730 (e)(4); *U.S. ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 39-40 (4th Cir. 2016). "The public-disclosure bar aims to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits in which a relator, instead of plowing new ground, attempts to free-ride by merely reiterating previously disclosed fraudulent acts." *Id.* at 43 (internal quotation marks and citation omitted) (vacating the district court's dismissal order because the fraudulent scheme alleged by the relators had not been publicly disclosed before the complaint was filed).

The Affiliated Defendants argue that Relators' Amended Complaint runs afoul of the FCA's public disclosure bar.[2]  But this argument suffers from two fatal flaws.  First, the critical

---

[2] Specifically, the Affiliated Defendants argue that the Court should dismiss for lack of jurisdiction. Alvarez Defs. Br. at 25; Henderson Defs. Br. at 10.  The Affiliated Defendants are confused.  The Fourth Circuit has explicitly held that the 2010 amendment to the public disclosure bar means that "the public-disclosure bar is no longer a jurisdiction-removing provision." *Beauchamp*, 816 F.3d at 40. Post-amendment, the

elements of the Affiliated Defendants' fraud as alleged in the Amended Complaint were never themselves publicly disclosed.  Second, even assuming arguendo there was a public disclosure of the specific fraud alleged—which Relators do not concede—Relators are original sources as defined by the FCA.

A.    **The Allegations and Transactions on Which Relators' Lawsuit Are Grounded Were Not Publicly Disclosed.**

The Henderson Defendants argue that because "[a]llegations of PPP fraud have been in the public discourse since shortly after PPP went into effect," the detailed allegations in the Amended Complaint "are not unique from those which were publicly disclosed" before the complaint was filed.  Meanwhile, the Alvarez Defendants contend that the public disclosure bar applies because websites such as Pro Publica provide the names, addresses, and loan amounts for all companies that received funding from the PPP.   Such arguments are not supported by any case law and lead to absurd results.

On its face, the Affiliated Defendants' collective argument insists that any claim of fraud about any PPP loan issued to any small business throughout the country is subject to the public disclosure bar.  To date, the SBA and lenders have originated over 11.7 million loans totaling nearly $800 billion in relief to over 8.5 million small businesses. *See SBA Announces Opening of Paycheck Protection Program Direct Forgiveness Portal*, U.S. Small Bus. Admin. (July 28, 2021),     https://www.sba.gov/article/2021/jul/28/sba-announces-opening-paycheck-protection-program-direct-forgiveness-portal.  Taking the Affiliated Defendants' argument to its illogical

---

public-disclosure bar acts as an affirmative defense, rather than a jurisdictional bar. *Id.* Because the public disclosure bar is no longer jurisdictional, the Affiliated Defendants motions must be construed as invoking Rule 12(b)(6), and not Rule 12(b)(1). Therefore, in analyzing the Affiliated Defendants' public disclosure bar arguments, the Court is to take the Relators' factual allegations as true and draw all inferences in favor of Relators. *See Ibarra*, 120 F.3d at 474.

conclusion, there has been a public disclosure of at least 11.7 million instances of fraud, ostensibly committed by 8.5 million small businesses—an absurd result that is unsupported by the statute or the relevant case law.

One of the bedrock principles of the public disclosure bar is that the publicly disclosed information must be sufficient to "put[] the Government on notice of wrongdoing such that the Government could have started an investigation." *U.S. ex rel. Vitale v. MiMedx Grp., Inc.*, 381 F. Supp. 3d 647, 657 (D.S.C. 2019); *see also Citynet, LLC on behalf of the U.S. v. Frontier W.Va., Inc.*, Civil Action No. 2:14-15947, 2018 WL 1582527, at *20 (S.D. W. Va. Mar. 30, 2018).   The publicly available information must be "sufficient to set the government squarely on the trail of the alleged fraud." *U.S. ex rel. Outlaw v. Compassionate Care Hospice Grp., Inc.*, No. 3:18-CV-00914-JFA, 2019 WL 10893989, at *2-3 (D.S.C. Sept. 3, 2019) (quoting *In re Nat. Gas Royalties*, 562 F.3d 1032, 1041 (10th Cir. 2009)). The purpose behind the public disclosure bar is to prevent parasitic lawsuits based on information of which the government is already aware. *United States v. Meridian Senior Living, LLC*, No. 5:16-CV-410-BO, 2018 WL 1463347, at *3 (E.D.N.C. Mar. 23, 2018) (the government's "general knowledge of [fraud] simply does not satisfy the intent of the public disclosure bar, which seeks to 'bar a subset of [false claims] suits that [are] deemed unmeritorious or downright harmful.'" (citation omitted).

The language of the FCA conveys congressional intent to prohibit qui tam actions only when the public domain contains "the conclusion that fraud has been committed," or "a misrepresented state of facts and a true state of facts." *U.S. ex rel. Saunders v. Unisys Corp.*, No. 1:12-CV-00379 GBL, 2014 WL 1165869, at *6 (E.D. Va. Mar. 21, 2014); *see also Beauchamp*, 816 F.3d at 43. A reference to unspecified public articles about PPP fraud generally—none of

which mention any Defendant—did not disclose the specific transactions that serve as the basis for Relators' allegations against the Affiliated Defendants.

The Affiliated Defendants characterize these vague references to PPP fraud as constituting a public disclosure that specifically precludes Relators' claims.[3]  Defendants rely on *U.S. ex rel. Black v. Health & Hosp. Corp. of Marion Cnty.*, 494 F. App'x 285 (4th Cir. 2012) (per curiam), an unpublished decision of the Fourth Circuit, for the proposition that public debate over the propriety of certain actions constitutes a public disclosure of a FCA claim related to the debated actions.

This argument fails because the articles cited by Defendants fail to put the government squarely on the trail of fraud.  First, unlike *Black*, the Affiliated Defendants fail to point this Court to any public disclosure that describes the critical elements of the scheme in this case, *i.e.*, that the Affiliated Defendants operated as one interconnected company, sharing office space, employees, software, computers, vehicles, equipment, human resources, cash management and commingling funds, yet fraudulently misrepresented to the government that each was not affiliated with any other business and thus was eligible to receive PPP loan proceeds.  *See, e.g.*, FAC at ¶¶ 142-61.  None of these critical elements have been publicly disclosed.

Requiring that allegations specific to a particular defendant be publicly disclosed before finding the action potentially barred encourages private citizen involvement and increases the chances that every instance of specific fraud will be revealed.  To hold otherwise would preclude any qui tam suit once widespread, but not universal, fraud in an industry was revealed—a proposition without any supporting case law.  *U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866, 868

---

[3] The Henderson Defendants claim that "the organization, management, and operations of the Henderson Defendants, Alvarez Defendants, and Urso Defendants are publicly disclosed."  Henderson Defs. Br. at 12.  This is a bizarre argument insofar as it concedes the inner workings of the Affiliated Defendants somehow reveals the elements of a fraudulent scheme.

(7th Cir. 2011) ("As far as we can tell, no court of appeals supports the view that a report documenting widespread false claims, but not attributing them to anyone in particular, blocks qui tam litigation against every member of the entire industry."). The government often knows on a general level that fraud is taking place and that it, and the taxpayers, are losing money. *See Meridian Senior Living, LLC*, 2018 WL 1463347, at *3. But the government has difficulty identifying all of the individual actors engaged in the fraudulent activity. This casting of a net to catch all wrongdoers is precisely where the government needs the help of its "private attorneys general." *See U.S. ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 577 (9th Cir. 2016) ("Allowing a public document describing 'problems'—or even some generalized fraud in a massive project or across a swath of an industry—to bar all FCA suits identifying specific instances of fraud in that project or industry would deprive the Government of information that could lead to recovery of misspent Government funds and prevention of further fraud.").

In this case, the government was unaware of any allegations of PPP fraud against the Affiliated Defendants until after Relators came forward. And no information in vague articles published about instances of fraud on the PPP was sufficient to set the government on the trail of any alleged fraud committed by these defendants. Simply stated, the critical allegations or transactions of the Affiliated Defendants' fraud were not publicly disclosed.

### B.      Even If There Were a Public Disclosure, Relators Are Original Sources

Because the Affiliated Defendants' fraud has not been publicly disclosed, the Court need not consider the bulk of Defendants' arguments about whether Relators qualify as original sources. *Doe v. Gormley*, No. CV ADC-15-2183, 2016 WL 4400301, at *4 (D. Md. Aug. 17, 2016) ("[The original source requirement of Section 3730(e)(4)(B) is contingent upon an occurrence of public disclosure." (internal quotation marks omitted)). Faced with the fact that their fraudulent conduct

was not actually disclosed publicly, the Affiliated Defendants are forced to turn the public disclosure bar analysis on its head, arguing primarily that Relators are not "qualified" to be relators because they are competitors—a distinction the FCA does not make.

### 1.   Relators Have Direct and Independent Knowledge of the Affiliated Defendants' Fraud

Notwithstanding Defendants' arguments, Relators plainly qualify as original sources. Here, the Relators have "direct and independent knowledge of the information on which the allegations are based." § 3730(e)(4)(B).

In their Amended Complaint, Relators pull back the curtain with detailed, nonpublic allegations revealing the inner workings of the Affiliated Defendants' operations—none of which had previously been made public. And yet incredibly, the Affiliated Defendants have managed to ignore every new allegation in their public disclosure arguments. This is no small feat. The Amended Complaint contains no less than twenty-five distinct allegations that Relators derived from insiders and other nonpublic sources. Relators have direct knowledge of the Affiliated Defendants' fraud that is independent from vague articles describing general fraud involving some PPP recipients. Relators' own investigation put the government on the "trail of fraud." The table below captures in detail these specific allegations, their nonpublic source and citation within the Amended Complaint:

|   | Allegation | Nonpublic Source | FAC ¶ |
|---|---|---|---|
| | Common Ownership | | |
| 1. | "[I]n December 2017, ERG was in the process of securing suppliers, including Environmental Tank & Container ("ETC"). In an effort to establish creditworthiness, Defendant Henderson, on behalf of ERG, made the representation to ETC's senior management that Defendant Alvarez was a major owner of ERG." | Bill Polacek Chris Rogers Christina Galasso | 105 |
| 2. | "Alvarez also represented himself as the owner of Energy Transportation, ET360, and ERG to potential customers." | Gary Baxter | 106 |

9

| | | | |
|---|---|---|---|
| 3. | "ERG employees similarly understood that Alvarez owned ERG." | Deposition Testimony of Jason Richards, Aaron Giles, and Amanda Hunt | 107 |
| 4. | Alvarez started and continued to use ET360 to support his other companies (ACS and Energy Transportation) | Deposition Testimony of David B. Alvarez | 109 |
| 5. | "[D]espite supposedly handing control of ET360 over to Henderson, Alvarez continued to claim ownership and maintain control over ET360." | ET360 Credit Application, dated 1/11/2019 | 110 |
| Common Management | | | |
| 6. | As of April 4, 2020, Alvarez was identified to customers as the CEO and highest-ranking individual within ET360 while Henderson was listed as the President and second-highest ranking individual. | ET360's internal organizational chart (provided by Travis Knotts) | 113 |
| 7. | Alvarez offered employment opportunities on behalf of ERG | Deposition Testimony of David B. Alvarez and Amanda Hunt | 114 |
| 8. | The general manager of ET360 directly reported to Alvarez. Alvarez would have "the final say" on day-to-day management conflicts. Alvarez also had the control to terminate a high-level ET360 employee. | Travis Knotts | 115 |
| 9. | "The common management that Alvarez exercised over the Affiliated Defendants included, at his direction, the sharing of critical resources and personnel among the companies." Alvarez would arrange the sharing of trucks, drivers, and work among the Affiliated Defendants, while intermixing the companies' finances by not requiring the invoices for those shared resources and work to be "accurately maintained or, ultimately, even paid." | Marshall Fife Travis Knotts Breanne Reboux | 117-122 |
| 10. | "Defendant Henderson, in his role as CFO of all the Affiliated Defendants, also exerted common management over these entities." Henderson had "Energy Transportation pay for ERG's storage tanks." | Christina Galasso (ETC) and Supporting Invoice | 123 |
| 11. | "At the end of each year, Alvarez held a business review meeting that was attended by all of the general managers from each of the Affiliated Defendants. These annual meetings also included team-building exercises between the companies." | Travis Knotts | 124-125 |
| Cross-Sell Their Various Services | | | |

10

| 12. | "Defendant Alvarez represents himself as the owner of Defendants ACS, Energy Transportation, ET360 and ERG. Alvarez also actively solicits work from customers on behalf of all four companies." | Gary Baxter | 128 |
|---|---|---|---|
| 13. | In the presentation to customers, "Alvarez touts the 8760 Solution as a way to offer 'additional cost savings' to potential customers if they agree to use the services offered by Alvarez's 'other related companies.' Discounts were often offered to customers if they used an affiliated entity." This presentation connects Energy Transportation to both ET360 and ERG by offering their location and services. | EQT Presentations 7.30.19 (Given to Gary Baxter in the form of a PowerPoint slide) | 131-134 |
| 14. | Energy Transportation would "'piggy back' connections established by ET360 to push use of Energy Transportation's trucks" | Kim Sinnett | 136 |
| 15. | Alvarez coordinated client meetings attended by representatives from ET360, ERG, Energy Transportation, and ACS and even provided ET360 with a copy of ERG's full rate sheet to cross-sell their services. | Travis Knotts | 137-138 |
| 16. | "[I]f ET360 was having a difficult time getting a customer to agree to use ET360's water trucks, ET360 would use ACS's or ERG's existing service agreements as a "pry-bar" to get access to the opportunity." | Marshall Fife | 139 |
| 17. | "Alvarez and Henderson had set up ERG as a "shell company.. Though it essentially existed only on paper, ERG managed to secure a Master Service Agreement ("MSA") with EQT." | Deposition Testimony of Rick Richards | 140 |
| | **Share Critical Resources, Personnel, and Finances** | | |
| 18. | "Up until early 2020, Defendant Alvarez had office space at 1000 Jerry Dove Drive where he and the Affiliated Defendants' accounting, information technology, human resources, and other back-office employees worked. These back-office employees routinely performed work across the various entities. In early 2020, David Alvarez exited the office space on Jerry Dove Drive and relocated the Affiliated Defendants' back-office employees to the building at 5338 Shinnston Pike." | Breanne Reboux | 144 |
| 19. | The Affiliated Defendants shared the same HR Director, health insurance plans through Kitty Blackwood, information technology services, accounting services, cash management, and hiring and onboarding process. | Marshall Fife Travis Knotts Breanne Reboux Ernie Rush | 147-153 |
| 20. | "Eric Reed, an ET360 employee, provided water hauling services for an ET360 customer using both an ET360 truck and an Energy Transportation truck in the same week." | Work Orders of Eric Reed | 157 |
| 21. | "[B]oth ET360 and Energy Transportation trucks were used to perform work for Antero…the same employee would drive | ET360's Antero Disposal tickets | 158 |

11

| | an ET360 truck one day, and then an Energy Transportation truck the next day while working on the same project." | | |
|---|---|---|---|
| 22. | "The Affiliated Entities also share Health, Safety, and Environmental (HSE) personnel." | "Safety Performance History Records Request" sent by ET's Jon Cline to prospective ERG employees | 159 |
| | Concealed Plans to Shut Down and Sell ET360 before Appling for PPP Loans | | |
| 23. | "In early April 2020, Alvarez convened a meeting among senior personnel from Defendants ACS, Energy Transportation, and ET360. At this meeting, Alvarez directed that ET360's trucking services be transferred to Energy Transportation's operations, while ET360's industrial and other non-trucking services be moved to ACS. Thereafter, Alvarez explained the plan to wind up ET360's business entirely." | Travis Knotts | 9; 168-169 |
| 24. | Travis Knotts prepared a schedule that "outlines the costs that Alvarez had directed be absorbed by ET360 without plans to compensate the company for services actually performed." | Travis Knotts | 170 |
| 25. | The schedule showed that Alvarez still had control over ET360. It was owed $640,000 from ACS and had done an unknown amount of "Free Work", referring to the "free dump truck services performed by ET360 for West Virginia University, where Alvarez was serving as Chairman of the Board of Governors at the time." | ET360 Schedule of Costs prepared by Travis Knotts | 171 |

The Affiliated Defendants simply stick their heads in the sand and ignore the litany of detailed, nonpublic information set forth by Relators in the Amended Complaint. Rather than address the dozens of specific, nonpublic allegations that were added in the Amended Complaint, the Affiliated Defendants copy and paste their public disclosure argument from their first motions to dismiss the original complaint. *See* ECF 64, 67. For their part, the Alvarez Defendants managed to cite to a single allegation about the employees from all the Affiliated Defendants being invited to the annual holiday party, *see* ECF 89 at 8-9, but somehow missed the other twenty-five distinct, nonpublic allegations of their fraudulent conduct. The Henderson Defendants, meanwhile, invested no effort at all to explain to this Court why the dozens of nonpublic allegations in the

table above do not satisfy the original source exception.  The complete failure to address even a single one of these new allegations cannot be overlooked and is a tacit admission by the Affiliated Defendants that their flimsy original source arguments can be so easily dismantled.

**2.     The Affiliated Defendants Invent Two Public Disclosure Tests Not Found in the FCA or Recognized By Any Court**

The Affiliated Defendants are clearly not comfortable with the fact that their fraudulent conduct has been brought to light by whistleblowers who the Affiliated Defendants consider "direct competitors."  *See* Henderson Defs. Br. at 12-13, Alvarez Defs. Br. at 10-11.  And based on their mistaken belief that only a current or former employee of a defendant can be a relator under the FCA, the Affiliated Defendants look to the "public disclosure bar" as the vehicle to make their unwieldy argument that Relators are not "qualified" to be relators.  Read charitably, the Affiliated Defendants' invented requirement that relators be "qualified" is a reference to the FCA's "original source" provision.

Throughout their motions, the Affiliated Defendants repeatedly contend that because Relators are not "insiders," they are "not qualified to be relators under the FCA." Alvarez Defs. Br. at 11; Henderson Defs. Br. at 12-13.  But the Affiliated Defendants fail to define "insiders" and, more importantly, what that status has to do with whether the public disclosure bar applies. And the Affiliated Defendants' inability to point this Court to any authority in support of its argument is telling.

Congress never intended to limit the qui tam provisions in this way.  And no court has adopted the Affiliated Defendants' invented criteria that a "competitor" is prohibited from being a relator.  Instead, FCA jurisprudence is littered with instances in which relators were competitors of the defendant companies.  For example, in *U.S. ex rel. Sanofi-Aventis US LLC v. Mylan Inc., et al.*, Civil Action No. 16-CV-11572 (D. Mass.), pharmaceutical company Mylan Inc. paid $465

million to resolve allegations in a qui tam suit brought by Sanofi-Aventis—a direct of competitor of Mylan.  The Department of Justice noted that "[a] competing pharmaceutical manufacturer, Sanofi, raised this matter with the United States Attorney's Office" and DOJ "commend[ed] Sanofi for bringing this matter to our attention." *See Mylan Agrees to Pay $465 Million to Resolve False Claims Act Liability for Underpaying EpiPen Rebates*, U.S. Dep't Just. (Aug. 17, 2017), https://www.justice.gov/opa/pr/mylan-agrees-pay-465-million-resolve-false-claims-act-liability-underpaying-epipen-rebates; *see also U.S. ex rel. Harman v. Trinity Indus. Inc.*, No. 2:12-cv-00089 (E.D. Tex.) ($663 million FCA judgment against Trinity Industries, a guardrail manufacturer, brought by relator who was a direct competitor of Trinity); *U.S. ex rel. Savage et al. v. CH2M Plateau Remediation Co. et al*., Case No. 4:14-cv-05002 (E.D. Wash.) ($5.5 million FCA settlement resolving relator's claim against two competitors for allegedly creating fake businesses to get small disadvantaged business funding); *U.S. ex rel. Carlisle v. Pacific Ambulance et a*l., No 3:09-cv-02628 (S.D. Cal. 2009) ($11.5 million FCA settlement involving relator who owned ambulance company and filed a whistleblower claim against five competing ambulance companies for allegedly defrauding Medicare by paying unlawful kickbacks).

Plainly, competitors with nonpublic information about fraud against the government can be relators under the FCA.  And the Affiliated Defendants cite no authority to the contrary.

Not satisfied with creating one new test, the Henderson Defendants double down and argue that eligibility as a relator in an FCA matter somehow requires one to be a "knowledgeable insider" who has a comprehensive understanding of both the SBA's alternative size standard test and the agency's affiliation rules.  Henderson Defs. Br. at 13-15.  The FCA requires no such thing and no court has adopted this argument either.  Again the Henderson Defendants seemingly know this, as they do not—because they cannot—cite to any legal authority in support of this invented criteria.

14

The Affiliated Defendants' poorly conceived public disclosure arguments ultimately fail. First, nothing about the critical elements of the Affiliated Defendants' fraudulent certifications to the SBA were publicly disclosed. And despite the Affiliated Defendants' attempts to characterize Relators as not "qualified" using fabricated tests not found in the text of the FCA or recognized by any court, Relators are original sources with direct and independent knowledge of the Affiliated Defendants' fraud as detailed in the Amended Complaint's nonpublic allegations. Accordingly, this Court should reject the Affiliated Defendants' public disclosure arguments in their entirety and decline the offer to read these new tests into the statute.

## II.    Relators' Amended Complaint Plausibly Alleges Violations of the FCA.

The FCA is designed to prevent fraud on the government and the federal fisc, and reflects Congress' broad goal "to protect the funds and property of the government." *U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 728 (4th Cir. 2010) (internal quotation marks and citation omitted). To state a claim under the FCA, the plaintiff must allege that "(1) [t]here was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 788 (4th Cir. 1999).

The Amended Complaint alleges that (1) claims for payment were presented to the United States, (2) those claims for payment were false or fraudulent, (3) the Affiliated Defendants caused them to be submitted, and (4) the Affiliated Defendants knew that the claims were false. Relators' allegations are more than adequate to defeat the Affiliated Defendants' motions to dismiss.

### A.    Relators' Amended Complaint Plausibly Alleges that the Affiliated Defendants Made False Statements.

The Amended Complaint contains more than sufficient allegations to satisfy the FCA's "false statement" element. Relators allege that the PPP Application required applicants to certify

as to their small business status under regulations promulgated by the Small Business Administration ("SBA"). FAC ¶ 50. Relators further allege that because Defendants are affiliated, their employees must be aggregated when determining eligibility for PPP loans as a small business. *Id*. ¶ 73 ("According to their own certifications to the SBA, the Affiliated Defendants collectively have at least 764 employees—far exceeding the 500-employee threshold required for eligibility to receive PPP loans."). As a result, Defendants submitted false claims. FAC ¶¶ 79-80 (ACS submitted false claims), *id*. ¶¶ 83-84 (Energy Transportation submitted false claims), *id*. ¶¶ 87-88 (ET360 submitted false claims), *id*. ¶¶ 92-93 (ERG submitted false claims). These facts, accepted as true, sufficiently allege that Defendants made false statements.

Relators have pleaded sufficient facts to demonstrate that Defendants are affiliated. Entities are affiliated under SBA regulations when "when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.103(a)(1). To determine whether affiliation exists between entities, "SBA considers factors such as ownership, management, previous relationships with or ties to another concern, and contractual relationships." *Id.* § 121.103(a)(2). "SBA will consider the totality of the circumstances, and may find affiliation even though no single factor is sufficient to constitute affiliation." *Id.* § 121.103(a)(5).

Relators have adequately alleged that Defendants are affiliated by virtue of common ownership. Relators allege that "Alvarez maintained ownership and control of ACS, ERG, Energy Transportation, and ET360." FAC ¶ 104. Relators offer specific instances where Alvarez or Henderson represented to third parties that Alvarez owned these entities. *Id.* ¶¶ 105-06, 110. Relators also allege that "ERG employees similarly understood that Alvarez owned ERG." *Id.* ¶ 107. Additionally, relying on testimony given by Alvarez in a deposition, Relators further allege

that "Alvarez's ownership extends beyond ERG to ACS and Energy Transportation," *id.* ¶ 108, and to ET360, *id.* ¶ 109. These allegations are sufficient to demonstrate affiliation because of common ownership.

Relators have also adequately alleged that Defendants are affiliated by virtue of common management. Relators alleged that Alvarez and Henderson held senior management positions with the capability of directing the Affiliated Defendants' activities. FAC ¶ 113 (ET360's internal organizational chart, last updated on April 4, 2020, identifies David Alvarez as the Chief Executive Officer and Jason Henderson as the President); *id.* ¶ 112 (Henderson "serves as the de facto CFO for all the Affiliated Defendants"); *see also id.* ¶ 61 ("The positions of CEO, COO, and CFO are commonly understood to be senior leadership positions that carry with them the ability to exercise substantive control or critical influence over the company's operations."). Relators have also provided specific examples of Alvarez and Henderson actively exercising their control over the Affiliated Defendants. *See, e.g.*, FAC ¶¶ 115, 117-18, 120, 123. These allegations are sufficient to demonstrate affiliation because of common management. 13 C.F.R. § 121.103(a)(1) ("It does not matter whether control is exercised, so long as the power to control exists.").

Relators have alleged sufficient facts to demonstrate that Defendants were affiliated because of an identity of interest. Under SBA regulations, affiliation based on identity of interest exists where entities hold "identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships)." *Id*. § 121.103(f).  This type of affiliation is supported by Relators' detailed allegations about the Affiliated Defendants' actions to cross-sell their services to prospective customers, FAC ¶¶ 127-41, and by allegations describing the Affiliated Defendants' sharing of (1) physical office space, *id.* ¶¶ 142-44, (2) management

personnel and resources, *id.* ¶¶ 145-53, and (3) employees and Equipment, *id.* ¶¶ 154-61. Taken together, these allegations are more than sufficient to demonstrate that Defendants were affiliated based on an identity of interest.

All of the allegations supporting affiliation under these individual factors, when taken together, also adequately allege affiliation under the SBA's totality of the circumstances test. *See* FAC ¶¶ 104-11, 112-26, 127-141, 142-62.[4]

Defendants' arguments on the issue of falsity serve only to obfuscate the analysis and cannot overcome Relators' allegations, particularly at the pleadings stage. Defendants make two arguments on the issue of falsity. First, Defendants argue that Relators have failed to plead affiliation because, in their view, Relators' have relied on the wrong tests to establish affiliation for purposes of the PPP. Alvarez Defs. Br. at 11-12; Henderson Defs. Br. at 18-21. Second, Defendants claim that they did not make false statements concerning their business size because they satisfy the Alternative Size Standard. Alvarez Defs. Br. at 13-14; Henderson Defs. Br. at 21-22. Neither argument justifies dismissal of the Amended Complaint.

### 1. Defendants Manufacture a Dispute About the Tests for Affiliation.

According to the Affiliated Defendants, affiliation for PPP loans must be established under the version of 13 C.F.R. § 121.301(f) in effect at the time the Affiliated Defendants applied for PPP loans, rather than under 13 C.F.R. § 121.103 ("How does SBA determine affiliation?"). But this is a distinction without a difference. While Defendants argue that there are four tests for determining whether a PPP applicant has affiliates: (1) affiliation based on ownership; (2)

---

[4] The Alvarez Defendants contest whether some of Relators allegations actually support affiliation, suggesting that allegations concerning the "decision to cooperate and reduce expenses for all parties involved shows professionalism, not affiliation." Alvarez Defs. Br. at 13. This argument asks the court to draw an inference *against* Relators based on the facts alleged, an exercise that is inappropriate when considering a motion to dismiss under Rule 12(b)(6). *Ibarra*, 120 F.3d at 474 (the court should "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff").

affiliation arising under stock options, convertible securities, and agreements to merge; (3) affiliation based on management; and (4) affiliation based on identity of interest, Alvarez Defs. Br. at 1; Henderson Defs. Br. at 18, these are the same four affiliation tests found at 13 C.F.R. § 121.103.[5] *Id.* § 121.103(c) ("Affiliation based on stock ownership"); *Id.* § 121.103(d) ("Affiliation arising under stock options, convertible securities, and agreements to merge"); *Id.* § 121.103(e) ("Affiliation based on common management"); *Id.* § 121.103(f) ("Affiliation based on identity of interest").

As discussed above, Relators have adequately alleged that the Defendants were affiliated due to (1) ownership; (2) common management; and (3) identity of interests. *See supra*, Section I(A). Thus, the Affiliated Defendants' argument is nothing more than a distraction and fails to support dismissal under Rule 12(b)(6).

### 2. The Alternative Size Standard Does Not Retroactively Apply to Defendants' False Certifications.

The Affiliated Defendants' second argument on falsity—that they satisfy the Alternative Size Standard—fares even worse than their first argument. As an initial matter, the Alternative

---

[5] To the extent that it even matters which regulation governs PPP loans, Defendants' argument is betrayed by two separate provisions of the CARES Act, which indicate that the PPP is governed by ordinary SBA affiliation principles as described in 13 C.F.R. § 121.103. The CARES Act provides that "the provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations, … are waived with respect to eligibility for a [PPP] loan" for three specific categories of entities (none of which the Affiliated Defendants qualify as). CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) § 1102(a)(2)(D)(iv). If Defendants were right and § 121.103 did not apply to determinations of affiliation for purposes of PPP loans, then Congress would have had no need to institute a waiver for specific categories of entities; that section would not apply to *any* entities applying for a PPP loan. The CARES Act also states that "[t]he provisions applicable to affiliations under section 121.103 of title 13, Code of Federal Regulations … shall apply with respect to a nonprofit organization and a veterans organization *in the same manner as with respect to a small business concern*." CARES Act, § 1102(a)(2)(D)(vi) (emphasis added). Once again, if Defendants were right and § 121.103 was wholly inapplicable to PPP loans for small business concerns, then this provision of the CARES Act would have no effect at all. Thus, accepting Defendants' argument violates the core canon of statutory construction that every provision is to be given effect. *U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009) (courts should not read regulations in a manner that "contradict[s] well-established principles of statutory interpretation that require statutes to be construed in a manner that gives effect to all of their provisions").

Size Standard does not apply to the Affiliated Defendants' PPP applications.  As alleged in the Amended Complaint, Defendants submitted their PPP Applications *before* the SBA published guidance on the Alternative Size Standard, on April 6, 2020. Thus, Defendants' false certifications about their small business status could not have been rendered true based on the Alternative Size Standard; the guidance did not exist at the time. *See* FAC ¶¶ 81, 85, 89, 94.

The Henderson Defendants argue that this timing does not matter because the Alternative Size Standard must apply "retroactively." Henderson Defs. Br. at 21-22. But the retroactive application of statutes is generally "not favored in the law." *Baldwin v. City of Greensboro*, 714 F.3d 828, 835 (4th Cir. 2013). The Supreme Court has consistently noted that the "presumption against retroactive legislation is deeply rooted in our jurisprudence." *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 946 (1997) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994)). Regulations are typically applied according to the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place ... unless Congress has clearly manifested its intent to the contrary." *Id.*

The Henderson Defendants point to just two aspects of the SBA's FAQs in support of their retroactivity. First, the April 6, 2020 FAQs "apply … without restriction on when applications are submitted." Henderson Defs. Br. at 21. But applying the guidance retroactively based on the *absence* of language amounts to retroactivity by negative inference – that because the SBA did not explicitly limit the Alternative Size Standard to applications submitted after the guidance was published, it therefore must also apply to applications submitted prior. This turns the presumption against retroactivity on its head, where every amendment is retroactive unless there is clear intent to the contrary. This is directly contrary to the Supreme Court's guidance in *Hughes Aircraft*.

Next, the Henderson Defendants point out that the FAQ "provides that an applicant needed to meet the Alternative Size Standard's tests 'as of March 27, 2020.'" *Id.* But, once again, careful attention must be paid to the actual language of the FAQ. The FAQ provides that "a business can qualify … as a small business concern if it met both tests in SBA's 'alternative size standard' as of March 27, 2020." *Paycheck Protection Program Loans: Frequently Asked Questions (FAQs)*, U.S. Small Bus. Admin. 1, 2 (July 8, 2022), https://www.sba.gov/sites/sbagov/files/2022-07/FAQ%20PPP%20for%20Borrowers%20and%20Lenders%20Questions%201-71%20V12%20%28FINAL%207-8-22%29-508.pdf. The FAQ also states that "[a] business that qualifies as a small business concern under [the Alternative Size Standard], may truthfully attest to its eligibility for a First Draw PPP Loan." *Id.* The most natural reading of this language is that the alternative size standard applies to applications that have not been submitted and that, when evaluating their status under the alternative size standard, businesses should look to their size status "as of March 27, 2020." Notably, the "as of March 27, 2020" language is part of the sentence addressing when the business "can qualify," rather than the sentence addressing when the business "may truthfully attest." In other words, "as of March 27, 2020" governs the evaluation of status under the alternative size standard and not the submission of an application. Defendants ask more of the language than it can bear and would have this Court to rewrite SBA's guidance.

Even if this language could reasonably be viewed as implying retroactivity, that would still be insufficient. A hint of retroactivity will not do. Because there is a presumption against retroactivity, the Supreme Court has required the use of clear and explicit language before it would apply a regulation retroactively. *Black*, 494 F. App'x at 291 (citing *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010)). A false attestation cannot be rendered true after the fact, and the SBA guidance does not explicitly say otherwise.

21

**3.      Even if the Alternative Size Standard Could Excuse the Affiliated Defendants' False Certifications, Relators Have Plausibly Alleged the Defendants Do Not Meet the Alternative Size Test.**

Even if the court were to find it appropriate to evaluate the application of the Alternative Size Standard at the motion to dismiss stage, Relators have adequately pled that Affiliated Defendants do not satisfy this standard. Relators have alleged that "the Affiliated Defendants had approximately $30,000,000 in accumulated business assets at the time they submitted their PPP applications" in March 2020. FAC ¶ 175.[6] Relators also alleged that "the Affiliated Defendants employed approximately 800 people with an annual payroll of about $73,000,000." *Id*. As a result, "even if the alternative size test applies (which it does not), the Affiliated Defendants would not qualify" because "the Affiliated Defendants had a maximum tangible net worth well exceeding $15 million" as required to satisfy the Alternative Size Standard. FAC ¶ 176.[7]

The Affiliated Defendants argue that these allegations are "conclusory estimates." Henderson Defs. Br. at 12; *see also* Alvarez Defs. Br. at 14. But Relators allegations are hardly "conclusory." Instead, relying on their knowledge of the Affiliated Defendants, and the industry generally, Relators have provided allegations with greater specificity, *e.g.* context from NAICS codes about the size of comparable companies and estimates of the Affiliated Defendants' actual number of employees and amount of payroll. This is sufficient for the motion to dismiss stage. *See*

---

[6] The Alvarez Defendants suggest that Relators "rely almost entirely upon the size standards set by" NAICS codes in alleging that Defendants do not qualify under the Alternative Size Standard. Alvarez Defs. Br. at 13. Not so. Relators point to the NAICS codes as factual support for their allegations of the Defendants size, which in turn determines eligibility under the Alternative Size Standard. In fact, the Complaint plainly states that "[t]he NAICS Codes the Affiliated Defendants are classified under give a sense of how large such companies in the oil and gas space are." FAC ¶ 174. The Alvarez Defendants entirely ignore this explanation.

[7] Defendants cannot rely on the Alternative Size Standard to overcome their false certifications for a second reason: the CARES Act caps the maximum loan amount at $10 million. CARES Act, § 1102(a)(2)(E)(ii). Relators have adequately alleged that the Defendants are (and were) affiliated, *see supra* Section I(A), and that Defendants received a total loan amount well in excess of $10 million. FAC ¶ 5 ("the Affiliated Defendants received PPP loan proceeds—for which they were not eligible—totaling up to $13,849,170.00.")

*U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 187 n.14 (D. Md. 2019) (even "'information and belief' allegations [can] meet Rule 9(b)" where plaintiffs "understandably lack access to necessary information." (citations omitted)); *U.S. ex rel. Maharaj v. Est. of Zimmerman*, No. DLB-18-2998, 2020 WL 4501464, at *9 (D. Md. Aug. 5, 2020); *see also Lowery*, 2021 WL 1405960, at *7 (dismissal is not warranted due to "allegations made on information and belief" because "allegations not made on information and belief provide the support factually for the remaining allegations made on information and belief."); *U.S. ex rel. Devarapally v. Ferncreek Cardiology, P.A.*, No. 5:17-CV-616-FL, 2023 WL 2333872, at *5 (E.D.N.C. Mar. 2, 2023) (same).

Finally, the Affiliated Defendants argue—without any evidence beyond their word—that they would satisfy the Alternative Size Standard. Henderson Defs. Br. at 21. The Affiliated Defendants' factual disagreement with Relators' allegations is not enough.  Indeed, that defense is incapable of resolution at this stage of the ligation, in part because the argument relies on facts that fall well outside the four corners of the Amended Complaint and thus is not an appropriate issue to resolve under Rule 12(b)(6).  Whether the Affiliated Defendants actually satisfy this standard is factual question that will be determined after full discovery, not as an argument to be evaluated at the motion to dismiss stage. *See United States v. Savannah River Nuclear Sols., LLC*, No. 1:16-CV-00825-JMC, 2016 WL 7104823, at *20 (D.S.C. Dec. 6, 2016).

Relators adequately allege that the Affiliated Defendants submitted false claims to the United States.  Whether the Affiliated Defendants satisfy the Alternative Size Standard—let alone whether the Alternative Size Standard applies at all—is an issue to be resolved at a later date.

## B.   Relators Plausibly Allege that the Affiliated Defendants' False Statements Were Material.

The definition of "material"—which the Affiliated Defendants entirely omit from their briefs—is "having a natural tendency to influence, or be capable of influencing, the payment or

receipt of money or property." 31 U.S.C. § 3729(b)(4). This standard does not require proof of but-for causation—*i.e.*, but for defendants' fraud, the government would not have paid the claim. "It has never been the test of materiality that the misrepresentation or concealment would more likely than not have produced an erroneous decision, or even that it would more likely than not have triggered an investigation." *Kungys v. United States*, 485 U.S. 759, 771 (1988) (cited with approval in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 193 (2016)).[8] The materiality element does not look to whether the false statements actually influenced agency action, but instead whether those statements are "capable of influencing the Government's decision to pay." *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017). Thus, Relators need not plead that the government's payment decision would have been different, only that the Affiliated Defendants' misconduct was "capable of influencing" that decision.

In *Escobar*, the Supreme Court offered factors that courts might consider when evaluating materiality but cautioned that the analysis "cannot rest on a single fact or occurrence as always determinative." *Escobar*, 579 U.S. at 193 (internal marks and citation omitted); *id.* at 194-95 (enumerated factors are non-exhaustive and not dispositive). That said, materiality is more likely to be found where the information at issue goes "to the very essence of the bargain," *Id.* at 193, n.5 (citation omitted). The Fourth Circuit has instructed courts to employ "common sense" to determine whether a complaint adequately alleges materiality. *Triple Canopy*, 857 F.3d at 179.

The Amended Complaint explains that the PPP was designed to offer potentially forgivable loans to small businesses for job retention and certain other expenses, FAC ¶¶ 2-3, 10. It is not just that PPP loans were intended to *prefer* small businesses. Instead, as alleged in the Amended

---

[8] The Senate Report accompanying the legislation that defined materiality for purposes of the FCA stated that it was intended to codify the definition used in *Neder v. United States*, 527 U.S. 1 (1999). S. Rep. No. 111-10, at 12 & n.6 (2009), reprinted in 2009 U.S.C.C.A.N. 430, 439. *Neder*, in turn, applied the definition of materiality used in *Kungys*. *Neder*, 527 U.S. at 16.

Complaint, PPP loans were available *exclusively* to small businesses, with loan applicants being required to certify that the business (including any affiliated companies) "'employs no more than the greater of 500 or employees or, if applicable, the size standard in number of employees established by the SBA in 13 C.F.R. [§] 121.201' for the applicant's industry." FAC ¶ 50 (quoting PPP Application form). Where the Affiliated Defendants' false certifications about their size status defeat the central purpose of the PPP, "it is difficult to conceive how the fraud alleged in this case could not be material." *U.S. ex rel. Jones v. Concerted Care Grp.*, No. CV RDB-16-3056, 2022 WL 861396, at *10 (D. Md. Mar. 23, 2022).

Relators also allege that the Affiliated Defendants' misrepresentation of their business size status "harms legitimate small businesses because it denies them the opportunity to secure much needed financial assistance during COVID-19." FAC ¶ 209. If not for the Affiliated Defendants' fraudulent conduct, legitimate small businesses would have received aid through PPP loans. FAC ¶ 11. Many of these legitimate small businesses were forced to shutter when they were unable to receive relief through PPP loans because funding was exhausted after just two weeks. *Id.* ¶ 12. Relators thus allege that the Affiliated Defendants' statements and certifications of eligibility to receive PPP loans were "material to false or fraudulent claims" that were submitted to the government. *Id.* ¶ 208 and that, had the United States known of the false statements made by the Affiliated Defendants, it would not have paid those submitted claims. *Id.* ¶¶ 15, 178, 216. Taking these allegations in the light most favorable to Relators, "it strains credulity to argue that the government's payment decision would not have been affected" by the Affiliated Defendants' false certifications. *United States v. Academi Training Ctr., Inc.*, 220 F. Supp. 3d 676, 682 (E.D. Va. 2016); *see also U.S. ex rel. Howard v. Caddell Constr. Co., Inc.*, No. 7:11-CV-270-H, 2016 WL

11786600, at *5 (E.D.N.C. Feb. 29, 2016) (concluding that false certifications of compliance with small business subcontracting requirements were material to the Government's decision to pay).

The Affiliated Defendants' arguments to the contrary amount to restating portions of the *Escobar* decision and citing a Fourth Circuit case for the proposition that materiality is a distinct element of an FCA claim. *See* Alvarez Defs. Br. at 22-23; Henderson Defs. Br. at 23-24. Notably, the Affiliated Defendants offer nothing more than the bald assertion that Relators have failed to allege materiality, in apparent disregard of the Amended Complaint's specific allegations about the purpose of PPP loans and the Affiliated Defendants' false statements about their eligibility. Alvarez Defs. Br. at 22 ("Relators make no allegations of the third element"); Henderson Defs. Br. at 23 (Relators "fail to sufficiently allege that the falsity of such statements was material"). The dearth of substance in the Affiliated Defendants' arguments reflects their lack of merit.

Relators adequately allege that the Affiliated Defendants' fraudulent conduct was material.

### C. Relators' Amended Complaint Plausibly Alleges that the Affiliated Defendants Knowingly Made False Statements.

To adequately plead scienter under the FCA, Relators need "show only that the defendant had *knowledge* of the illegality of its actions, rather than *specific intent* to defraud." *Fadlalla*, 402 F. Supp. 3d at 188 (quoting *U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 912 F.3d 731, 735 (4th Cir. 2019)) (emphasis in original). Under the FCA, the term "knowingly" means:

> [W]ith respect to information-(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b). A complaint "need not choose one theory of knowledge over the other, but rather may plead them in the alternative." *Lowery*, 2021 WL 1405960, at *6.

Relators have satisfied this standard. Relators plead that the Affiliated Defendants "knew, or at the very least, should have known, that they were affiliated." FAC ¶ 64.[9] Relators also allege that the Affiliated Defendants falsely certified "eligibility to participate in the PPP and caus[ed] subsequent claims for loan proceeds to be made that the Affiliated Defendants knew were ineligible for payment by the SBA." *Id*. ¶ 208. Additionally, the Amended Complaint alleges that "[t]he Affiliated Defendants' misrepresentations regarding their size as small were made knowingly and with the intent to cause the submission of false claims to Government Programs." *Id*. ¶ 206. Even if this were all that Relators alleged, that would be sufficient factual basis at the pleadings stage to show that the Affiliated Defendants acted with scienter. *United States v. Gwinn*, No. CIVA 5:06-CV-00267, 2008 WL 867927, at *15 (S.D. W. Va. Mar. 31, 2008)).

Of course, that is not all that Relators have alleged. The Amended Complaint contains additional allegations demonstrating that the Affiliated Defendants acted with knowledge that they were affiliated and that the certifications of their small business status were false. For example, Relators allege specific examples of instances where Defendants Alvarez and Henderson represented to others that Alvarez owned ERG, in addition to ET, ET360, and ACS. FAC ¶¶ 105-06, 108, 110. Relators also allege that Defendants Alvarez and Henderson held management positions in the Affiliated Defendants and plead specific examples of how Alvarez and Henderson

---

[9] The Affiliated Defendants argue that this allegation "is not sufficient to meet the FCA's standard for knowledge." Alvarez Defs. Br. at 23-24; Henderson Defs. Br. at 23 (arguing that this allegation cannot establish scienter because the Amended Complaint does not contain "an allegation that the Henderson Defendants had actual knowledge."). This argument is defeated by the very text of the Amended Complaint that the Affiliated Defendants quote. "Defendants knew" is an allegation of actual knowledge, the first theory of knowledge under the FCA. "Defendants … should have known" is an allegation that Defendants acted with deliberate ignorance or reckless disregard. Either allegation standing alone is sufficient to allege scienter. *See Maharaj*, 2020 WL 4501464, at *9 (the complaint sufficiently alleged scienter where the "relator has alleged that the defendants *knew or should have known* that the representation … was false, and that the false statement caused the government to pay them more money … than they were entitled to receive" (emphasis added)).

used their management positions to control the operations of these entities. *Id*. ¶¶ 113-20, 124 (Alvarez); *id*. ¶ 123 (Henderson). These allegations, as well as the Amended Complaint's allegations about the Affiliated Defendants' cross-marketing of services, *id*. ¶¶ 127-41, and the Affiliated Defendants' sharing of resources, personnel, and finances, *id*. ¶¶ 142-65, are more than adequate at the pleading stage for establishing that Affiliated Defendants acted with knowledge that their certifications to receive PPP loans were false.

The Affiliated Defendants take two very different approaches in arguing that Relators have failed to plead scienter. Neither approach has any merit.

The Alvarez Defendants argue Relators have failed to sufficiently allege scienter because "Relators try to allege that the Alvarez Defendants had actual knowledge through implication … in what is best described as a 'totality of the circumstances' approach." Alvarez Defs. Br. at 24. In particular, the Alvarez Defendants take exception with Relators' allegation that "Defendant Alvarez is the Interim Chairman of MVB Financial Corp. … [and] serves on MVB's bank loan approval committee," FAC ¶ 64, because, in their view, this amounts to an inference that Defendant Alvarez "knew the requirements for an SBA emergency loan program by virtue of his position." Alvarez Defs. Br. at 24. This argument fails because, though the Affiliated Defendants may wish otherwise, at the pleading stage, the court is to draw all reasonable inferences in favor of Relators. *Ibarra*, 120 F.3d at 474. Furthermore, as discussed above, the Amended Complaint contains pages of allegations demonstrating the Affiliated Defendants' knowledge that their certifications were false.

The Henderson Defendants, on the other hand, argue that scienter has not been alleged because their certification of small business status was reasonable. This argument fails.

As an initial matter, the legal authority cited by the Henderson Defendants lacks any persuasive power. The Fourth Circuit's *Sheldon* decision was vacated on rehearing en banc. *U.S. ex rel. Sheldon v. Allergan Sales, LLC*, 49 F.4th 873 (4th Cir. 2022). And the Henderson Defendants' reliance on *U.S. ex rel. Burlbaw v. Orenduff* is misplaced as an out-of-circuit summary judgment decision and thus inapposite. *See* Henderson Defs. Br. at 22-23 (citing 548 F.3d 931 (10th Cir. 2008)). Similarly, *United States ex rel. Hixson v. Health Mgmt. Sys.* is an out-of-circuit decision which relies on two summary judgment decisions to justify its opinion. *See id.* at 23 (citing 613 F.3d 1186, 1191 (8th Cir. 2010)). Finally, *United States ex rel. Swafford v. Borgess Med.* is an unpublished, out-of-circuit, per curiam decision at the summary judgment stage, which relies in turn on another summary judgment decision, and offers just a single conclusory sentence devoted to the issue of regulatory interpretation. *See id.* at 22 (citing 24 F. App'x 491, 2001 WL 1609913, at *1 (6th Cir. 2001)). None of the cases cited by the Henderson Defendants offer any meaningful support for its argument.

To the extent that this "objectively reasonable" argument previously held any weight, the United States Supreme Court removed the remaining remnants of the foundation just last week. In *United States ex rel. Schutte v. SuperValu Inc.*, a decision handed down on June 1, 2023, the Supreme Court addressed whether the FCA's scienter standard was met when a defendant believed that the claim it was submitting was false, even though it might be objectively reasonable to believe the claim was valid. No. 21-1326, 598 U.S. ____, slip op. at 2 (2023). The Court unanimously answered "yes," holding that "[w]hat matters for an FCA case is whether the defendant knew the claim was false." *Id.* The Court explained that "the focus is not … on post hoc interpretations that might have rendered their claims accurate. It is instead on what the defendant knew when presenting the claim." *Id.* at 11. That is the precise premise of the Henderson Defendants'

argument—the post hoc application of the Alternative Size Standard in an effort to rectify their false claims. The Amended Complaint offers detailed allegations about the Affiliated Defendants' knowledge, based on the information that was readily available to them at the time of their false certifications. Those allegations are more than sufficient under *SuperValu* to establish scienter.

Because the Amended Complaint adequately alleges that the Affiliated Defendants acted with the requisite scienter, their arguments to the contrary should be rejected.

### D.      Relators' Amended Complaint Plausibly Alleges that the Affiliated Defendants Conspired to Commit Violations of the FCA.

The FCA imposes civil liability on those individuals who "conspire[] to defraud the government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). To state a claim under § 3729(a)(3), a plaintiff "must allege with particularity facts (1) to support the formation of an unlawful agreement between the conspirators to get a false claim paid, and (2) at least one overt act in furtherance of the conspiracy." *U.S. ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407, 413 (4th Cir. 2010). The conspiratorial agreement need not be explicit, and a plaintiff need not allege the exact moment the agreement was reached, so long as the complaint's allegations "give rise to the inference that defendants had an implied agreement to violate the FCA." *Citynet, LLC*, 2018 WL 1582527, at *31.

The Amended Complaint sufficient alleges a conspiracy claim under the FCA. First, Relators have adequately alleged "who" entered into a conspiracy. "[T]he Affiliated Defendants' senior executives, including Defendants Alvarez and Henderson, directed their employees to gain the agreement of each of these entities to conceal the affiliation among the Affiliated Defendants." FAC ¶ 181. "Besides Defendants, the Co-Conspirators include numerous other related entities through which the Affiliated Defendants have conducted their fraudulent scheme." *Id*. ¶ 182. Relators proceed to name 14 "other related entities." *Id*. ¶¶ 183-96.

Only the Alvarez Defendants offer any argument to support dismissal of the Relators' conspiracy claim,[10] and their arguments are wholly without support and ignore most of Relators' allegations. The Alvarez Defendants' first argument that "Relators fail to state which employees were a part of this alleged conspiracy and they fail to identify which "other entities" were involved in the conspiracy," Alvarez Defs. Br. at 15, ignores four pages worth of allegations and is without merit. *Cf. United States v. Berkeley Heartlab, Inc.*, 225 F. Supp. 3d 487, 500 (D.S.C. 2016) ("[N]either the FCA nor Rule 9(b) require the identification of individuals within a defendant corporation."). Regardless, Relators *have* pleaded the identity of the individuals—Defendants Alvarez and Henderson—and the entities who engaged in the conspiracy.

Second, Relators have adequately alleged "what" the conspirators agreed to: the Affiliated Defendants conspired to defraud the government by falsely certifying their small business status in order to receive PPP loans. FAC ¶ 199. The Alvarez Defendants' argument that Relators have failed to plead "facts which indicate a meeting or discussion took place in which Defendants hatched a plan to defraud the Federal Government," Alvarez Defs. Br. at 18, is a red herring. Relators are not required to do so. Rather, Relators need only plead sufficient allegations which "permit an inference … that [defendants] thus together agreed to engage in a course of activity to cause the government to pay false or fraudulent claims." *Lowery*, 2021 WL 1405960, at *7. Relators have done so. FAC ¶¶ 79-80, 83-84, 87-88, 92-93 (alleging Affiliated Defendants falsely certified eligibility for PPP loans); *id*. ¶¶ 104-11, 112-26, 127-41, 142-62 (alleging facts and specific examples of Affiliated Defendants' conduct that reveals their affiliation).

Finally, Relators have alleged overt acts made in furtherance of the Affiliated Defendants' conspiracy to defraud the United States by submitting false claims for the purpose of receiving

---

[10] Perhaps reflecting the strength of the Amended Complaint's allegations supporting the conspiracy claim, the Henderson Defendants make no argument at all that the conspiracy claim should be dismissed.

31

PPP loans. For example, the Amended Complaint contains allegations concerning Defendant Alvarez finalized plans to shutter ET360 prior to applying for a PPP loan for the very same business. FAC ¶¶ 167, 169. Relators allege that "Alvarez convened a meeting among senior personnel from Defendants ACS, Energy Transportation, and ET360," and name the specific personnel in attendance. *Id*. ¶ 168. Relators' allegations about the Defendants' affiliation, and efforts to cover-up their affiliation including falsely certifying that they qualified as small businesses, constitute further overt acts in furtherance of their conspiracy. *See Berkeley Heartlab*, 225 F. Supp. 3d at 502 (finding that the complaint "clearly states a FCA conspiracy cause of action" because "all of the acts undertaken as part of those schemes … qualify as acts in furtherance of the agreement").

The Amended Complaint adequately alleges that the Affiliated Defendants conspired to submit false claims to the government in violation of the FCA.

### III.    Relators' Amended Complaint Alleges Fraud with Particularity Sufficient to Satisfy Fed. R. Civ. P. 9(b).

Relators' allegations detail how the Affiliated Defendants falsely certified that they were eligible small businesses on their respective PPP loan applications because they were affiliated entities and, as a result, received $13,849,170 in loans for which they were not eligible. Yet Henderson Defendants argue that those detailed allegations are not enough to satisfy Rule 9(b) and the Amended Complaint should be dismissed as a result.[11]  They are wrong.

"In simple terms, a plaintiff complies with Rule 9(b) by, at a minimum, describing the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Bunk v. Gov't Logistics N.V.*,

---

[11] Perhaps in an implicit admission of the weakness of this argument, Alvarez Defendants' Motion to Dismiss contains no substantive argument that Relators Amended Complaint does not satisfy Rule 9(b) despite mentioning it in one sentence in their introduction. *See* Alvarez Def. Br. at 3.

842 F.3d 261, 275 (4th Cir. 2016) (internal quotation marks and citations omitted). Generally, "a court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* (internal quotation marks and citations omitted); *see also* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (4th ed. 2008). Pleading particularity under Rule 9(b) "does not require elucidation of every detail of the alleged fraud." *Jones*, 2022 WL 861396, at *5 (quoting *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074 (D. Md. 1991)).

The Amended Complaint provides more than sufficient detail to satisfy Rule 9(b). It alleges the that the Affiliated Defendants submitted PPP loan applications under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act enacted on March 29, 2020. *See* FAC ¶¶ 45-46, 80, 84, 88, 93, 97, 101 (the time and place of the false representations). It details that the Affiliated Defendants' loan applications contained false certifications about each entity's eligibility for the PPP Loan Program, *i.e.*, the certification that the Affiliated Defendants were not affiliated and were small businesses was false. *See id.* ¶¶ 49-51, 79-81, 83-85, 87-89, 92-94, 96-98, 100-02, 104-71 (the contents of the false representations). It further alleges the identity of each business that submitted a fraudulent PPP loan application and the exact amount of money each received. *See* FAC ¶¶ 80, 84, 88, 93, 97, 101 (the identity of the fraudster and the amount obtained via fraud). Such detail is sufficient under Rule 9(b).

The Henderson Defendants argue that Relators "do not specifically allege details and contents of the Defendants' PPP application submissions" but point to only two specific missing factual allegations: "the dates upon which any PPP application was submitted" and "who submitted the PPP applications to the SBA on behalf of the Henderson Defendants." *See*

33

Henderson Def. Br. at 16. The Henderson Defendants' argument fails for two reasons. First, Relators do allege both facts. The Amended Complaint says that the fraudulent PPP loan applications were submitted pursuant to the CARES Act. *See* FAC ¶¶ 1-2, 45-47. The application period for the PPP loan program started with the enactment of the CARES Act on March 27, 2020 and PPP loan applications were accepted through May 31, 2021.[12] *See About the CARES Act and the Consolidated Appropriations Act,* U.S. Dep't Treasury, https://home.treasury.gov/policy-issues/coronavirus/about-the-cares-act; *First Draw PPP loan*, U.S. Small Bus. Admin. (May 24, 2023), https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan. The Amended Complaint also alleges that PPP applications were submitted by the various Henderson Defendants, *i.e.*, Jason P. Henderson, Energy Resource Group, LLC, and ET360, LLC. *See* FAC ¶¶ 1-2, 45-47. That level of detail is sufficient under Rule 9(b). *See Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (holding that Rule 9(b) was satisfied, in part, because "Smith's complaint identified who committed fraud-Defendants").

The Henderson Defendants seem to argue that without an exact date of submission and the identity of the person who "submitted" the applications, Relators claims fail to satisfy Rule 9(b). The rule, however, does not require the Plaintiff to plead *every* detail of the fraud. Rather, Rule 9(b) only requires sufficient detail such that the Defendant is made aware of the circumstances for which it will need to prepare its defense and evidence supporting the allegations. *See Bunk*, 842 F.3d at 275. Relators have more than done that here; the Affiliated Defendants cannot reasonably be confused about the claims for which they need to prepare a defense.

---

[12] Each Defendant only submitted two PPP Loan Applications at most, so there should be no confusion about the dates at issue.

IV.     **If the Court Grants Defendants' Motions, It Should Allow Leave to Amend.**

If the Court identifies any pleading deficiencies, Relators respectfully request that they be given leave to amend the First Amended Complaint to address those deficiencies. A dismissal with prejudice "is warranted only when the trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009); *see also Ostrzenski v. Seigel*, 177 F.3d 245, 252–53 (4th Cir. 1999) ("The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that plaintiff be given every opportunity to cure a formal defect in his pleading."). "Failure to plead fraud with particularity . . . does not support a dismissal with prejudice. To the contrary, leave to amend is 'almost always' allowed to cure deficiencies in pleading fraud." *U.S. ex rel. Rector v. Bon Secours Richmond Health Corp.*, No. 3:11-CV-38, 2014 WL 1493568, at *14 (E.D. Va. Apr. 14, 2014) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996)). Because Relators' claims have never before been tested, the Court should grant leave to amend the First Amended Complaint so Relators may cure any defects.

**CONCLUSION**

For the foregoing reasons, this Court should deny the Affiliated Defendants' motions to dismiss Relators' Amended Complaint.

35

_/s/ Anthony J. Majestro_
Anthony J. Majestro, Esq. (WVSB #5165)
Powell & Majestro, PLLC
405 Capitol Street, Suite P-1200
Charleston, WV 25301
304-346-2889 / 304-346-2895 (f)
amajestro@powellmajestro.com

William G. Powers (_pro hac vice_)
Andrew M. Miller (_pro hac vice_)
Baron & Budd, P.C.
The Watergate
600 New Hampshire Ave., NW, 10th Floor
Washington, DC  20037
Telephone:  202.333.4562
Facsimile:  202.337.1039
wpowers@baronbudd.com
amiller@baronbudd.com

_Counsel For Plaintiff-Relators_

36

### CERTIFICATE OF SERVICE

I certify that on June 5, 2023, this document was filed electronically, that it is available for viewing and downloading from the ECF system, and that all counsel of record will be served by the ECF system.

*/s/ Anthony J. Majestro*